KATHERINE MCMORROW (Cal. Bar No. 315723)
kmcmorrow@bakerlaw.com
BAKER & HOSTETLER LLP
1900 Avenue of the Stars, Suite 2700
Los Angeles, CA 90067
Telephone: (310) 820-8800

ROCCO J. SCRENCI (*admitted pro hac vice*)
rscrenci@mcandrews-ip.com
MCANDREWS, HELD & MALLOY LTD.
500 W. Madison Street, Suite 3400
Chicago, IL 60661
Telephone: (312) 775-8000

*Attorneys for Defendants*
*Entrepreneur Enterprises, Inc. dba Pattie Gonia Productions and Wyn Wiley*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION – LOS ANGELES**

| | |
|---|---|
| PATAGONIA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ENTREPRENEUR ENTERPRISES, INC. and WYN WILEY,<br><br>Defendants. | Case No. 2:26-cv-0586-RGK-RAO<br><br>**DEFENDANTS' MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |

## TABLE ON CONTENTS


I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 1

A. Pattie Gonia rises to fame as a backpacking drag queen. ..... 1

B. Patagonia actively supported and promoted Pattie Gonia's brand and work. ..... 2

C. Patagonia established clear coexistence terms, which Defendant honored in third-party partnerships. ..... 3

D. Patagonia reversed years of acquiescence and unexpectedly filed suit, inflicting severe prejudice on Defendants ..... 4

III. SUMMARY JUDGMENT STANDARD ..... 5

IV. PATAGONIA'S CLAIMS FAIL AS A MATTER OF LAW ..... 6

A. Patagonia's claims of dilution and infringement are barred by laches ..... 6

i. The presumption of laches applies because Patagonia had actual and constructive knowledge of the alleged infringement before 2022 ..... 7

ii. Patagonia cannot rebut the presumption that its multi-year delay was unreasonable ..... 9

iii. Defendants have suffered and will suffer serious prejudice from Patagonia's unreasonable delay ..... 12

1. Defendants face severe economic prejudice if enjoined ..... 12

2. Patagonia's delay has inflicted evidentiary prejudice ..... 13

B. Patagonia's claims are barred by acquiescence and equitable estoppel ..... 14

i. Patagonia expressly and implicitly represented that it would not assert its marks against Defendants ..... 15

ii. Patagonia's multi-year delay was unreasonable and inexcusable ..... 15

iii. Patagonia's delay inflicted reliance prejudice ..... 16

C. Progressive encroachment does not save Patagonia's stale claims ..... 16

D. Patagonia waived its right to challenge pre-2022 conduct ..... 17

V. CONCLUSION ..... 17

## TABLE OF AUTHORITIES

**Cases**

*adidas–Am., Inc. v. Payless Shoesource, Inc.*,
546 F. Supp. 2d 1029 (D. Or. 2008) .......... 22

*Adv. Mag. Publishers, Inc. v. Fashion Elecs., Inc.*,
2023 WL 4261426 (TTAB June 28, 2023) .......... 12

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 7

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 7

*Danjaq LLC v. Sony Corp.*,
263 F.3d 942 (9th Cir. 2001) .......... 16, 17

*Deckers Outdoor Corp. v. Romeo and Juliette, Inc.*,
2026 WL 851436 (C.D. Cal. Mar. 20, 2026) .......... 7

*Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*,
880 F.3d 1109 (9th Cir. 2018) .......... 10, 11

*E-Sys., Inc. v. Monitek, Inc.*,
720 F.2d 604 (9th Cir. 1983) .......... 12

*Expert Microsystems, Inc. v. U. Chicago*,
712 F. Supp. 2d 1116 (E.D. Cal. 2010) .......... 11

*Fitbug Ltd. v. Fitbit, Inc.*,
78 F. Supp. 3d 1180 (N.D. Cal. 2015) .......... 13

*Grupo Gigante SA De CV v. Dallo & Co., Inc.*,
391 F.3d 1088 (9th Cir. 2004) .......... passim

*Harman Int'l Indus., Inc. v. Jem Accessories, Inc.*,
668 F. Supp. 3d 1025 (C.D. Cal. 2023) .......... 13, 14

*Hoy v. Sears, Roebuck & Co.*,
861 F. Supp. 881 (N.D. Cal. 1994) .......... 7

*Internet Specialties W., Inc. v. Milon-DiGiorgio Enters.*,
559 F.3d 985 (9th Cir. 2009) .......... 8, 10

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
304 F.3d 829 (9th Cir. 2002) ........................................................................passim

*Kierulff v. Metro. Stevedore Co*., 315 F.2d 839, 842 (9th Cir. 1963) ..........................18

*Lehman v. United States*,
154 F.3d 1010 (9th Cir. 1998) ........................................................................19

*Marketquest Grp., Inc. v. BIC Corp.*,
316 F. Supp. 3d 1234 (S.D. Cal. 2018)..........................................................19

*Matsuo Yoshida v. Liberty Mut. Ins. Co*.,
240 F.2d 824 (9th Cir. 1957) ..........................................................................18

*Miller v. Glenn Miller Prods., Inc.*,
454 F.3d 975 (9th Cir. 2006) ....................................................9, 12, 16, 17

*Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*,
894 F.3d 1015 (9th Cir. 2018) ...................................................12, 13, 14, 15

*Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of California*,
694 F.2d 1150 (9th Cir. 1982) ........................................................................21

*Saul Zaentz Co. v. Wozniak Travel, Inc.*,
627 F. Supp. 2d 1096 (N.D. Cal. 2008).....................................................10, 11

*Seller Agency Council, Inc. v. Kennedy Ctr. for Real Est. Educ., Inc.*,
621 F.3d 981 (9th Cir. 2010) ..........................................................................18

*Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*,
311 F. Supp. 2d 1023 (D. Or. 2004) ................................................................21

*Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*, 465 F.3d 1102,
1109 (9th Cir. 2006)........................................................................10, 21, 22

*United States v. King Features Entertainment*,
843 F.2d 394 (9th Cir. 1988) ..........................................................................22

**Other Authorities**

5 McCarthy on Trademarks and Unfair Competition § 31:38 ....................................10

**Rules**

Fed. R. Civ. P. 56(a) ...........................................................................................7

## I. INTRODUCTION

This case exemplifies why equity bars trademark owners from bringing stale claims, particularly where the trademark owner actively encouraged and promoted the very conduct it now challenges.

Plaintiff Patagonia, Inc. is suing Defendants Entrepreneur Enterprises, Inc. and Wyn Wiley for trademark infringement, dilution, and unfair competition relating to the "Pattie Gonia" drag-queen persona that Wiley adopted in 2018. For seven years, Patagonia coexisted with Pattie Gonia, supported the persona's growth, and raised no objection when Defendants partnered with Patagonia's direct competitors. Only now, after Defendants filed for federal trademark protection and offered custom t-shirts and sweatshirts in connection with Pattie Gonia's drag performances, does Patagonia claim that its trademarks have been diluted and infringed all along.

This is textbook laches. Having sat on its rights and watched Defendants grow the Pattie Gonia business for at least seven years, Patagonia cannot now ask the court to eliminate the business it helped cultivate. The Court should dismiss Patagonia's claims.

## II. FACTUAL BACKGROUND

### A. Pattie Gonia rises to fame as a backpacking drag queen.

"Pattie Gonia" is the drag persona adopted by Defendant Wyn Wiley in 2018, inspired by the "Patagonia" region in South America. SUF 1. The persona debuted on October 3, 2018, when Wiley posted a humorous video as Pattie Gonia on Instagram that became an overnight sensation. SUF 2. Within a year, Pattie Gonia's following surpassed 150,000 users; today her following exceeds nearly 2 million on Instagram alone. SUF 3.

Pattie Gonia's sizeable following has given Wiley a platform to advocate social-justice and climate action; Wiley describes Pattie Gonia as an "Intersectional Environmentalist." SUF 4. Pattie Gonia's content combines drag performances with

outdoor recreation, environmental advocacy, and LGBTQIA+ inclusion in outdoor spaces. SUF 5. Since 2019, Pattie Gonia has hosted group hikes, organized community-building events, and hosted annual social-media fundraisers that have raised over $1 million for charitable nonprofits. SUF 6.

This visibility has established Pattie Gonia as a sought-after partner for brands. Since 2019, Pattie Gonia has posted "sponsored content" for numerous brands. SUF 7. For example, in 2021, Pattie Gonia partnered with footwear brand HOKA and outdoor-gear maker Cotopaxi to promote their collaboration for products sold at REI. SUF 8. Pattie Gonia also delivered speeches about equality, environmentalism, and inclusion at corporate and nonprofit events. SUF 9.

Pattie Gonia's live drag performances have grown alongside her platform—progressing from group hikes and private events in 2019 to public drag shows and multi-artist touring productions beginning in 2023. SUF 10.

What began as a spur-of-the-moment social-media post has developed into a full-scale business. To support this growth, Wiley repurposed his high-school photography business—Defendant Entrepreneur Enterprises Inc.—into Pattie Gonia Productions, formally hiring Jennifer Dugan as the business's first employee and manager in 2020. SUF 11.

**B. Patagonia actively supported and promoted Pattie Gonia's brand and work.**

Plaintiff Patagonia, Inc. makes and sells outdoor apparel and gear. SUF 12. Patagonia has a reputation for selling high-quality, though expensive, products. SUF 13. To protect its brand position, Patagonia aggressively monitors the outdoor apparel and gear marketplace and routinely sends cease-and-desist letters to alleged infringers of its trademarks. SUF 14 & 15.

Alongside its commercial business, Patagonia boasts about its environmental and outdoor community initiatives. Perhaps most notably, Patagonia is recognized for its founding role in 1% for the Planet—a nonprofit organization co-created by Patagonia's

founder Yvon Chouinard whose corporate members commit to donating at least 1% of their revenues to environmental causes. SUF 16.

Patagonia's awareness of Pattie Gonia dates back to at least December 2019. SUF 17. That year, Patagonia contacted Wiley and agreed to match 1/5 of all donations to a nonprofit featured in Pattie Gonia's annual fundraiser. SUF18. Defendants publicly broadcasted Patagonia's sponsorship on the Pattie Gonia Instagram page without any objection from Patagonia. SUF 18. In 2020, Patagonia personnel expressed enthusiasm about collaborating with and promoting Pattie Gonia's projects and were aware that Pattie Gonia had partnered with brands like REI and Backcountry on sponsored content. SUF 19. By 2021, Patagonia's Senior Global Environmental Marketing Manager, Whitney Clapper, was in regular communication with Wiley about potential partnership opportunities between Patagonia and Pattie Gonia. SUF 20. Indeed, Patagonia's Chief Impact and Communications Officer acknowledged that Pattie Gonia "was a visible advocate for a more inclusive outdoors [and] outdoor industry" by December 2021. SUF 21. Further, Patagonia publicly amplified Wiley's efforts, publishing a blog post endorsing a nonprofit co-founded by Pattie Gonia and encouraged readers to sign up for a Pattie Gonia workshop on equitable access to the outdoors. SUF 22.

Pattie Gonia's industry prominence led 1% for the Planet to select her as the keynote speaker for its 2022 Global Summit. SUF 23. At that same event, Patagonia founder Yvon Chouinard conducted a fireside chat, and multiple senior Patagonia executives spoke and led panel sessions alongside Pattie Gonia. SUF 24.

### C. Patagonia established clear coexistence terms, which Defendant honored in third-party partnerships.

In 2021, Hydro Flask, a water-bottle company, approached Defendants about a potential collaboration and consulted Patagonia to ensure the partnership would not raise trademark concerns. SUF 25. Patagonia's internal communications confirm that its leadership and employees were well aware of Pattie Gonia's work by that time. SUF 26 & 27.

Following that outreach, Patagonia then spoke with Defendants directly about their use of "Pattie Gonia." Rather than demanding that Defendants abandon the persona, Patagonia established clear operational guardrails. In February 2022, Patagonia in-house counsel, Rob Tadlock, emailed Defendants to set forth three restrictions governing their third-party projects: "1. Not use or otherwise display Patagonia's logos [or any substantially similar logos]; 2. Not use the 'belwe font' in the content that is created; and 3. Not use Pattie Gonia in any form on product." SUF 28. As Mr. Tadlock explained, the intent of those restrictions was to give Defendants clarity needed so that "Pattie's broader work can move forward without any disruptions." SUF 29.

Both Wiley and Pattie Gonia's manager, Jennifer Dugan, reasonably understood that these restrictions defined the boundaries for Defendants' third-party partnerships. SUF 30. In reliance on these explicit criteria, Defendants continued their operations – posting parody designs, giving away Pattie Gonia stickers, and entering agreements with third parties—all while observing Patagonia's stated requirements. SUF 31. Over the ensuing years, Patagonia raised no objection, even as Defendants partnered with Patagonia competitors such as The North Face and REI. SUF 32.

### D. Patagonia reversed years of acquiescence and unexpectedly filed suit, inflicting severe prejudice on Defendants

In late 2024, Defendants began making custom "merch" for fans of Pattie Gonia's drag performances. SUF 33 Consistent with Defendant's environmental objectives, these custom designs were placed on "upcycled" t-shirts and sweatshirts diverted from landfills. SUF 34. Defendants sold these products exclusively at live performances and through Defendants' website, PattieMerch.com (formerly PattieGoniaMerch.com), and promoting them in person or on the Pattie Gonia Instagram page. SUF 35.

In 2025, after three years of silence, Patagonia contacted Defendants to object to Defendants' merch line and, for the first time, Defendants' stickers. SUF 36. The stickers Patagonia referenced were non-commercial fan art stickers that Defendants

gave away for years at live events, to fundraiser donors, and to Patagonia employees without prior complaint. SUF 37. Defendants confirmed that the merch line does not incorporate Patagonia logos, designs, or signature font, and that the stickers were never sold. SUF 38. And Patagonia admits that it received no complaints from consumers confused about the source of Defendants' merchandise. SUF 39.

Later in 2025, after another drag performer (Lexi Love) faced legal challenges to her drag persona, Defendants sought to register "Pattie Gonia" with the USPTO. SUF 40. In response, Patagonia sued. During discovery, Patagonia revealed that it seeks to stop any commercial use of "Pattie Gonia," contending that any use in connection with any goods or services in Defendants' trademark application constitutes infringement and dilutes Patagonia's wordmark and P-6 Logo. SUF 41.

Patagonia's seven-year delay will cause severe economic and evidentiary prejudice. Forcing a name change now would destroy the brand equity and goodwill, blocking Defendants' from entering partnerships that represent major revenue streams. SUF 42. As a result, Patagonia's requested remedy will disrupt contracts and stop support for partner nonprofits. SUF 43. While Patagonia's CEO publicly stated that Patagonia "never had an interest in taking Pattie's name away, identity away, stopping them from performing in drag, or stopping them from engaging in environmental activism or equitable access to the outdoors," SUF 44, that is precisely what Patagonia's requested injunction seeks.

## III. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), a court may grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It need not, however, disprove the other party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A moving party may satisfy its burden of proof on a motion for summary judgment by showing that the plaintiff's claim cannot be established because of the absence of

evidence on some critical element of the claim. *Id.* at 325; *Hoy v. Sears, Roebuck & Co.*, 861 F. Supp. 881, 884 (N.D. Cal. 1994) ("The burden on the moving party may be discharged by pointing out to the district court that there is absence of evidence to support the opposing party's claim"). A non-moving party must offer "specific facts showing that there is a genuine issue for trial," and must come forward with more than the "mere existence of a scintilla of evidence." *Celotex*, 477 U.S. at 322. Facts are "material" only if dispute about them may affect the outcome under applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## IV. PATAGONIA'S CLAIMS FAIL AS A MATTER OF LAW

Equity bars Patagonia's infringement and dilution[1] claims because Patagonia knew about Defendants' allegedly unlawful conduct long before the statute of limitations period, failed to timely object to it, and in several instances supported it, to Defendants' detriment. Even if equity is not a compete bar to Patagonia's claims, it at least limits Patagonia's claims to Defendants' merch line, which is the only allegedly infringing activity that exclusively post-dates the statute-of-limitations period.

### A. Patagonia's claims of dilution and infringement are barred by laches

Courts in the Ninth Circuit apply a two-part test for laches. *Internet Specialties W., Inc. v. Milon-DiGiorgio Enters.*, 559 F.3d 985, 990 (9th Cir. 2009). First, courts ask whether the plaintiff unreasonably delayed in bringing suit. *Id.* This first factor examines when the claim was filed relative to the applicable statute of limitations and what the justification, if any, is for the delay. *See id.* at 990–91. Second, courts determine whether the defendant was prejudiced by the delay. *Id.* at 990.

Patagonia knew about Pattie Gonia and the challenged conduct long before the limitations period yet waited until 2026 to sue. This causes Defendants economic and

---

[1] Because Patagonia's state and federal claims are substantively identical, this brief will refer to Patagonia's causes of action as Patagonia's "infringement and dilution claims" generally. *Deckers Outdoor Corp. v. Romeo and Juliette, Inc.*, 2026 WL 851436, at *17 (C.D. Cal. Mar. 20, 2026).

evidentiary prejudice.

**i. The presumption of laches applies because Patagonia had actual and constructive knowledge of the alleged infringement before 2022**

At step one of the laches analysis, courts examine the length of the delay from when the claim accrued relative to the statute of limitations. *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002). Because the Lanham Act contains no statute of limitations, Ninth Circuit courts look to state-law—here, California's 4-year statute of limitations for infringement, dilution, and unfair competition claims. *See Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 997 (9th Cir. 2006) (applying Cal. Civ. Proc. Code § 343). A "presumption of laches" applies if any part of the claimed wrongful conduct occurred beyond that 4-year period. *Jarrow Formulas*, 304 F.3d at 837. Measuring back four years from Patagonia's Complaint, the limitations period begins January 21, 2022. *See generally* ECF 1.

There is no genuine dispute that Patagonia knew or should have known of the facts underlying its claims before January 21, 2022. To start, Patagonia admits that it knew about Pattie Gonia no later than December 2019. SUF 17. And the conduct Patagonia now targets predates January 2022. Indeed, Patagonia's expert identifies "Pattie Gonia's history of collaborations with other prominent brands in the outdoor industry" as a source of potential confusion, citing several collaborations from 2021 and earlier. SUF 45. So while Patagonia may argue otherwise, Patagonia cannot defeat laches by severing its awareness of Pattie Gonia's existence from knowledge of her actionable conduct. That argument fails on the law and the facts.

Patagonia had actual notice. Patagonia employees spoke with Wiley about potential brand collaborations. SUF 19 & 20. Concurrent internal communications show Patagonia employees believed that Wiley "built his whole [Pattie Gonia] persona off of Patagonia" and lamented that the "situation has been left unchecked far too long." SUF 27. Indeed, Patagonia's 30(b)(6) designee testified that Pattie Gonia "was a visible

advocate for a more inclusive outdoors, outdoor industry," by December 2021. SUF 21.

In any event, actual knowledge is not needed. The laches period begins when the plaintiff "knew or should have known about its potential cause of action." *Internet Specialties W., Inc.*, 559 F.3d at 990; *Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*, 880 F.3d 1109, 1116 (9th Cir. 2018). This standard recognizes constructive knowledge and imposes an affirmative duty on trademark owners to police their marks. *Saul Zaentz Co. v. Wozniak Travel, Inc.*, 627 F. Supp. 2d 1096, 1109–10 (N.D. Cal. 2008). Courts have thus imputed constructive knowledge to a trademark owner who had an existing business relationship with the defendant. *See Eat Right Foods Ltd.*, 880 F.3d at 1116 (imputing notice from public announcements amid an existing business relationship); *see also Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*, 465 F.3d 1102, 1109 (9th Cir. 2006) (affirming summary judgment) ("'A plaintiff is certainly put on notice [for laches] where for many years the parties had plants in the same city and plaintiff had many business contacts with defendant.'") (quoting 5 McCarthy on Trademarks and Unfair Competition § 31:38).

Constructive knowledge is incontrovertible here. Patagonia's experts rely on evidence from publicly accessible sources that Patagonia knew about or actively monitored. Nearly all of the challenged conduct—stickers, brand partnerships, drag performance, and advocacy-related events—were posted on Pattie Gonia's social media, which Patagonia knew about and which had almost 500,000 followers in 2022. SUF 46; *see also* Ex. 101 at PGP_0127286. Patagonia routinely files trademark enforcement actions against targets with far fewer Instagram followers than Pattie Gonia. SUF 47; *see Saul Zaentz*, 627 F. Supp. 2d at 1110. Several of Defendants' sponsored content involved Patagonia's competitors, like Cotopaxi, whom Patagonia admittedly monitors. SUF 8, 14, 32. Given these facts, it is "inconceivable" that Patagonia lacked constructive notice before January 2022. *Cf. Saul Zaentz*, 627 F. Supp. 2d at 1110.

Because Patagonia had actual and constructive knowledge before January 21,

2022, a presumption of laches applies, shifting the burden to Patagonia to demonstrate that its multi-year delay was reasonable. *See Expert Microsystems, Inc. v. U. Chicago*, 712 F. Supp. 2d 1116, 1122 (E.D. Cal. 2010).

**ii. Patagonia cannot rebut the presumption that its multi-year delay was unreasonable**

To overcome the presumption of laches, Patagonia must show that its delay was reasonable. *See Jarrow Formulas*, 304 F.3d at 839. But Patagonia cannot offer any of the "reasonable justifications" for delay recognized by the Ninth Circuit such as exhausting administrative remedies, evaluating complicated claims, or determining "whether the scope of proposed infringement will justify the cost of litigation." *See Eat Right Foods*, 880 F.3d at 1117. Far from evaluating a threat, Patagonia monitored, communicated with, and publicly promoted Defendants for years before reversing course to file suit.

Nor do equitable considerations rebut the presumption of laches. In the Ninth Circuit, courts analyze factors when weighing the equities of applying laches to infringement claims[2]: (1) the strength and value of the asserted trademark rights; (2) plaintiff's diligence in enforcing the mark; (3) harm to the senior user if relief is denied; (4) good faith ignorance by the junior user; (5) competition between the senior and junior users; and (6) the extent of the harm suffered by the junior user because of the senior user's delay. *E-Sys., Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983). Summary judgment is appropriate even if one or more factors weigh in the trademark owner's favor, so long as the balance otherwise favors the defendant. *See Grupo Gigante SA De CV v. Dallo & Co., Inc.*, 391 F.3d 1088, 1102–05 (9th Cir. 2004). Here the balance of the *E-Systems* factors favor Defendants.[3]

---

[2] It is questionable whether these factors apply to a dilution claim. *See generally Miller*, 454 F.3d 975 (no discussion of *E-Systems* factors); *Adv. Mag. Publishers, Inc. v. Fashion Elecs., Inc.*, 2023 WL 4261426, at *17 (TTAB June 28, 2023).

[3] Defendants do not dispute, for summary judgment purposes, the strength of Patagonia's marks. So Defendants' analysis focuses on the remaining factors.

**Factor 2: Patagonia lacked diligence**. Patagonia's seven-year delay matches or exceeds the delays held by the Ninth Circuit to support laches. *See, e.g.*, *Grupo Gigante*, 391 F.3d at 1102 (delay of just over four years); *E-Sys., Inc.*, 720 F.2d at 607 (six to eight years); *Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*, 894 F.3d 1015, 1027 (9th Cir. 2018) (five years); *Jarrow Formulas*, 304 F.3d at 838–39 (seven-year delay on three-year statute of limitation period).

Patagonia's aggressive trademark policing against others highlights its lack of diligence here. While Patagonia routinely initiated enforcement actions and sent cease-and-desist letters against parties with much smaller commercial presences, it took no formal action against Defendants for years despite Pattie Gonia's massive, visible following. SUF 36, 47, 55-56. This cuts against Patagonia. *See Pinkette Clothing*, 894 F.3d at 1027; *see also Harman Int'l Indus., Inc. v. Jem Accessories, Inc.,* 668 F. Supp. 3d 1025, 1042 (C.D. Cal. 2023) ("Indeed, Jem's diligence elsewhere only highlights Jem's lack of diligence as to Harman here."). Nor can Patagonia rely on its sporadic communications in 2022 and 2025; courts have held that even greater enforcement efforts did not demonstrate diligence. *See Grupo Gigante*, 391 F.3d at 1102 (lack of diligence where plaintiff contacted defendant three times over four years); *Fitbug Ltd. v. Fitbit, Inc.*, 78 F. Supp. 3d 1180, 1193 (N.D. Cal. 2015) (one letter over five years).

**Factor 3: Patagonia will not face meaningful harm.** Even though Patagonia contends there is "actual confusion," the examples it cites are de minimis and legally inadequate. Patagonia's expert cites a negligible handful of comments culled from countless social media comments on Defendants' accounts. SUF 48. These comments do not demonstrate actionable confusion. Because Patagonia repeatedly endorsed Pattie Gonia publicly and Patagonia's in-house counsel expressly acknowledged a "relationship" between Patagonia and Pattie Gonia, consumers associating the two entities were reflecting Patagonia's own public conduct, not commercial deception. SUF 18-22 & 60.

More to the point, the record contains no evidence of tangible commercial injury:

Patagonia concedes that no customer ever complained about purchasing a Pattie Gonia product believing it originated with Patagonia. SUF 39. Isolated, stray impressions do not tip this factor in Patagonia's favor. *See Grupo Gigante*, 391 F.3d at 1103–04, 1103 n.37 (factor #3 favored defendant despite evidence that consumers mistakenly tried to use plaintiff's discount cards at defendant's stores). Finally, Patagonia's election to seek only nominal damages confirms the absence of measurable harm. *See Pinkette Clothing*, 894 F.3d at 1027–28 (holding abandonment of damages claim despite "diminished control" over brand reputation was neutral or favored laches).

**Factor 4: Defendants acted in good faith.** The fourth factor looks not only at whether Defendants knew about Patagonia's marks, but whether Defendants intended to deceive consumers or sought to free ride off Patagonia's goodwill. *See Pinkette Clothing*, 894 F.3d at 1028; *Harman Int'l Indus.*, 668 F. Supp. 3d at 1043 ("Prior knowledge of a senior user's trademark does not necessarily give rise to an inference of bad faith and may be consistent with good faith.").

The record confirms Defendants acted in good faith at every turn. In their commercial partnerships, Defendants always adhered to the three restrictions in Patagonia's February 9, 2022 email. SUF 49. As to Defendant's other allegedly infringing activities—including promotional stickers, advocacy-related work, drag performances, and community-building activities-Defendants acted in the open, often with Patagonia's express encouragement and public participation. SUF 18-22, 32, 46, 56. To put it bluntly: Defendants never hid their use of the Pattie Gonia mark; "it was open and notorious." *Pinkette Clothing*, 894 F.3d at 1028. While Patagonia recently claimed that Defendants' "merch" violated the 2022 restrictions, both of Defendants' representatives testified that they understood things differently, that performance-related merchandise was permissible—an understanding corroborated by Defendants' use of custom fonts and original designs looking nothing like Patagonia's trademarks. SUF 30 & 50.

**Factor 5: The Parties do not compete**. The last factor looks at whether the

Parties compete for the same customers. *See* Grupo *Gigante*, 391 F.3d at 1104. They do not. Patagonia is an outdoor retailer; Pattie Gonia is an environmental activist and drag performer. SUF 1, 4, 12. There is simply no evidence suggesting that the two compete. And any contention that Defendants' fan merch creates competition is meritless. In *Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*, the Ninth Circuit faced a mirror-image issue, affirmed summary judgment on laches, and found that factor #5 supported the accused infringer. *See* 894 F.3d at 1028. There, the junior user sold "high-end, women's fashions," while the senior user "sold a relatively small number of LUSH-branded t-shirts, tank tops, and sweatshirts," and "only for promotional purposes." *Id.* The same is true here: Defendants sell upcycled apparel in promotion of Defendants' "Pattie Gonia" performances. They do not compete with Patagonia's mass-market outdoor gear or apparel. SUF 57-59.

**iii. Defendants have suffered and will suffer serious prejudice from Patagonia's unreasonable delay**

Under the sixth *E-Systems* factor, the party asserting laches must show prejudice resulting from the senior user's delay. *See, e.g.*, *Grupo Gigante*, 391 F.3d at 1105. The Ninth Circuit recognizes two forms of prejudice that support a laches finding: (1) evidentiary prejudice and (2) expectations-based or economic prejudice. *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 955 (9th Cir. 2001). Both are present here.

**1. Defendants face severe economic prejudice if enjoined**

Economic prejudice arises where a defendant "took actions or suffered consequences that it would not have, had the plaintiff brought the suit promptly." *Danjaq*, 263 F.3d at 955. In the trademark context, this standard is met when a defendant "continued to build a valuable business around its trademark during the time that the plaintiff delayed the exercise of its legal rights." *Grupo Gigante*, 391 F.3d at 1105; *see also Glenn Miller*, 454 F.3d at 999.

The economic prejudice Defendants would face if enjoined could not be greater. Defendants' use of "Pattie Gonia" is not merely incidental to their business; it *is their*

*business*. Virtually every business expense Defendants have incurred since 2019 have been dedicated to establishing and cultivating the Pattie Gonia brand. It is now too late for Defendants to change identities. *Jarrow Formulas*, 304 F.3d at 839-40 (recognizing a "presumption of prejudice"; "If Jarrow had filed suit sooner, Nutrition Now could have invested its resources in shaping an alternative identity for PB8 in the minds of the public").

Defendants' investments in their brand are unrecoverable: Defendants support hundreds of contractors to produce their live shows and community-building events and employ an internal staff of four. SUF 61. Additionally, an injunction would jeopardize Defendants' partnerships and contracts, exposing them to operational and breach-of-contract liabilities. SUF 42-43. These substantial outlays and contractual commitments constitute cognizable economic prejudice as a matter of law. *See Miller*, 454 F.3d at 1000.

**2. Patagonia's delay has inflicted evidentiary prejudice**

Evidentiary prejudice includes "lost, stale, or degraded evidence, or witnesses whose memories have faded or who have died." *Danjaq*, 263 F.3d at 955. Patagonia's multi-year delay has substantially degraded the evidentiary record on the central factual disputes in this litigation, specifically the parties' critical February 2022 interactions and baseline understandings. Deposition testimony confirms that key witnesses no longer recall foundational events.

Corley Kenna, Patagonia's Chief Impact and Communications Officer, testified that she could not recall when she first learned of Pattie Gonia, could not remember her interactions with Pattie Gonia's Instagram account, and could not identify which Patagonia representatives attended the 1% for the Planet events that Pattie Gonia also attended. SUF 51. This memory lapse directly prejudices the defense because Wiley testified he gave out stickers, which Patagonia now accuses of infringement, to Patagonia employees at those events. Wiley Dep. at 94:14-95:2; 96:18-23.

Patagonia's witnesses have virtually no recollection of internal or external meetings regarding Pattie Gonia's Hydro Flask partnership, given that it happened over four years ago. Kenna could not recall writing internal emails discussing the potential of advising Hydro Flask on the partnership. SUF 52.

Inhouse counsel, Robert Tadlock, who conducted the critical February 2022 discussions setting the parties' operational boundaries, could only testify to the vague "general tenor" of those discussions. SUF 53. And several Patagonia employees with relevant knowledge—Richard Thornton, Mary Martin, and Hans Cole—are no longer with the company, further impairing Defendants' ability to present a complete record. SUF 54.

In summary, Patagonia sat on its hands while critical witness memories eroded and Defendants invested years of labor and capital into the Pattie Gonia brand.

**B. Patagonia's claims are barred by acquiescence and equitable estoppel**

Acquiescence requires proof that: (1) the trademark owner expressly or impliedly represented that it would not assert a claim against the mark user; (2) the delay between this representation and assertion of a claim was inexcusable; and (3) this delay unduly prejudiced the defendant. *Seller Agency Council, Inc. v. Kennedy Ctr. for Real Est. Educ., Inc.*, 621 F.3d 981, 989 (9th Cir. 2010). Equitable estoppel similarly applies when a plaintiff's representations or conduct "misleads another to his prejudice so that a repudiation of such conduct would be unjust in the eyes of the law." *Matsuo Yoshida v. Liberty Mut. Ins. Co.*, 240 F.2d 824, 829-30 (9th Cir. 1957). *See also Kierulff v. Metro. Stevedore Co.*, 315 F.2d 839, 842 (9th Cir. 1963). In the trademark context, estoppel requires establishing that: (1) the plaintiff knew of a defendant's alleged infringement; (2) the plaintiff's "actions or failure to act led [d]efendants to reasonably believe," that the plaintiff would not enforce its mark; (3) the defendants were unaware of plaintiff's "actual object[ion] to its potential infringement of the marks,"; and (4) if the plaintiff proceeds with their claim, the defendant "will be materially prejudiced"

due to their reliance on plaintiff's conduct. *Marketquest Grp., Inc. v. BIC Corp.,* 316 F. Supp. 3d 1234, 1295 (S.D. Cal. 2018) (citing *Lehman v. United States*, 154 F.3d 1010, 1016 (9th Cir. 1998)).

**i. Patagonia expressly and implicitly represented that it would not assert its marks against Defendants**

Patagonia repeatedly communicated its assent to Defendants' ongoing operations. For years, Patagonia publicly endorsed Pattie Gonia's advocacy, staged joint appearances, and highlighted Defendants' initiatives, thereby impliedly confirming it viewed the persona as non-infringing. *See* SUF 18-22.

Patagonia also gave express assurances in February 2022 when in-house counsel Tadlock provided Defendants with three restrictions for third-party collaborations. Defendants understood that those restrictions were an affirmative commitment that compliance would allow "Pattie's broader work [to] move forward without any disruptions." SU 29. Wiley confirmed that: "I followed that before. I followed that then with Hydroflask. I followed it since." Wiley Dep. 233:13-233:19. Patagonia reinforced this understanding by not objecting to Defendants' continued distribution of stickers with a design that Tadlock characterized as "substantially similar" to Patagonia's logo. SUF 55-56; *see also* Ex. 13.

**ii. Patagonia's multi-year delay was unreasonable and inexcusable**

The delay between Patagonia's affirmative representations and the filing of this lawsuit is inexcusable for the same reasons that compel a finding of laches. *See, supra* IV.A.ii. Even when Patagonia emailed Defendants in 2025 regarding performance merch and stickers, it never objected to Defendants' live touring, advocacy work, or third-party brand sponsorships. In the intervening period, Defendants continued to work with third parties—including The North Face—without challenge. SUF 32. Indeed, Patagonia's CEO reiterated: "[u]nequivocally, we have never had an interest in taking Pattie's name away, identity away, stopping them from performing in drag, or stopping them from engaging in environmental activism or equitable access to the outdoors."

SUF 44. Patagonia's consistent conduct and public representations over seven years conveyed that it would not seek to stop use of the Pattie Gonia mark.

**iii. Patagonia's delay inflicted reliance prejudice**

Patagonia's delay has caused prejudice for the same reasons discussed above as to laches. Defendants conformed their partnerships to the three restrictions Patagonia prescribed in 2022, only for Patagonia to reverse course years later and claim that Defendants' persona has been infringing and diluting its marks from the outset. Having built their entire commercial identity and operational framework around Patagonia's explicit parameters, Defendants cannot now be forced to abandon their goodwill.

**C. Progressive encroachment does not save Patagonia's stale claims**

Patagonia cannot evade laches, acquiescence, and estoppel by invoking progressive encroachment. To show progressive encroachment, Patagonia must show that Defendants fundamentally changed their business by "expanding its business into different regions or into different markets" to compete with Patagonia. *See Grupo Gigante*, 391 F.3d at 1103. A "junior user's growth of its existing business and the concomitant increase in its use of the mark do[es] not constitute progressive encroachment." *Tillamook Country Smoker, Inc.*, 465 F.3d at 1110.

Defendants' core business has remained constant since 2018. Defendants' only activity that post-dates the laches period is the sale of limited, upcycled "merch" sold in connection with Pattie Gonia's drag performances. SUF 33, 46. Defendants' merch does not compete with Patagonia's outdoor apparel, are sold through a dedicated performer site and live tour venues, and share no retail channels with Patagonia. SUF 57-59. This modest addition of promotional merchandise does not constitute progressive encroachment. *See Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of California*, 694 F.2d 1150, 1154 (9th Cir. 1982) (progressive encroachment requires "selling the same 'product' through the same channels and causing actual market confusion").

Even if there were progressive encroachment, it would not salvage Patagonia's broader claims. At most, progressive encroachment permits a plaintiff to challenge the newly expanded commercial activity; it does not grant a trademark owner carte blanche to resurrect stale challenges against established, long term uses. *See Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*, 311 F. Supp. 2d 1023, 1033 (D. Or. 2004)("[E]ven if progressive encroachment were to apply in favor of Creamery, the doctrine could at most prohibit Smoker from using the name in connection with the circle T package design and directly selling its products to grocery and warehouse stores"), *aff'd*, 465 F.3d 1102 (9th Cir. 2006). Progressive encroachment cannot revive claims against Defendants' persona, performances, speaking engagements, or historical sponsorship activities.

**D. Patagonia waived its right to challenge pre-2022 conduct**

"Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it." *United States v. King Features Entertainment*, 843 F.2d 394, 399 (9th Cir. 1988); *adidas–Am., Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1074 (D. Or. 2008). Patagonia's internal conduct demonstrates that it knew of its possible infringement claims before January 2022, and elected not to assert them. When Hydro Flask raised the prospective collaboration in 2021, Patagonia employees acknowledged that the "situation has been left unchecked far too long and any legal action will be a battle on social channels for us." SUF 27. Patagonia chose to forgo legal action, and set third-party guidelines that allowed Pattie Gonia to continue coexisting. Having knowingly relinquished its right to challenge Defendants' core activities to avoid public backlash, Patagonia waived its right to challenge that pre-2022 conduct today.

## V. CONCLUSION

For at least these reasons, Defendants respectfully request that the Court grant their motion for summary judgment.

Respectfully submitted,

Dated: November 11, 2026

By: /s/ *Rocco J. Screnci*

Rocco J. Screnci (*admitted pro hac vice*)
rscrenci@mcandrews-ip.com
MCANDREWS, HELD & MALLOY LTD.
500 W. Madison Street, Suite 3400
Chicago, IL 60661
Telephone: (312) 775-8000

Katherine McMorrow (SBN 315723)
kmcmorrow@bakerlaw.com
BAKER & HOSTETLER LLP
1900 Avenue of the Stars, Suite 2700
Los Angeles, CA 90067
Telephone: (310) 820-8800

*Attorneys for Defendants Entrepreneur Enterprises, Inc. and Wyn Wiley*

**L.R. 11-6.2 CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants Entrepreneur Enterprises, Inc. and Wyn Wiley certifies that this brief contains fewer than 5,600 words and 20 pages, which complies with the word limit set by Court Order dated February 3, 2026 (ECF 13).

Respectfully submitted,

Dated: November 11, 2026 By: /s/ *Rocco J. Screnci*

Rocco J. Screnci (*admitted pro hac vice*)
rscrenci@mcandrews-ip.com
MCANDREWS, HELD & MALLOY LTD.