# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION LOS ANGELES

PATAGONIA, INC., )
)
Plaintiff, )Case No.
)2:26-cv-0586-RGK-RAO
v. )
)
ENTREPRENEUR ENTERPRISES, )
INC. et al., )
)
Defendants. )
------------------------------)

- - -
Tuesday, October 13, 2026
- - -

Remote Videotaped Deposition of WYN WILEY, beginning at 9:06 A.M., before Nancy J. Martin, a Registered Merit Reporter, Certified Shorthand Reporter. All parties appeared remotely.

REPORTED BY NANCY J. MARTIN
CSR. NO. 9504, RMR, RPR
PAGES 1 - 288

MR. SCRENCI: Objection. Calls for 10:47:03
speculation. 10:47:04
You can answer. 10:47:08
THE WITNESS: You would have to ask her. 10:47:10
MR. GILCHRIST: Okay. Let's look at 10:47:12
Exhibit 15. 10:47:12
(Deposition Exhibit 15 was marked for 10:47:24
identification.) 10:47:24
BY MR. GILCHRIST: 10:47:24
Q. Have you seen this before? It's a post by 10:47:24
"biobearnie," with a comment by biobearnie to your 10:47:26
post? 10:47:34
A. I see that comment and -- 10:47:35
Q. "@patagonia do you know this funny guy?" 10:47:38
A. Uh-huh. 10:47:41
Q. Do you think he's referring to the region 10:47:42
there? 10:47:43
A. As he's using the at handle before your 10:47:45
name -- or sorry, not your name, but before the brand 10:47:48
Patagonia, that signifies to me that he is asking the 10:47:52
brand Patagonia if they know of this funny guy. 10:47:56
Q. Is there something about the image that would 10:48:02
lead you to understand why he was referring to at 10:48:04
Patagonia and calling you a funny guy? 10:48:07
A. I don't know. You would have to ask him, but 10:48:11



I think biobearnie understands that this post is a 10:48:14
joke, as he calls me a funny guy. And, again, that 10:48:19
this image is fan art that I do not create or 10:48:24
commission, but was created by a fan. 10:48:26
Q. You recognized, when you received or saw the 10:48:32
Instagram post, that Mr. Maddox made of these images, 10:48:36
you understood that this was a reference to Patagonia, 10:48:42
the brand's logo, did you not? 10:48:44
A. I understood it to be a joke and a parody. 10:48:48
Q. And that's how you interpret biobearnie's 10:49:01
comment as well; correct? 10:49:04
A. I don't know if I've ever seen biobearnie's 10:49:05
comment before today. 10:49:07
Q. Okay. 10:49:09
A. So I cannot speak to that. 10:49:11
MR. GILCHRIST: Let's look at Exhibit 16. 10:49:13
(Deposition Exhibit 16 was marked for 10:49:28
identification.) 10:49:28
BY MR. GILCHRIST: 10:49:28
Q. Do you see Lindsay M.D.'s comment in the 10:49:28
middle of the page? 10:49:30
A. Uh-huh. 10:49:32
Q. I don't know what the at is. 10:49:39
Do you recognize what that means? 10:49:39
A. It appears to be a -- your name handle of 10:49:41



someone that they know. 10:49:44
Q. Okay. "this Patagonia thing has really taken 10:49:46
off for you. Nice work"? 10:49:51
A. Yeah. That's a classic example of 10:49:52
autocorrect. Oftentimes, my name, or even with 10:49:56
voice-to-comment can often correct to that. Again, 10:50:00
she has the name Patagonia here. Could be the region 10:50:08
of the country. Could be the brand. Who knows? 10:50:13
But we see that a lot with autocorrect and 10:50:16
with voice-to-text writing out the region in the 10:50:19
country Patagonia when my name is spoken or typed. 10:50:25
MR. GILCHRIST: Let's look at Exhibit 17. 10:50:44
(Deposition Exhibit 17 was marked for 10:50:52
identification.) 10:50:52
BY MR. GILCHRIST: 10:50:52
Q. Do you see sathiyably's comment in response 10:50:52
to your post, asking for votes? 10:50:56
A. I do see her comment. 10:51:02
Q. And the comment is just "@patagoniavta"? 10:51:03
A. Yes, I don't know what that is. I don't know 10:51:08
what patagoniavta is. 10:51:10
Q. Okay. And you don't remember whether you saw 10:51:13
these comments in response to your request for votes? 10:51:19
A. Again, I can't recall seeing specific 10:51:21
comments six, seven years ago on a post, but I do 10:51:23



think it's important to note that you're finding some 10:51:29
choice examples here out of 1,000 comments on a post, 10:51:33
and I'd be curious to hear the ratio of these 10:51:37
stand-out comments to others that understand this as a 10:51:41
joke and a parody. 10:51:46
And again, as a design that I did not 10:51:48
commission and that was fan art that I re-posted here 10:51:50
with permission. 10:51:56
MR. GILCHRIST: If you could look at 10:51:59
Exhibit 18. 10:52:00
(Deposition Exhibit 18 was marked for 10:52:12
identification.) 10:52:12
THE WITNESS: I'm on Exhibit 18. 10:52:12
BY MR. GILCHRIST: 10:52:14
Q. stevestuart says, "Unoriginal fan art for an 10:52:14
unoriginal name @ Patagonia." 10:52:17
Do you see that? 10:52:20
A. Uh-huh. 10:52:20
Q. You would interpret that to be a reference to 10:52:21
Patagonia, the brand; correct? 10:52:23
A. I cannot speak for him. 10:52:26
Q. Okay. Did you interpret it as referring to 10:52:28
the brand? 10:52:32
A. I do not believe I've ever seen this comment 10:52:36
before today. Again, there are over 1,200 comments on 10:52:38

A. No. To the best of my knowledge, no. I think, to the best of my knowledge, photography works differently, and that every image that I take is technically copyrighted. I don't know the technical details about it. 11:12:56 11:13:01 11:13:04 11:13:10 11:13:14
Q. I don't want to get into legalities of it, but I don't disagree with you that every image that you take as a photographer is copyrighted when you take it. My question is whether you ever registered a copyright to make a formal, public record of your copyright? 11:13:17 11:13:19 11:13:23 11:13:26 11:13:28 11:13:32
A. To the best of my knowledge, no. 11:13:34
Q. Do you know if Mr. Maddox ever registered a copyright in the fan art that he posted? 11:13:41 11:13:43
A. To the best of my knowledge, no, but you would have to ask him. 11:13:51 11:13:52
Q. Did you ever secure a license from Mr. Maddox, a written license? I know you said you talked to him, in connection with the fan art? 11:13:55 11:13:56 11:14:01
MR. SCRENCI: I'm going to object to the extent calls for legal knowledge. 11:14:06 11:14:08
You can answer if you know. 11:14:10
THE WITNESS: To the best of my knowledge, no. 11:14:12 11:14:13
BY MR. GILCHRIST: 11:14:20

Page 78

Q. Okay. At some point Mr. Maddox went to work for Seriously Stickers; is that correct? 11:14:20 11:14:21
A. I know that we hired Seriously Stickers to print the stickers. I don't know the inner workings of when and how he worked there, et cetera. 11:14:27 11:14:30 11:14:36
Q. Do you know if he worked there at the time you first saw the fan art? 11:14:39 11:14:40
A. I do not know. 11:14:46
Q. When, in relation to -- obviously, it was after, but how long after you saw the fan art before you hired Seriously Stickers to produce stickers for you? 11:14:46 11:14:54 11:14:59 11:15:02
MR. SCRENCI: Objection. Lacks foundation. 11:15:02
You can answer. 11:15:04
THE WITNESS: I do not recall. 11:15:06
BY MR. GILCHRIST: 11:15:06
Q. You did, at some point, hire Seriously Stickers to make stickers for you; right? 11:15:06 11:15:08
A. Yes. 11:15:11
Q. Okay. How did you get the imagery to Seriously Stickers in order for them to make the stickers? 11:15:18 11:15:19 11:15:22
MR. SCRENCI: Objection to foundation. 11:15:22
You can answer if you know. 11:15:24
THE WITNESS: Can you repeat your question one more time, Greg, please? 11:15:29

Page 79

11:15:32
BY MR. GILCHRIST: 11:15:34
Q. I can tell you what I'm trying to find out, and then maybe that will help understand the question. 11:15:34 11:15:35
I'm trying to figure out whether or not Mr. Maddox took the images that he had created and created stickers for them, or whether you sent images to Seriously Stickers so that they could make the stickers? 11:15:35 11:15:37 11:15:39 11:15:43 11:15:46
A. There were no images sent to Will. Will's design that he made as fan art was the design printed, and when it was printed, only used for my artistic expression and my fundraising efforts as Pattie Gonia. 11:15:47 11:15:55 11:16:01 11:16:04
Q. So the stickers that were created were of the first image that you had posted, not the second image; correct? 11:16:11 11:16:17 11:16:24
A. I believe we printed -- let me be clear with my words. 11:16:25 11:16:29
I believe he printed some of each design, or that we ordered some of each design early on. 11:16:29 11:16:31
Q. Okay. 11:16:36
A. But I do not recall details or specifics. 11:16:36
Q. Okay. Were one or the other of the images that Mr. Maddox created part of all the sticker packs that you've distributed in connection with your work? 11:16:40 11:16:49 11:16:55

Page 80

MR. SCRENCI: Objection. Form. 11:17:01
THE WITNESS: Did you say a "part of all"? 11:17:03
BY MR. GILCHRIST: 11:17:06
Q. Was one or the other of the images part of every sticker pack that you distributed in connection with your work? 11:17:06 11:17:08 11:17:10
A. No. 11:17:14
Q. Okay. So there were some sticker packs that went out without either of those stickers? 11:17:14 11:17:16
A. Yeah. Well, what do you mean by "out"? We knew -- 11:17:19 11:17:23
Q. That you distributed or gave away or whatever. 11:17:23 11:17:25
A. We have distributed and gave away many different sticker packs, some that have had Will's design and some that have not and have never sold any of the stickers with Will's design. Those are given away as a part of fundraisers. 11:17:27 11:17:30 11:17:36 11:17:41 11:17:48
In fact, actually, the stickers with Will's design were given away in a fundraiser that Patagonia donated to and supported. 11:17:52 11:17:56 11:18:00
Q. That was a sustainable (inaudible) Hawaii fundraiser that you did? 11:18:08 11:18:10
A. I believe it was for that organization nestled under a larger fundraisers that we were doing 11:18:13 11:18:16

Page 81

including their blog, we -- the design was used for 11:26:28
stickers that were donated -- were given to people 11:26:32
when they donated to fundraisers. 11:26:35
Q. Some of the fundraisers that you gave 11:26:40
stickers included fundraisers that were sponsored by 11:26:43
other companies; correct? 11:26:53
A. They were not sponsored by other companies. 11:26:56
It was where companies had made donations to the 11:26:59
fundraisers as well. 11:27:04
Q. Is your testimony that you never gave 11:27:12
stickers away to any contributors of fundraisers where 11:27:14
your work, in connection with promoting the 11:27:18
fundraiser, was sponsored by one of your partners? 11:27:22
A. I'm confused as to the question. I'm sorry. 11:27:28
Q. Sure. 11:27:31
A. Maybe you can do that thing like where you 11:27:32
said what you're trying to get at. 11:27:35
Q. Fair enough. 11:27:37
I'm trying to find out whether or not -- And 11:27:37
first of all, I take it that some of your fundraising 11:27:42
efforts were made in conjunction with paid sponsors 11:27:44
who were also promoting the fundraiser. 11:27:51
Is that fair? 11:28:00
A. I do not recall specifics. I would have to 11:28:01
go back and read contracts. Many of the times 11:28:05

Page 86

companies just donated out of the good of their heart. 11:28:08
Q. Uh-huh. I understand that, but -- well, were 11:28:11
there any partnerships with other brands where you 11:28:19
were promoting both a fundraising initiative and the 11:28:27
support that that brand was providing to that 11:28:33
fundraising initiative? 11:28:37
A. That, I don't recall. 11:28:39
Q. Okay. 11:28:40
A. There's been a lot of fundraisers and a lot 11:28:42
of money raised. 11:28:45
Q. Okay. So is it also fair to say, then, that 11:28:47
you don't recall whether or not you gave away stickers 11:28:48
with Mr. Maddox's design on it to contributors of two 11:28:51
causes that were supported by some of your partners? 11:28:58
A. I'd have to answer I don't recall to that 11:29:02
either. 11:29:04
Q. Okay. What about in your public 11:29:29
performances? Have there ever been incidents where 11:29:31
you have used Mr. Maddox's design in connection with 11:29:36
your performances? 11:29:41
A. To the best of my knowledge, potentially 11:29:55
some. 11:30:01
Q. In what way did you use Mr. Maddox's design 11:30:04
in connection with your performances? 11:30:08
A. Potentially handing out some sticker sheets 11:30:15

Page 87

at shows. 11:30:19
Q. Okay. Other than sticker sheets, did you use 11:30:22
Mr. Maddox's design in any other way at shows? 11:30:26
A. To the best of my knowledge, no. 11:30:29
MR. GILCHRIST: I've got to find a couple 11:30:54
documents. 11:30:56
Can we take another five-minute break. 11:30:56
THE VIDEOGRAPHER: We're off the record. The 11:31:04
time is 11:31 a.m. 11:31:04
(A recess was taken from 11:31 a.m. 11:44:21
to 11:44 a.m.) 11:44:21
THE VIDEOGRAPHER: We are back on the record. 11:44:21
The time is 11:44 a.m. 11:44:24
BY MR. GILCHRIST: 11:44:30
Q. Mr. Wiley, can you go back to Exhibit No. 5. 11:44:30
Do you have it? 11:44:46
A. It's loading on my end. Sorry. 11:44:47
Okay. Yes. 11:44:49
Q. There are three different tables in this 11:44:58
attachment, and I was hoping you could provide some 11:45:00
explanation of the division and the distinction 11:45:02
between the three different types of items that are 11:45:04
recorded. 11:45:07
A. Okay. Would you like me to do that now? 11:45:09
Q. Yeah. 11:45:17

Page 88

A. Let me review these in full. Okay. 11:45:28
So Table 1 is going to be a bucket to capture 11:45:34
all of our sponsored content partnerships with 11:45:38
third-party grants. 11:45:44
Table 2 would be speaking and/or educational 11:45:44
workshops. 11:45:51
Table 3 would be shows. 11:45:55
Q. Okay. And so -- so Table 1 relates to things 11:46:07
that you did in connection with your paid sponsors; is 11:46:15
that right? 11:46:22
A. Yes. More specifically, sponsored content. 11:46:22
Q. Okay. 11:46:29
A. Well, actually, no. It would be labeled just 11:46:30
under the scope of partnership and deliverables. So 11:46:33
this is -- yeah. Third-party partnerships. 11:46:35
Q. Okay. 11:46:39
A. I would describe Table 1 as third-party 11:46:40
partnerships. 11:46:42
Q. And is it true that some of the third-party 11:46:43
partnerships would be in the Pattie Gonia persona and 11:46:50
some would be done as Wyn Wiley, or were they all done 11:46:56
as Pattie Gonia? 11:47:02
A. It would be mix. 11:47:04
Q. So some of the partnerships that are 11:47:05
described in Table 1 were executed as Wyn Wiley as 11:47:07

Page 89

BY MR. GILCHRIST: 11:53:29
Q. Now, with respect to the engagements in Table 2, in connection with those engagements, have you used Mr. Maddox's designs in discharging the partnership? 11:53:29 11:53:33 11:53:41 11:53:49
A. What do you mean by "discharging the partnership"? 11:53:54 11:53:55
Q. That's not good language, is it? 11:53:55
What I mean is when you did the work that was followed for in Table 2, did you use Mr. Maddox's designs? 11:53:57 11:53:59 11:54:03
A. The designs were never -- to the best of my knowledge, the designs were never a part of any of these speaking contracts. I remember handing out stickers at 1 percent for the Planet conferences to Patagonia employees who were interested in receiving the stickers, and I did not even offer them up. They asked for them. That is a recollection I have. 11:54:04 11:54:07 11:54:10 11:54:21 11:54:25 11:54:28 11:54:32
Q. Did you -- were you giving out stickers at these events? 11:54:37 11:54:40
A. To the best of my knowledge, other than that instance, no. And yeah, in fact, like the only time I really remember as a part of this ever being asked specifically for stickers was by Patagonia and 1% for the Planet employees at both 1% for the Planet 11:54:43 11:54:45 11:54:52 11:54:56 11:55:02

Page 94

conferences saying that they were big fans, and they wanted those stickers specifically. 11:55:05 11:55:09
Q. So you had those stickers with you, but you weren't distributing them? 11:55:12 11:55:14
A. I think at the time, I always had some stickers in my backpack, to the best of my recollection. 11:55:16 11:55:17 11:55:24
Q. Why did you keep stickers in your backpack? 11:55:24
A. I think it was just a convenient place to keep them. 11:55:28 11:55:30
Q. Okay. Who at Patagonia -- or what Patagonia employee do you remember giving stickers at 1% for the Planet event? 11:55:32 11:55:37 11:55:45
A. I do not recall specifically, but I do remember them introducing themselves as Patagonia at 1% for the Planet employees. 11:55:45 11:55:47 11:55:51
Q. Are you distinguishing between those as different employees of one organization as compared to the other, or are you lumping those together? 11:55:53 11:55:56 11:56:00
A. To my recollection, they're one and the same. 11:56:02
Q. So if a 1% for the Planet employee asked for a sticker, you would attribute that to Patagonia? 11:56:04 11:56:07
A. No. Let me clarify. 11:56:10
There were different people that asked for stickers, both 1% for the Planet employees and 11:56:13 11:56:15

Page 95

Patagonia company direct employees. 11:56:20
Q. Okay. And you don't remember who or what their names were? 11:56:24 11:56:26
A. The only person -- two people I remember meeting specifically at that conference were Corley Kenna and Yvonne Shinard. 11:56:28 11:56:31 11:56:41
Q. Did they ask for stickers? 11:56:44
A. They did not, but they said, "Thank you for your work." 11:56:46 11:56:49
Q. And you don't -- but you're saying that there were some other Patagonia employees there that did ask for stickers; is that correct? 11:56:51 11:56:55 11:56:58
A. Yes. 11:57:00
Q. Or was it at a different conference? 11:57:00
A. No. Same conference, but there were two different 1% for the Planet conferences. 11:57:03 11:57:09
Q. Right. 11:57:11
Did Patagonia employees ask for stickers at the same conference where you met Corley and Yvonne? 11:57:11 11:57:14
A. To the best of my memory, yes. 11:57:19
Q. How many Patagonia employees asked for stickers? 11:57:24 11:57:27
A. I do not recall. Like numerous, though. You know, at the time, 1% for the Planet actually had me as a keynote speaker of that conference in support of 11:57:28 11:57:36 11:57:41

Page 96

my work as Pattie Gonia, and actually helped link me to a paid third-party partner -- let me be clear. 11:57:44 11:57:51
1% for the Planet helped link me directly to a third-party partner to get paid for that speaking gig. So they helped facilitate in third-party partnerships that I was paid for as Pattie Gonia and speaking engagements and helped connect me to even more partners that I had further sponsor content work with after those conferences. 11:57:55 11:58:00 11:58:03 11:58:06 11:58:10 11:58:17 11:58:19
Q. Okay. So 1% for the Planet arranged for a sponsor to help defray expenses regarding your experience. 11:58:19 11:58:24 11:58:27
Is that what you're saying? 11:58:28
A. To the best of my knowledge, yes. 11:58:29
Q. Who was the partner that sponsored you for the conference? 11:58:30 11:58:32
A. I can't remember per se because there were a few different people that 1% for the Planet was trying to land. That's not necessarily totally my purview. It's more Jenny Dugan's. 11:58:36 11:58:38 11:58:43 11:58:48
Q. Uh-huh. Okay. In connection with your shows in Table 3, have you ever used Mr. Maddox's designs? 11:58:52 11:59:05
A. To the best of my knowledge, no. 11:59:15
Q. Have you ever used any other designs that are derived from the Patagonia logo? 11:59:16 11:59:22

Page 97

document production. 12:05:47
MR. SCRENCI: Okay. Understood. If you'd like me to look into that, we can. 12:05:49 12:05:52
MR. GILCHRIST: I mean there's a lot of Google file drives that we probably don't care about. This is one we'd like to see, and we'd generally like to have all the attachments to documents that are produced. 12:05:57 12:05:59 12:06:01 12:06:05 12:06:08
MR. SCRENCI: Yeah. I can look into that and confirm whatever the reason it was not produced is. 12:06:11 12:06:13
MR. GILCHRIST: Thanks. 12:06:18
Let me ask you to look at Exhibit 25. 12:06:20
(Deposition Exhibit 25 was marked for identification.) 12:06:35 12:06:35
BY MR. GILCHRIST: 12:06:35
Q. This is referring to the 2026 sticker sheet. 12:06:35
A. Uh-huh. 12:06:41
Q. I should have said at the beginning that because the reporter has to take down answers, if you could say, "yes" or "no" rather than "uh-huh" and "uh-uh" because that's harder to decipher. 12:06:41 12:06:43 12:06:46 12:06:48
So is that a "yes," that you were saying this relates to the 2026 sticker sheet? 12:06:53 12:06:55
A. Yes. This document does appear to relate to the 2026 sticker sheet. 12:06:58 12:07:02



Q. Okay. And there are two categories of designs that are referred to; "OLD DESIGNS" with "NO CHANGES" and "NEW DESIGNS." 12:07:04 12:07:07 12:07:14
Do you see that? 12:07:15
A. Yes. 12:07:16
Q. And one of the designs that's described as an old design is "PATTIE GONIA PATAGONIA RIP OFF." 12:07:16 12:07:20
Do you see that? 12:07:25
A. Yes, I see that. I do not recall writing that myself. 12:07:25 12:07:28
Q. Do you know who wrote it? 12:07:30
A. I do not recall. 12:07:32
Q. Okay. Have you seen this document before? 12:07:37
A. Perhaps. It's over a year old. So I can't necessarily say per se. 12:07:41 12:07:46
Q. Okay. Does this refresh your recollection that occasionally the stickers were referred to as "the Patagonia design"? 12:07:50 12:07:52 12:07:57
A. Not necessarily. I see what's written here on the page. 12:08:04 12:08:07
Q. Did you ever call it "the Patagonia rip-off design"? 12:08:12 12:08:15
A. To the best of my knowledge, no. 12:08:16
Q. Okay. So you think this is someone else's document? 12:08:21 12:08:24



A. I'm not saying it's someone else's document. I'm saying that I do not recall writing that myself. 12:08:25 12:08:27
Q. Okay. I'll represent to you that -- I can show it to you if you want, but the metadata that we got from your counsel says that this was from -- that you're the author and that this came from your computer. That's all I can tell you. 12:08:31 12:08:34 12:08:36 12:08:38 12:08:41
You don't remember? 12:08:44
A. I share an E-mail and a Google drive with my whole team. So... 12:08:46 12:08:50
Q. Okay. Is it fair to say that somebody on your team wrote this? 12:08:54 12:08:56
A. I cannot speak to that. 12:08:58
Q. Who is the team -- 12:09:01
A. The team -- 12:09:05
Q. -- that has access to your computer and your E-mail? 12:09:05 12:09:07
A. Jenny Dugan and myself. 12:09:08
Q. Okay. And who is the entire team? Who else is on the team that's employed by Entrepreneur Enterprises, Inc. or Pattie Gonia Productions? 12:09:10 12:09:14 12:09:20
A. We have more than 300 subcontractors a year. 12:09:21
Q. That's why I was trying to limit it to people that were actually employed by the company. 12:09:25 12:09:26
MR. SCRENCI: I'm going to just object to the 12:09:29



extent it calls for legal knowledge as to that distinction, but also to the scope, I think. 12:09:31 12:09:33
If you want to ask Jenny about this, we can make sure she's prepared to testify about it, Greg. 12:09:39 12:09:42
MR. GILCHRIST: Well, I'm just asking who is employed by the company. If he doesn't know, that's fine. 12:09:47 12:09:51 12:09:54
Q. But there must be some distinction, in your mind, between people that work for the company and the 300-some contractors is my assumption. If not, that's fine. I'll ask Jenny. 12:09:55 12:09:58 12:10:00 12:10:05
A. I think it would be best to ask Jenny. I think it would be unrealistic for my lawyers to ask about the, you know, hundreds of employees at Pattie Gonia's offices. 12:10:09 12:10:13 12:10:16 12:10:20
Q. Do you have hundreds of employees? 12:10:21
A. I just told you we subcontract around 300 people a year. So to me, are those employees? Maybe. I don't know the right legal speak. 12:10:22 12:10:25 12:10:32
MR. SCRENCI: Greg, we're not trying to be difficult here. 12:10:35 12:10:37
MR. GILCHRIST: I understand. I'm not worried about it. I'll figure it out. 12:10:38 12:10:39
Q. Are there people that you work with who are working for full time for the effort? 12:10:45 12:10:47

extent it calls for a legal conclusion. 12:37:25
You can testify as to your factual 12:37:29
understanding. 12:37:30
THE WITNESS: Are you asking me, Rocco? 12:37:32
MR. SCRENCI: I'm saying you can testify to 12:37:35
your factual understanding. 12:37:37
THE WITNESS: Any -- any time that I am in 12:37:40
drag it is parody and satire. That's the foundation 12:37:43
of the art form of drag. That's my answer. 12:37:48
BY MR. GILCHRIST: 12:37:58
Q. Okay. The specific use of the labels on the 12:37:58
gloves and on the dress, those were intended as parody 12:38:02
of the Patagonia brand; correct? 12:38:06
MR. SCRENCI: Same objection. 12:38:09
THE WITNESS: I would not agree with that at 12:38:10
all. In fact, I think I've answered quite the 12:38:11
opposite. 12:38:14
BY MR. GILCHRIST: 12:38:15
Q. Were they intended to indicate you or your 12:38:15
trademark? 12:38:20
MR. SCRENCI: Same objections. 12:38:25
THE WITNESS: Yeah. I can't answer to that. 12:38:28
I'm just confused. I'm confused as to what you're 12:38:31
getting at. If you can do the what I'm getting at 12:38:37
again, that could be helpful to me. 12:38:40



BY MR. GILCHRIST: 12:38:43
Q. Well, I'm asking if you were adopting that 12:38:43
logo as an indication that it was you who -- 12:38:45
A. No. I would say the indication that it's me 12:38:58
is it's like a photo of me. Like, again, I probably 12:39:00
wore these gloves on this dress. I mean I have 12:39:07
hundreds of dresses. Probably have worn this dress 12:39:13
like no more than like a few times a year, or this 12:39:17
look. 12:39:23
Again, this is a very small, isolated thing. 12:39:24
We're not banking the sale of a tour on a thing on a 12:39:30
glove. 12:39:35
MR. GILCHRIST: Let's take a break for a 12:39:44
second. 12:39:45
How is our court reporter doing? I can't see 12:39:49
you guys. 12:39:51
THE VIDEOGRAPHER: Do you want me to go off 12:39:52
the record real quick? 12:39:53
MR. GILCHRIST: Yeah. Let's go off the 12:39:54
record. 12:39:55
THE VIDEOGRAPHER: We're off the record. The 12:39:56
time is 12:39 p.m. 12:39:57
(A recess was taken from 12:39 p.m. 12:55:40
to 12:55 p.m.) 12:55:40
THE VIDEOGRAPHER: We are back on the record. 12:55:40



The time is 12:55 p.m. 12:55:43
MR. GILCHRIST: Mr. Wiley, can you look at 12:55:46
Exhibit 30. 12:55:49
(Deposition Exhibit 30 was marked for 12:55:54
identification.) 12:55:54
THE WITNESS: Yes. 12:55:54
BY MR. GILCHRIST: 12:55:56
Q. This is a post that you made to celebrate 12:55:56
hitting a million followers? 12:55:58
A. Yes. 12:56:04
Q. And you're wearing the dress with the gloves 12:56:04
that have the emblem we've been discussing; is that 12:56:06
correct? 12:56:08
A. Yes. 12:56:09
MR. GILCHRIST: Let me ask you to look at 12:56:20
Exhibit 31. 12:56:21
(Deposition Exhibit 31 was marked for 12:56:38
identification.) 12:56:38
THE WITNESS: I have 31 open. 12:56:39
BY MR. GILCHRIST: 12:56:40
Q. And in this post you're wearing a different 12:56:40
outfit, and the emblem that we've been discussing is 12:56:43
on your chest? 12:56:46
A. Yes. 12:56:53
Q. Okay. And was this costume created for any 12:56:55



particular purpose? 12:56:58
A. The costumes were created for my drag persona 12:57:02
and artistic use, and the emblems were moved from 12:57:06
dress to dress randomly over time. 12:57:15
Q. Uh-huh. 12:57:18
This post relates to a 100-mile hike that you 12:57:21
did to raise money; is that right? 12:57:26
A. Yes, part of the same fundraiser series that 12:57:28
Patagonia donated to. 12:57:32
Q. In what way did Patagonia donate to this 12:57:36
fundraiser? 12:57:38
A. Well, I do a yearly fundraiser every year, 12:57:40
and Patagonia donated to one -- I can't remember 12:57:43
exactly what year, in 2020, 2021, 2022, early days, 12:57:49
and then this is the same fundraiser just, a future 12:57:54
iteration, a future year in that fundraiser series. 12:57:59
Q. So when you're saying, a "fundraiser series," 12:58:06
are you talking about your GivingTuesday fundraiser? 12:58:08
A. You could call it that. I mean we just call 12:58:13
it a yearly fundraiser. 12:58:17
Q. Okay. In this fundraiser, you hiked 12:58:19
100 miles from somewhere to San Francisco; correct? 12:58:27
A. Correct. 12:58:32
Q. Did anyone sponsor you or pay you for 12:58:35
engaging in this hike? 12:58:42

where you were soliciting applications for people that 13:41:25
would come to work for Entrepreneur Enterprises -- 13:41:28
A. No. 13:41:32
Q. -- or did you always hire friends or friends 13:41:32
of friends? 13:41:34
A. Well, I mean sometimes. Like, for example, I 13:41:35
might have put a post out on Instagram, like, "Hey, 13:41:38
I'm looking for a graphic designer" and then have like 13:41:40
received portfolios of work. 13:41:43
Q. Okay. Where did you post the need for that 13:41:46
kind of assistance? 13:41:54
A. All on Instagram -- 13:41:55
Q. Okay. 13:41:58
A. -- or E-mail. I mean another example, to be 13:42:01
very thorough with you, is like, you know, now I have 13:42:02
cohosts to my drag show, and I will oftentimes consult 13:42:05
with them to be like, "Hey, who are the performers 13:42:08
across America who need the most financial support 13:42:11
right now," or who oftentimes are black, indigenous 13:42:14
people of color or trans people that we can give a job 13:42:17
to, and then they will help consult with me and then 13:42:21
we'll hire those people for shows. 13:42:24
Q. Uh-huh. 13:42:27
Do you own any other interests in any other 13:42:29
businesses other than Entrepreneur Enterprises? 13:42:34



A. I don't. 13:42:37
Q. Does Entrepreneur Enterprises have any 13:42:41
affiliates? 13:42:45
A. As in like any other dba's? 13:42:47
Q. Or, for example, does Entrepreneur 13:42:50
Enterprises hold any ownership of subcontractors that 13:42:55
the company hires to do things? 13:43:01
A. To my knowledge, no, I don't totally 13:43:05
understand like back-end business workings, but to my 13:43:07
knowledge, no. 13:43:10
Q. Okay. I take it from your answer that 13:43:11
Jenny's personal knowledge begins somewhere around the 13:43:28
pandemic; is that correct? About the company. 13:43:30
Obviously, she has knowledge that predates that. 13:43:39
A. Yes. Starting like in the pandemic, yes. 13:43:45
Q. Okay. Did you have employees before Jenny? 13:43:49
A. I've had other employees like under my 13:43:58
photography business, like when Entrepreneur 13:44:02
Enterprises, Inc. was a dba as Wyn Wiley Photography, 13:44:09
but those predated Pattie's creation. 13:44:12
Q. Okay. So Jenny was the first real employee 13:44:16
of Pattie Gonia Productions? 13:44:18
A. Yeah. There was a person named Dana 13:44:23
Turnblum, who was my like photography assistant. He 13:44:25
was helping me with like photography stuff before, and 13:44:28



I believe overlapped. Actually, I don't recall if 13:44:34
they overlapped Pattie world at all. I think they 13:44:41
were just photography world. 13:44:45
MR. GILCHRIST: Okay. All right. Let me at 13:44:47
least pause and ask how people are doing in terms of 13:44:54
needing breaks or a meal break. 13:44:57
THE WITNESS: I'm personally great on my end, 13:45:04
but I'm happy to give anyone who needs a break, a 13:45:05
break. 13:45:08
MR. SCRENCI: I'm the same. I can take a 13:45:14
break. I'm happy to keep going. 13:45:16
THE VIDEOGRAPHER: I'm fine. I just want to 13:45:19
leave it up to Nancy. 13:45:20
(A discussion was held off the record.) 13:46:15
THE VIDEOGRAPHER: We are off the record. 13:46:15
The time is 1:46 p.m. 13:46:16
(A recess was taken from 1:46 p.m. 13:46:20
to 2:17 p.m.) 13:46:20
THE VIDEOGRAPHER: We are back on the record. 14:17:19
The time is 2:17 p.m. 14:17:20
BY MR. GILCHRIST: 14:17:24
Q. Mr. Wiley, let's look back at Interrogatory 14:17:24
No. 7. 14:17:39
A. Is this on Exhibit 4? 14:17:39
MR. GILCHRIST: Yeah. 14:17:41



Let me just quickly check to see if it was 14:17:41
updated. I don't think so. 14:17:44
MR. SCRENCI: It was not. 14:17:49
BY MR. GILCHRIST: 14:18:05
Q. No. 7 on Exhibit 4. 14:18:05
A. Okay. 14:18:13
Q. No, that's not right. I'm talking about 14:18:13
Interrogatory No. 7 on Exhibit 4. 14:18:17
Is that what I said? 14:18:18
Are you on Interrogatory No. 7, Mr. Wiley? 14:18:22
A. Yes. 14:18:31
Q. Okay. And you've read your answer that 14:18:31
you're unaware of any inquiries or statements made by 14:18:33
anyone about whether you're affiliated, associated 14:18:37
with, or operating in collaboration with Patagonia; is 14:18:40
that correct? 14:18:45
A. Yes. My response on Interrogatory No. 7 is 14:18:46
the best response, to my knowledge. 14:18:54
Q. And it says, at the end of that response, 14:18:56
that you further note that you were unable to locate 14:18:57
comments that were identified on Page 4 of the 14:18:59
Complaint; is that correct? 14:19:05
A. Like comments as of -- what kind of comments? 14:19:08
Social media comments? 14:19:11
Q. Well, I'm asking you what you meant in your 14:19:14

were many steps taken to do that. 14:25:20
Q. Did you do any searching or review of 14:25:22
comments that were made, in response to your posts, to 14:25:27
answer this interrogatory? 14:25:31
MR. SCRENCI: Object. Asked and answered at 14:25:35
this point. 14:25:37
THE WITNESS: What did you say, Rocco? 14:25:38
Sorry. 14:25:40
MR. SCRENCI: I said objection. This has 14:25:41
been asked and answered. 14:25:43
But you can answer it again. 14:25:43
THE WITNESS: Yeah, we did a search on social 14:25:45
media, but, again, social media apps make it very -- 14:25:47
like there is no tool to search comments. You can't 14:25:51
keyword search comments. I don't possess that 14:25:55
technology to do that. 14:25:59
BY MR. GILCHRIST: 14:26:01
Q. Okay. What did you do? 14:26:01
A. I do not recall in detail. 14:26:04
Q. Okay. Did you look at any of your 14:26:06
correspondence with partners? 14:26:14
A. I do not recall. 14:26:20
Q. Okay. I assume you searched your own 14:26:27
memories about whether or not you received such 14:26:29
inquiries; is that correct? 14:26:32



A. Yes. 14:26:32
Q. Did you talk to Jenny about whether or not 14:26:35
she remembered any such inquiries? 14:26:37
A. I do not recall. 14:26:41
Q. Okay. Did Jenny review these interrogatory 14:26:44
answers before they were submitted? 14:26:47
A. I do not recall. Some, not all. There's 14:26:56
also -- it's -- we talking about this specifically or 14:26:59
the 30(b)(6) too? 14:27:05
Q. No. I'm talking about when you submitted the 14:27:07
interrogatory answers that you signed, I was wondering 14:27:10
if Jenny had reviewed them before you sent them off? 14:27:11
A. I wouldn't say that like Jenny necessarily 14:27:17
like reviewed them. That was -- I mean 14:27:19
attorney-client privilege? Can I say that here? 14:27:25
MR. SCRENCI: I guess what I will say is that 14:27:30
to the extent that you know what Jenny looked at, you 14:27:31
can testify. I don't want you -- yeah. I don't want 14:27:36
you speculating as to what Jenny may or may not know 14:27:39
to the extent that speculation would require you to, 14:27:42
you know, rely on stuff that I may have said to you. 14:27:46
BY MR. GILCHRIST: 14:27:52
Q. Yeah. I'm not asking you to tell me what 14:27:52
Jenny said about something she heard from Rocco 14:27:54
either. So I'm only asking if she looked at these, to 14:27:55



your knowledge. 14:28:00
A. I do not recall in detail. I do know she 14:28:05
helped with like documents and data collection as the 14:28:07
discovery request required. 14:28:13
Q. Have you ever had any questions or inquiries 14:28:18
or comments that were made -- I guess we looked at 14:28:21
some, but about whether or not the logos that you were 14:28:27
using or the patches that you were using were similar 14:28:31
to Patagonia's logo? 14:28:37
A. Did I ever get inquiry into them? 14:28:40
Q. Yeah. Did anyone ever ask you about your use 14:28:43
of a logo expressing that it was similar to 14:28:45
Patagonia's logo? 14:28:49
A. No, beyond the few comments out of multiple 14:28:51
thousands that you have flagged in the case. 14:28:56
Q. Uh-huh. 14:29:00
A. I think it's very widely understood as an art 14:29:01
form of drag, parody and satire and humor, of which 14:29:05
all the use of different forms of art and emblems 14:29:10
across many different outfits and artistic expressions 14:29:14
are a part of. 14:29:23
Q. Did you ever get any questions about whether 14:29:29
or not you had heard any protests from Patagonia about 14:29:38
your use of the Patagonia name or Mr. Maddox's art or 14:29:44
the patches? 14:29:51



MR. SCRENCI: I'm going to object to the 14:29:52
form. 14:29:53
You can answer if you understand. 14:29:53
THE WITNESS: Could you repeat that again, 14:29:56
Greg? Again, I'm not trying to play dumb here. I 14:29:57
just want to make sure I'm understanding. 14:30:00
BY MR. GILCHRIST: 14:30:05
Q. Sure. 14:30:05
I'm asking if you or the company had ever 14:30:05
received any comments or inquiries about whether 14:30:06
Patagonia had objected to your use of Pattie Gonia or 14:30:11
the artwork that we've looked at. 14:30:17
A. To my knowledge, other than the discussions 14:30:26
we had about third-party partnerships, no. My -- 14:30:30
yeah. 14:30:40
Q. When you say that "we had," you mean between 14:30:41
you and Patagonia about Hydroflask, for example? 14:30:43
A. Uh-huh. Yeah. So other than the 14:30:48
communications about Hydroflask, that also applied to 14:30:50
third-party partners, no. And, in fact, like, again, 14:30:55
everything separate from that was from my artistic use 14:31:06
as Pattie Gonia, and also for my fundraising efforts, 14:31:09
both of which Patagonia has stated publicly they are 14:31:16
in support of and don't want to get in the way of, and 14:31:19
donated to fundraisers for. 14:31:24

past; is that right? 14:37:52
A. Potentially. 14:37:52
Q. Okay. And at least in the case of the post 14:37:53
that we saw that was two years later, we can assume 14:38:00
that that was not something that popped up 14:38:04
contemporaneously in their Instagram feed. So they 14:38:09
must have looked at it after coming to your page from 14:38:11
another post. 14:38:14
Is that fair? 14:38:14
A. That's not necessarily the case. The 14:38:15
algorithm will pull things from years ago to put into 14:38:17
people's algorithms. 14:38:20
Q. Okay. So -- and maybe you could and 14:38:33
describe -- I know something about it, but for the 14:38:33
Court, when you say the algorithm they pull. 14:38:36
How do your posts get delivered to potential 14:38:38
viewers? 14:38:40
A. I cannot speak to that as I'm not Meta and 14:38:41
they change the algorithm all the time. 14:38:43
Q. I assume that none of us know exactly how it 14:38:50
happens, but I'm asking for your general understanding 14:38:52
about how somebody might come across one of your posts 14:38:54
that you're making on behalf, for example, one of your 14:38:58
paid partners? 14:39:03
A. If anything, oftentimes posts with my paid 14:39:04

Page 170

partners are deprioritized in the algorithm, meaning 14:39:08
they are shown to far less people than the average 14:39:12
post, and oftentimes are not even searchable by search 14:39:15
functions because the app doesn't want "ads" to be the 14:39:20
primary part of their app. They want funny content, 14:39:26
you stick around and you watch one of their ads after, 14:39:30
to be the content that you see. 14:39:32
So if anything, it's like the anti what 14:39:35
you're saying. It's quite the opposite. 14:39:38
Q. All right. So let's take one that's not a 14:39:40
paid ad that you're -- a post that you're making 14:39:43
that's not a paid ad. 14:39:48
How does that get delivered to a potential 14:39:49
viewer? 14:39:52
A. I mean if the viewer follows me, they might 14:39:53
see the post. There's no guarantee these days. Other 14:39:55
than that, I have no idea and I cannot speak to it. 14:40:01
It's Meta. 14:40:03
Q. Okay. In your relationships with sponsors, 14:40:05
do they, to your knowledge, do anything to push out or 14:40:12
promote your posts so that they are seen in Instagram 14:40:20
feeds of potential consumers? 14:40:27
A. I do not know. You would have to ask those 14:40:34
brands as to their practices. 14:40:37
Q. Okay. To your knowledge, there's nothing in 14:40:41

Page 171

the contracts that would stop them from doing that? 14:40:42
A. I mean every contract is different, and I 14:40:46
just want to make sure I'm answering truthfully. Like 14:40:48
it is not our general practice to allow brands to like 14:40:54
promote posts further than like the reach it gets. 14:41:00
Q. You don't permit it or you don't forbid it, 14:41:08
or you don't address it? 14:41:11
A. It's not my practice to allow that. 14:41:13
Q. And do you believe that there are provisions 14:41:17
in the contracts that restrict the sponsors' ability 14:41:18
to promote your posts? 14:41:22
MR. SCRENCI: I'm going to object to the 14:41:25
extent it calls for a legal conclusion. 14:41:26
You can answer if you have an understanding. 14:41:28
THE WITNESS: Yeah. Like I want to be clear 14:41:31
that third-party partners are partnering with me to 14:41:33
partner with me and the advocacy and legacy and impact 14:41:38
work that I have done as an activist and as a 14:41:43
performer. There is no -- to my knowledge, no other 14:41:47
reason why a partner would be working with me, and 14:41:55
I've built the work that I've done over the last eight 14:42:01
years, and my drag persona, Pattie Gonia, is a highly 14:42:04
sought after partner. That's my answer to that. 14:42:11
BY MR. GILCHRIST: 14:42:16
Q. All right. I think we may be off the 14:42:16

Page 172

contract, but I can ask Jenny about that too. She's 14:42:25
designated to do that. 14:42:28
A. I also just want to note, while we're on 14:42:28
Exhibit 38, if I may. 14:42:31
Q. Sure. 14:42:32
A. I think this is another great example of you 14:42:34
can find anything you're searching for in a comment on 14:42:36
the Internet because above the comment that's 14:42:41
highlighted saying "stop I thought this was a legit ad 14:42:43
from pride month from Patagonia," you have someone who 14:42:46
is mispronouncing the word heels, like you're going to 14:42:52
find -- you're going to find whatever you're looking 14:42:55
for on the Internet when it comes to comments. 14:42:57
And, again, comments are not something that I 14:43:01
have created. I am not intentionally creating the 14:43:03
impression that this is a pride month ad. I am doing 14:43:07
my art form outdoors in drag. 14:43:11
Q. Okay. I take it one of the things you're 14:43:18
saying is that you're not responsible for how people 14:43:22
perceive what you do? That's up to them to perceive 14:43:24
what you do? 14:43:30
A. I'm not necessarily saying that. I'm saying 14:43:31
what I said, which is that, you know, you've clearly 14:43:33
found the 1 or 2 comments out of 5,000 on each post 14:43:36
that reference some, "I thought is this a reference 14:43:39

Page 173

Q. Okay. Do you know if there's any limitation in the contracts about what partners with do with, for example, the Will Maddox artwork? Is there any restriction on using that? 15:02:12 15:02:13 15:02:17 15:02:22
MR. SCRENCI: Same objections. 15:02:24
THE WITNESS: That's not my purview, and I don't -- again, everything is contract specific. 15:02:26 15:02:31
BY MR. GILCHRIST: 15:02:33
Q. Okay. Do you know if there's anything in the contract that prevents your partners, in connection with the campaign they're doing with you, to prevent them from using the Patagonia brand? 15:02:33 15:02:36 15:02:44 15:02:48
MR. SCRENCI: You can answer if you know in your personal capacity. 15:02:50 15:02:52
THE WITNESS: I do not recall, and this is something that like so rarely comes up because people are interested in partnering with me, the drag queen and environmentalist. 15:02:56 15:02:59 15:03:05 15:03:08
BY MR. GILCHRIST: 15:03:17
Q. You just did a partnership with Back Market, the mind your phone campaign in which when they were discussing the campaign, they referred to Patagonia; correct? 15:03:17 15:03:20 15:03:23 15:03:30
A. Please be more specific as to what you mean by "discussing the campaign." 15:03:30 15:03:32



Q. Well, I can say -- represent, because I've seen it, that there's a YouTube video about the marketing director for Back Market, who says that the campaign that they're doing about phones is patterned after the footprints campaign that Patagonia did, advertising the habits of sourcing apparel and that they were doing that for funds. 15:03:37 15:03:39 15:03:42 15:03:47 15:03:50 15:03:57 15:04:00
And my question is whether you're aware of the fact that they referred to the campaign you were working on in that context? 15:04:02 15:04:04 15:04:07
A. Again, that's not -- first of all, I have not seen that YouTube video. 15:04:11 15:04:17
Second of all, anything a partner says is their free speech and is likely a person at a company, not the company. And what they say is not my -- I do not have control over. 15:04:19 15:04:22 15:04:26 15:04:38
Q. That goes back to my question, is whether or not you do anything in your contracts to try to assert control over how they use your name or Patagonia, the brand, in connection with a campaign as part of contracting with them? 15:04:40 15:04:42 15:04:46 15:05:00 15:05:00
A. Again, it's just individual contract dependent. I can't speak to what someone at one corporation said in one YouTube video when speaking about the campaign. And, again, not the campaign 15:05:02 15:05:04 15:05:06 15:05:09



itself, not anything I said, not anything that I approved, not anything that was run by me, but what they're saying independently. It's not up to me. 15:05:12 15:05:16 15:05:18
Q. And you're saying that one person that works for a company may not be speaking for the company. Is that what you're saying? 15:05:25 15:05:27 15:05:29
MR. SCRENCI: Object to form. 15:05:30
THE WITNESS: I'm saying I'm not certainly speaking to that. 15:05:32 15:05:33
BY MR. GILCHRIST: 15:05:37
Q. I understand, but I understood you to say that if some person at the company in a YouTube video, that they may not be speaking for their company when they made that? 15:05:37 15:05:39 15:05:46 15:05:48
A. I don't know. I have not seen this YouTube video. 15:05:50 15:05:52
Q. Okay. Have any other partners expressed concern to you about the people that understand Pattie Gonia to have a relationship with Patagonia? 15:05:53 15:06:03 15:06:11
A. No, because we have not partnered to date. 15:06:16
MR. GILCHRIST: Let me get some exhibits. I think I have to go and get them. 15:06:28 15:06:30
THE WITNESS: Well, let me phrase my answer specifically. 15:06:31 15:06:33
To the best of my knowledge, no. And it's 15:06:34



very broadly understood that I am a separate entity by most rational people, but whatever. 15:06:46 15:06:55
BY MR. GILCHRIST: 15:07:08
Q. You say that as though you've conducted some sort of a survey or -- 15:07:09 15:07:10
(Indiscernible cross-talk.) 15:07:13
THE WITNESS: You are -- 15:07:13
BY MR. GILCHRIST: 15:07:13
Q. Have you done that? 15:07:13
A. You are so correct. Let me not -- let me clarify. Yeah. Let me clarify that. 15:07:14 15:07:17
I do not recall what brands might have reached out about confusing me with the brand. I have done what I've done for eight years, and outside of Patagonia reaching out about Hydroflask, in creating -- or sharing guardrails they wanted us to abide to for third-party partnerships, we have not even heard from Patagonia even when I worked with Patagonia's direct competitor, Northface. 15:07:40 15:07:42 15:07:49 15:07:56 15:07:59 15:08:02 15:08:06 15:08:15
So no. To my knowledge, there would not be confusion on that. Other brands are also paying attention to things like that. 15:08:19 15:08:21 15:08:24
MR. GILCHRIST: Let me ask you to look at Exhibit 46. 15:08:25 15:08:26
(Deposition Exhibit 46 was marked for 15:08:38

A. I'm frequently asked about it in person, and that is the answer I give, which is truthful. The reason I'm named what I'm named, as well as given that answer in countless interviews about the origin of my name, which is truthful to the coffee shop conversation that I had with Griffin and Melissa, in which we named my drag persona Pattie Gonia after the region and the country, Patagonia. 15:20:33 15:20:35 15:20:38 15:20:41 15:20:44 15:20:46 15:20:53 15:20:57

Q. Other than interviews that you've given where you were asked about this and in which you recount that the origin of your name was the region of South America, is there any other public demonstration that you've made which associates Pattie Gonia with the region? 15:21:00 15:21:02 15:21:09 15:21:11 15:21:17 15:21:20

Any jokes, any other references that you've made in which the region is the subject of the reference? 15:21:27 15:21:29 15:21:31

A. I don't recall. I'm sure I have made some. 15:21:35

Q. Okay. 15:21:40

A. But, again, those wouldn't be jokes because that's the truth. So yeah, I know that I have said that in interviews as well as -- 15:21:40 15:21:42 15:21:51

(Indiscernible cross-talk.) 15:21:53

BY MR. GILCHRIST: 15:21:56

Q. -- told you to say that in interviews; right? 15:21:56



MR. SCRENCI: Object to the form. 15:21:57

(Indiscernible cross-talk.) 15:21:59

THE WITNESS: That's argumentative. 15:21:59

But I'm here to tell the truth, and that's the truth. 15:22:02 15:22:07

MR. GILCHRIST: Okay. You should, in a minute, be able to look at Exhibit 85. Not 85. It's Exhibit 48. Sorry. 15:22:08 15:23:14 15:23:16

(Deposition Exhibit 48 was marked for identification.) 15:23:18 15:23:18

THE WITNESS: Exhibit 48 is loading for me. 15:23:18

All right. It has loaded. 15:23:23

BY MR. GILCHRIST: 15:23:31

Q. Can you tell me what Exhibit 48 is. 15:23:31

A. This is a Word document of -- outlining partnership opportunities with us for 2021, 2022. 15:23:33 15:23:39

Q. How was this document used? 15:23:47

A. I believe this document was used to educate third-party brands, as well as nonprofits, about who we are and what we do. 15:23:51 15:23:55 15:24:00

Q. You refer -- if you look at Page 3 -- 15:24:25

A. Okay. 15:24:25

Q. -- there's a -- I mean it's Page 3 of the PDF, I think. 15:24:28 15:24:34

A. Uh-huh. 15:24:35



Q. Just to make sure, it's under the heading -- the heading "Partnerships" is on this page. Is that how -- are we on the same place? 15:24:35 15:24:38 15:24:41

A. Yes. 15:24:43

Q. And then underneath "No matter what," there's a statement that says, "Our business model." 15:24:47 15:24:49

Do you see that? 15:24:53

A. Yes. 15:24:55

Q. And it says, "We use partnership dollars to pay our full time team of three employees." 15:24:56 15:24:59

A. Uh-huh. 15:25:02

Q. Is that you, and at the time, Jenny and Grace? 15:25:03 15:25:08

A. I believe so, to the best of my knowledge. 15:25:09

Q. "pay the diverse partners." I assume that's the subcontractors that you've referred to; is that right? 15:25:16 15:25:18 15:25:21

A. Yes. 15:25:22

Q. And then it says, "fund our community programing." 15:25:26 15:25:27

What does that mean? 15:25:28

A. So we'll often do free group hikes, climate rallies, beach cleanups, like the one pictured below, that are free community events that we get paid nothing for that we do as community service and call 15:25:29 15:25:33 15:25:38 15:25:41



it community programming. 15:25:47

So like our work were our third-party partners often funds that work that gets -- that makes them money and, in fact, actually is like -- costs a lot to put on from all the third party -- or all the subcontractors that we hire to do those events. 15:25:51 15:25:53 15:25:57 15:26:00 15:26:03

Q. Then No. 4 is "invest in non-profit and individuals working to diversify the outdoors"? 15:26:10 15:26:12

A. Uh-huh. 15:26:14

Q. Do you see that? 15:26:14

What nonprofits have you invested in? 15:26:16

A. So I think the word "invest" isn't the best word there. I see that's a word on the page. It would be to -- well, maybe it is. 15:26:19 15:26:21 15:26:25

We are constantly doing free a consulting work with nonprofits and individual community organizers that do work to diversify the outdoors. So yeah. We're doing -- 15:26:31 15:26:32 15:26:36 15:26:43

Q. So you're investing time rather than money. 15:26:45

Is that what you're saying? 15:26:48

A. Yeah. We're investing our time and our resources and our connections to connect nonprofits to other nonprofits, to other communities or, you know, doing free marketing for them on our social channels, or educating them on how to use social media to grow 15:26:49 15:26:52 15:26:54 15:27:00 15:27:03

department at Northface at the time. 16:01:13
Q. And Maren says, on May 17 at 9:34, that's the 16:01:14 entry I'm looking at, "My copy team just asked if we 16:01:20 could play on the patagonia irony a bit....they 16:01:22 suggested something like 'Nothing is impossible: 16:01:26 @patagonia has teamed up with... @thenorthface. Join 16:01:29 us for Pride." 16:01:34
Do you see that? 16:01:36
A. I do see that. 16:01:37
Q. Okay. And then there's a reference that 16:01:38 says, "Wyn is great by this!" 16:01:42
Do you see that? 16:01:44
A. I do see that an outside contractor did say 16:01:46 that. 16:01:51
Q. And the leaning into the irony of Patagonia 16:01:56 would be that nothing is impossible being that 16:02:02 somebody associated with Patagonia had teamed up with 16:02:09 Northface; right? 16:02:11
A. I do not agree with that assumption in the 16:02:14 least bit. 16:02:16
Q. What do you think the addition of nothing is 16:02:17 impossible at Patagonia as teamed up without the 16:02:23 Northface was leaning into the Patagonia irony? 16:02:27
A. First of all, I believe that Maren might have 16:02:34 auto corrected or spell corrected to that. 16:02:37



Second of all, I think -- I don't want to 16:02:40 speculate here. This is not -- I did not say this. 16:02:41 Maren did. You'd have to ask her. 16:02:44
Q. Okay. 16:02:46
A. And also -- 16:02:47
Q. All right. Did you ever object to this stuff 16:02:49 in your comments which are ascribed to your Google 16:02:52 account? 16:02:55
A. Did I "ever object to stuff"? 16:02:59
Q. Did you ever object to the comment by 16:03:01 Courtney Sanford, who I take it that you're saying is 16:03:04 a third-party contractor where "Wyn is great by this" 16:03:07 was recorded in your later comments in the document? 16:03:12
A. I do not recall, but it would never be my 16:03:19 directive to try to do something like this and -- 16:03:21
Q. Okay. 16:03:33
A. -- I think it's important to note here that 16:03:33 after this partnership with Northface went live, we 16:03:36 heard nothing from Patagonia in complaint of it for 16:03:40 years. Their biggest competitor. 16:03:45
Q. You already talked to Patagonia by the time 16:03:47 this went live, hadn't you? 16:03:51
A. I don't recall. I do know -- 16:03:53
MR. GILCHRIST: We'll get to those documents 16:03:55 and we can put it in time for you. 16:03:57



Let me ask you to look at Exhibit 54. 16:03:59
THE WITNESS: I do want to say -- I felt 16:04:02 cutoff there. 16:04:04
I do want to just say clearly, again, that 16:04:05 when this did go live, we heard nothing from anyone at 16:04:10 Patagonia's team in complaint of this partnership. So 16:04:14 the fact that you're asserting it here has me a bit 16:04:17 confused because this was never an issue that 16:04:21 Patagonia addressed to us. 16:04:27
What's the next exhibit? 16:04:32
MR. GILCHRIST: I'll move to strike that as 16:04:33 nonresponsive. 16:04:35
Exhibit 54. 16:04:38
(Deposition Exhibit 54 was marked for 16:04:42 identification.) 16:04:42
THE WITNESS: Okay. 16:04:43
BY MR. GILCHRIST: 16:04:45
Q. You entered into a partnership with 16:04:45 Aspiration Bank; is that correct? 16:04:48
A. Yes. 16:04:54
Q. And if I read this correctly, they are 16:05:07 proposing sending you a script to use, and somebody 16:05:09 from Patagonia, I assume Jenny, given her name is 16:05:10 there, responds, "Instead of a script, please send 16:05:17 over a doc with" a call to action, a link and the main 16:05:19



talking points; correct? 16:05:23
THE WITNESS: Let me review this E-mail. 16:05:41
(The witness reviewed materials.) 16:05:41
THE WITNESS: Yes. 16:05:41
BY MR. GILCHRIST: 16:05:41
Q. And the call to action that they wanted was 16:05:41 use was "Use my link to give your wallet a glow-up, 16:05:44 fossil free and fabulous (something along those 16:05:48 lines)"; is that right? 16:05:50
A. Can you point to what page you're reading on 16:05:51 the document? 16:05:53
Q. It's -- yeah, because these are in reverse 16:05:54 chron order, the E-mail, it's more recent in time at 16:05:57 the top. So this -- the response to the request from 16:06:00 Jenny for a call to action is covered in the first 16:06:04 E-mail. It's in bold. So you can see that. 16:06:10
A. Yes, I do see that, but I just wanted to 16:06:15 reference the part where you were talking about the 16:06:17 call to action messaging. 16:06:21
Q. I think it's labeled "CTA." I assumed that 16:06:25 was call to action -- 16:06:29
A. Yes. 16:06:30
Q. -- and it's in bold. 16:06:30
And my assumption was that Ashley is 16:06:31 responding to Jenny's request for a CTA by giving this 16:06:33

about the outdoor stuff; is that correct? 16:12:26
A. Yeah. To be clear, she was tasked with 16:12:30
writing a blog post about The Outdoorist Oath, a 16:12:34
nonprofit I co-founded, and my activism work directly 16:12:39
as Pattie for Patagonia's blog, in which I believe 16:12:42
they also turned that into Instagram post that 16:12:47
Patagonia shared on their Instagram and then 16:12:50
circulated worldwide on their other blogs globally to 16:12:53
show support of me and my nonprofit. 16:12:57
MR. GILCHRIST: Okay. Pardon me. 16:13:00
Let me show you Exhibit 56. 16:13:27
(Deposition Exhibit 56 was marked for 16:13:33
identification.) 16:13:33
THE WITNESS: I see Exhibit 56. 16:13:34
BY MR. GILCHRIST: 16:13:35
Q. Did you post this? 16:13:35
A. I did post this. 16:13:38
Q. And what was the purpose of this post? 16:13:40
A. The purpose of this post was to invite 16:13:44
Patagonia in to be a leader in the space to support 16:13:47
queer communities, especially in the outdoors. 16:13:56
Q. Did Ms. Clapper have a role in helping you 16:14:00
write this or in suggesting that you write this? 16:14:04
A. To the best of my knowledge, no. 16:14:08
Q. Okay. Who, if anybody, was involved in this 16:14:11

Page 222

other than you? 16:14:13
A. To the best of my knowledge, it was just me. 16:14:14
Q. Okay. Do you know if you discussed it with 16:14:17
Ms. Clapper before you posted it? 16:14:20
A. I don't recall. 16:14:24
MR. GILCHRIST: Could the court reporter 16:14:56
remind me what last exhibit was I talked about. 16:14:58
THE WITNESS: It was 56. I have it open here 16:15:03
still. 16:15:05
MR. GILCHRIST: Thank you, Wyn. 16:15:07
Can you look at Exhibit 57? 16:15:09
(Deposition Exhibit 57 was marked for 16:15:10
identification.) 16:15:10
THE WITNESS: Yes. 16:15:10
BY MR. GILCHRIST: 16:15:11
Q. And I'll represent to you that is another 16:15:18
message that we had produced to us by Hydroflask. 16:15:20
Does this refresh your recollection about who 16:15:26
reached out to who about Patagonia's concerns about 16:15:33
IP? 16:15:36
MR. SCRENCI: Object to the foundation. 16:15:37
THE WITNESS: I do not recall this. I don't 16:15:38
know who Aileen and Naomi my are, nor Mark, nor can I 16:15:42
tell who works for who via this exhibit. 16:15:46
BY MR. GILCHRIST: 16:15:51

Page 223

Q. You don't know that this was Ms. Vieira 16:15:51
reaching out to Patagonia about this issue? 16:15:57
A. I don't recall. Again, these are 16:16:03
communications between two entities that were not me. 16:16:04
Q. Okay. At some point you remember that you 16:16:08
had a meeting with Rob Tadlock and Whitney Clapper; 16:16:10
correct? 16:16:17
A. Yes. 16:16:21
Q. And two representatives from Hydroflask? 16:16:22
A. I don't recall how many people were there 16:16:30
from Hydroflask. 16:16:32
Q. Was there anybody there from Hydroflask that 16:16:33
you recall? 16:16:36
A. Potentially. I mean I -- yeah. Potentially. 16:16:38
There were a few different meetings. So I don't know. 16:16:43
Q. Okay. Look at Exhibit -- well, I'll ask you: 16:16:48
Did you meet with Ms. Clapper separately from your 16:16:58
meeting with Mr. Tadlock about Hydroflask concerns? 16:17:01
A. To the best of my knowledge, no. 16:17:04
MR. GILCHRIST: Okay. Let me ask you to look 16:17:07
at Exhibit 58. 16:17:09
(Deposition Exhibit 58 was marked for 16:17:13
identification.) 16:17:13
THE WITNESS: Okay. 16:17:14
BY MR. GILCHRIST: 16:17:29

Page 224

Q. Do you see this meeting request, "Pattie, 16:17:29
Jenny and Whit catchup"? 16:17:31
A. I do see that. 16:17:35
Q. And it's for a "Pre-huddle on legal call"; is 16:17:36
that right? 16:17:41
A. Yes. Frequently, Whitney would connect with 16:17:41
us to go over what was happening in the climate space 16:17:46
with my nonprofit. Other happenings. 16:17:51
Q. This was the half an hour before you met with 16:17:57
Mr. Tadlock, isn't it? 16:18:00
A. I don't recall. I don't know. 16:18:05
Q. When you were talking about your nonprofit or 16:18:09
climate action, you wouldn't describe it as a "legal 16:18:15
call," would you? 16:18:17
A. I believe my understanding of Whitney's 16:18:21
vision here is a pre-huddle just before the legal 16:18:26
call, not about the legal call. 16:18:31
Q. You don't remember talking to her about what 16:18:36
your strategy should be in talking about Hydroflask 16:18:38
and Pattie Gonia's plans before you got on the phone 16:18:42
with Mr. Tadlock? 16:18:45
A. No. 16:18:46
Q. You did go ahead then and meet with 16:19:04
Mr. Tadlock; correct? 16:19:09
A. Are you saying on this day or when? 16:19:15

Page 225

Q. I'll show you the documents later, but I'll represent to you that they recount a discussion on February 9, 2022. 16:19:19 16:19:21 16:19:25
So, yes, on that day, did you go ahead and meet with Mr. Tadlock and some representatives from Hydroflask? 16:19:30 16:19:34 16:19:37
A. I believe so. 16:19:39
Q. Okay. Do you remember what happened on the call? 16:19:41 16:19:44
A. I do not remember details or specifics. But I do remember walking away from that conversation with like a clear understanding of like what Patagonia cares about, not just in the Hydroflask partnership but with all third-party partnerships, which we had no problem agreeing to because we were already operating in that way, and we continued to do so. 16:19:47 16:19:53 16:19:59 16:20:05 16:20:08 16:20:13 16:20:17
And I will say that like my understanding leaving that call was also that like everything outside of third-party partnerships was my artistic work and my activism. Like stuff with merch and stickers were fine before, and Patagonia never objected to that on this call or at that time. 16:20:22 16:20:25 16:20:29 16:20:33 16:20:39 16:20:44
Q. Did you -- do you remember specifics that were discussed or do you remember only the impression that you had coming away from the call? 16:20:49 16:20:55 16:20:57

Page 226

A. I remember -- I remember arriving at that understanding by the end of the call that I just mentioned to you. 16:21:00 16:21:06 16:21:08
Q. Did you have any discussion in the call about stickers? 16:21:08 16:21:13
A. I don't recall specifically. 16:21:16
Q. Did you have any discussion in the call about logos? 16:21:18 16:21:20
A. To the best of my knowledge, I had discussion around -- centered mostly around not putting the name Pattie Gonia on product, which we had never done before and didn't do in this partnership and haven't done since, as it was our clear understanding that Patagonia cared about that and we had no problem agreeing to that because we hadn't done it and didn't do it. 16:21:26 16:21:30 16:21:36 16:21:40 16:21:42 16:21:49 16:21:51 16:21:53
Q. You mentioned that you came away with the understanding that this call that you had was not just about Hydroflask. It was something that you believed set an understanding about all of your third-party partnerships; is that correct? 16:21:54 16:21:56 16:21:59 16:22:03 16:22:10
A. That's correct. It was a general understanding -- because it was not a signed agreement. It was a general understanding of what my work with third parties could be without being a 16:22:11 16:22:12 16:22:16 16:22:18

Page 227

problem. 16:22:22
Q. Have you ever taken any opposite position that the call that you had with Mr. Tadlock was only about the Hydroflask partnership and didn't have any bearing on your future activities? 16:22:25 16:22:30 16:22:34 16:22:36
A. I do not recall, but I want to assert that like the agreement and understanding was not saying what I could or couldn't do as to my persona, my drag persona. That was prettily separate. This was only pertaining to third-party partnerships. 16:22:42 16:22:44 16:22:50 16:22:55 16:22:59
Q. And what did Mr. Tadlock said that led you to have that understanding? 16:23:00 16:23:03
A. What is written in his E-mail communication. 16:23:05
Q. Okay. So it wasn't something that you came away from -- that you specifically recall from the conversation. It's something that you came away from now having the written communications that came after? 16:23:09 16:23:11 16:23:13 16:23:15
A. It's a mix of both. Both conversations and the E-mails. 16:23:20 16:23:25
Q. Okay. And you don't remember ever taking the position that as respects to this partnership, that it only had to do with the Hydroflask portion? 16:23:27 16:23:29 16:23:32
A. I believe I've answered this. 16:23:40
Q. I'm giving you a chance to answer it differently. 16:23:44 16:23:46

Page 228

Did you ever take the position that this conversation you had with Patagonia and Mr. Tadlock only had to do with the Hydroflask partnership? 16:23:46 16:23:49 16:23:52
A. I -- I believe I've said what I need to say here. 16:24:12 16:24:14
MR. GILCHRIST: Okay. This is a digression, but if you look at Exhibit 59 -- 16:24:16 16:24:22
I need to load some more exhibits. 16:24:25
(Deposition Exhibit 59 was marked for identification.) 16:24:29 16:24:29
BY MR. GILCHRIST: 16:24:29
Q. If you look at Exhibit 59, you'll see the Complaint, and if you want to look at Page 4, you can see some comments. I promised you that I would let you look at it. 16:24:29 16:24:32 16:24:34 16:24:39
My question then and is now whether you remember what you did to look for these comments that you didn't find? 16:24:39 16:24:43 16:24:48
A. On Page 4 of the document? 16:24:55
Q. Yes. 16:24:57
A. Okay. So what about it. 16:25:01
Q. I promised you I'd show you the Complaint. My question had been in response to our interrogatories you had said that you were not able to find the posts that were shown on Page 4 of the 16:25:02 16:25:04 16:25:07 16:25:10

Page 229

Complaint, and my question was what you did to look 16:25:14
for them. 16:25:16
A. Just in general, searches on our social media 16:25:18
in general, and like my due diligence search. 16:25:21
Q. Okay. And when you say your searches on 16:25:25
social media, you're talking about manually looking 16:25:28
through comments; right? 16:25:31
A. Yes. 16:25:35
Q. Okay. 16:25:36
A. Also, it's important to note for the record, 16:25:38
that oftentimes, Instagram, after a certain length of 16:25:41
time the posts have been up, won't even show you all 16:25:45
of the comments on a post. Like it will glitch out, 16:25:48
and you can only see like a couple hundred before it 16:25:52
just like will glitch because they don't steward their 16:25:58
servers well. 16:26:04
Q. Okay. 16:26:05
THE WITNESS: Would you like me to open up 16:26:16
Exhibit 60? 16:26:18
(Deposition Exhibit 60 was marked for 16:26:20
identification.) 16:26:20
MR. GILCHRIST: You can if you want to. I'm 16:26:20
trying to load a few more. 16:26:22
In fact, let's take a five-minute break so 16:26:25
that I can do this more efficiently so you don't have 16:26:26



to wait for me every time. 16:26:29
THE WITNESS: Okay. 16:26:30
THE VIDEOGRAPHER: We are off the record. 16:26:31
The time is 4:26 p.m. 16:26:36
(A recess was taken from 4:26 p.m. 16:34:29
to 4:34 p.m.) 16:34:29
THE VIDEOGRAPHER: We are back on the record. 16:34:31
The time is 4:34 p.m. 16:34:32
BY MR. GILCHRIST: 16:34:35
Q. If you could look at Exhibit 60, Mr. Wiley. 16:34:35
A. Uh-huh. 16:34:41
Q. You mentioned that there was follow-up 16:34:46
correspondence after your meeting with Mr. Tadlock. 16:34:47
I'm showing you an E-mail dated Wednesday, February 9, 16:34:50
2022 from Mr. Tadlock to you, Mr. Vieira and 16:34:54
Mr. Makris. 16:35:01
Do you see that? 16:35:04
A. I do. 16:35:07
Q. And Jenny was also at the meeting; correct? 16:35:11
A. I don't recall. 16:35:13
Q. Okay. Do you remember that Mr. Vieira and 16:35:16
Mr. Makris were both at the meeting? 16:35:20
A. I remember Ms. Vieira, Robin. 16:35:26
Q. Sorry. 16:35:30
A. No. You're good. 16:35:32



And then I remember him, but I don't 16:35:35
necessarily remember him. I can't say whether he was 16:35:38
on or off the call. From this E-mail, it looks like 16:35:43
he was. 16:35:52
Q. And there's a discussion in here about 16:35:56
Patagonia's lack of objection "to the relationship 16:36:06
between Hydroflask and Pattie Gonia, in particular the 16:36:08
work described in your email last week Robin." 16:36:10
Do you see that? 16:36:13
A. Uh-huh. 16:36:15
Q. And do you know what work was described by 16:36:16
Robin prior to the call? 16:36:18
A. I cannot recall specifically. 16:36:22
Q. And I take it you don't recall what was 16:36:29
specifically discussed at the meeting about the work 16:36:31
you were going to be doing with Hydroflask? 16:36:32
A. I remember some parts. 16:36:39
Q. What parts do you remember? 16:36:42
A. The parts that are laid out here by Rob in 16:36:44
the meeting summary. 16:36:49
Q. Okay. These are things that you're not going 16:36:58
to be doing in the work. I understood that -- let me 16:37:00
ask you this: Did the work that you were going to be 16:37:04
doing with Hydroflask get discussed at the meeting, to 16:37:10
your recollection? 16:37:14



A. Yes, my work with Hydroflask and also like 16:37:19
all third party brand partners. 16:37:22
Q. Okay. So Mr. Tadlock says, "Patagonia has no 16:37:24
objection to that, in particular related to the work 16:37:32
described in" the E-mail, "but we do asks" -- he makes 16:37:33
a typo, "that the parties," and then he has three 16:37:38
things; correct? 16:37:41
A. Yes. 16:37:44
Q. And am I correct, in understanding your 16:37:44
testimony, that these three things did not just apply 16:37:47
to Hydroflask. You understood them to apply to 16:37:50
everything? 16:37:53
A. My clear implication and understanding of 16:37:58
Rob's E-mail was that this is what Patagonia cares 16:38:01
about and what should we avoid doing, not just unique 16:38:04
to Hydroflask but to all third parties. I followed 16:38:10
that before. I followed that then with Hydroflask. I 16:38:14
followed it since. I have no problem with this. It 16:38:18
was like we haven't done that. 16:38:22
But my clear understanding, walking away from 16:38:24
this conversation, was that I could to my artistic 16:38:27
stuff in my future separately. And Patagonia never 16:38:29
objected to it. In fact, they supported it. 16:38:37
Q. The first thing that Mr. Tadlock confirms is 16:38:46
that the parties will "Not use or otherwise display 16:38:48

content that was a part of the partnership at all. If 16:51:09
anything, that would have been a personal choice for 16:51:11
me outside of my business, to place fan art that I 16:51:13
liked on my personal water bottle. 16:51:20
Q. If you ever actually -- you know, how you can 16:51:23
tag a person in a photograph with their name? Have 16:51:31
you ever tagged a Hydroflask bottle with Hydroflask in 16:51:35
one of your posts? 16:51:40
A. I do not recall. 16:51:42
MR. GILCHRIST: Okay. Let me ask you to look 16:51:43
at Exhibit 67, which does not appear to have a stamp 16:51:45
for some reason. 16:51:54
(Deposition Exhibit 67 was marked for 16:52:01
identification.) 16:52:01
MR. SCRENCI: It looks like it's on the 16:52:01
second page, Greg. 16:52:02
MR. GILCHRIST: Okay. Can you look at this 16:52:04
exhibit, Mr. Wiley, and I'm really just trying to 16:52:11
orient you timewise. 16:52:18
Q. Is this the first time that you offered 16:52:19
merchandise -- 16:52:22
A. Are you asking about Exhibit 67? 16:52:25
Q. Yes. So approximately September 2024 was 16:52:27
when you had your first drop of merchandise; is that 16:52:35
right? 16:52:39

Page 242

A. Yes. 16:52:42
Q. And this was after your conversation with 16:52:46
Mr. Tadlock; correct? 16:52:47
A. Yes. 16:52:50
Q. And you would agree that Pattie Gonia appears 16:52:51
in any form at least on some of the merchandise; 16:52:53
correct? 16:52:57
A. Yeah. My merchandise is not a part of 16:52:57
third-party partnerships. My merchandise is marketed 16:53:00
to my fans specifically. 16:53:05
Q. All right. 16:53:10
A. And also -- 16:53:11
Q. You don't disagree that some of your 16:53:12
merchandise has Pattie Gonia on it; right? 16:53:15
A. Some of my merchandise has Pattie Gonia on 16:53:17
it, not using the belwe font, using custom Kilimanjaro 16:53:19
font. 16:53:26
Q. The merchandise is sold -- at least it was 16:53:31
sold at PATTIEGONIAMERCH.COM; correct? 16:53:36
A. I can check if that's the web address. I 16:53:44
don't want to verify until I check that. 16:53:47
Do you want me to do that? 16:53:49
Q. No. I'll represent to you that at first, 16:53:50
that was the website, and my question really is that 16:53:53
other than on the website, was the first drop 16:53:57

Page 243

distributed anywhere else? 16:54:01
A. No. 16:54:05
Q. And you've had subsequent drops of 16:54:07
merchandise; is that right? 16:54:13
A. Yes. We sell merchandise at our shows. 16:54:14
Q. Was that true of the first drop, or did that 16:54:17
sell through on the website? 16:54:20
A. I do not recall. 16:54:22
Q. Okay. And how is the product displayed and 16:54:23
distributed at the shows? 16:54:27
A. It is displayed and distributed in artist 16:54:30
merch booth at shows that are very standard for any 16:54:33
touring musical artist in which you sell T-shirts to 16:54:36
your fans specifically. 16:54:42
Of note, I'm not trying to compete with the 16:54:46
brand Patagonia. I'm not selling it on racks next to 16:54:49
Patagonia branded things. Merch is for my fans. It's 16:54:55
fan engagement. 16:55:00
Q. Are they sold at booths where stickers might 16:55:01
be given out? 16:55:05
A. I do not recall. 16:55:07
MR. GILCHRIST: Okay. Let me ask you to look 16:55:09
at Exhibit 68. 16:55:27
(Deposition Exhibit 68 was marked for 16:55:28
identification.) 16:55:29

Page 244

THE WITNESS: Okay. 16:55:29
BY MR. GILCHRIST: 16:55:41
Q. And I'll represent to you that this is a 16:55:41
compilation of E-mails that were exchanged between you 16:55:43
and Patagonia that tags onto the string of E-mails 16:55:45
that we were already looking at. 16:55:48
So I would ask you to go to the first E-mail 16:55:52
after Jenny's E-mail, which is dated February 10, 2025 16:55:57
from Mr. Tadlock to you. 16:56:05
A. What page are you on? 16:56:09
Q. I think that I'm on -- 16:56:11
MR. SCRENCI: It's 2 or 3. 16:56:17
BY MR. GILCHRIST: 16:56:18
Q. If you find the pictures and you go up from 16:56:18
there, you will see the beginning of Rob's E-mail. 16:56:20
A. The one that starts with "I hope you are 16:56:32
well"? 16:56:34
Q. Yes. 16:56:34
A. Okay. 16:56:35
Q. You received that E-mail; correct? 16:56:38
A. Our E-mail account received that E-mail, yes. 16:56:41
Q. Did you get it and read it? 16:56:44
A. To the best of my knowledge, I believe so. 16:56:49
Q. And Rob summarizes the three things he had 16:56:59
said before; correct? 16:57:03

Page 245

A. Yes. Something that is important to note is 16:57:14
that the screenshots, the way they're put together is 16:57:16
very misleading to the Court because these are from 16:57:18
two completely separate E-mails. 16:57:21
One is for our yearly fundraiser, of which 16:57:22
Patagonia, the brand, supported and never had a 16:57:27
problem with the stickers. 16:57:29
And the second is our merch. So they were 16:57:30
not together. Those were separate. 16:57:32
Q. You say that Patagonia never had a problem 16:57:37
with the stickers. 16:57:41
Isn't it true that Mr. Tadlock's E-mail in 16:57:43
2022, and again here in 2025, said that you would not 16:57:47
use or otherwise display Patagonia's logos or any 16:57:51
substantially similar designs, and that you would not 16:57:55
use the belwe font, both of which are used in the 16:57:58
stickers? 16:58:01
MR. SCRENCI: Objection. Form. 16:58:02
You can go ahead and answer. 16:58:03
THE WITNESS: That was my understanding with 16:58:04
third-party partnerships, not my artistic persona in 16:58:06
drag or my fundraising efforts, of which Patagonia's 16:58:09
own CEO supported on stage publicly after the news 16:58:12
about the lawsuit had dropped. Very publicly 16:58:17
supported, and they wouldn't interfere with that. 16:58:21

Page 246

MR. GILCHRIST: Move to strike as 16:58:25
nonresponsive. 16:58:26
Q. Did you or did you not agree to the things 16:58:27
that Mr. Tadlock said in his E-mail? 16:58:31
MR. SCRENCI: Objection to form. Which 16:58:35
E-mail? 16:58:37
BY MR. GILCHRIST: 16:58:39
Q. The one in 2022. 16:58:39
A. I don't recall. 16:58:45
Q. Okay. You don't recall now whether you 16:58:46
agreed? Before, I thought it was clear that you did 16:58:48
agree. 16:58:52
A. I feel like you're trying to get a certain 16:58:52
response out of me, and I have responded to the best 16:58:55
of my knowledge. 16:58:58
Q. Okay. Well, you've said that there are a 16:58:59
bunch of -- I'm not trying to put words in your mouth, 16:59:02
but as I am understanding your statement -- and we can 16:59:05
look back at the 2022 E-mails if you want. They're 16:59:09
right below here -- Mr. Tadlock says, "We do asks" -- 16:59:12
and there's a typo there -- "We do ask that the 16:59:21
parties" -- that would be you on the one hand and 16:59:22
Hydroflask on the other; right? 16:59:25
Do you agree with that? 16:59:27
A. That is correct. 16:59:28

Page 247

Q. -- "not use or otherwise display Patagonia's 16:59:30
logos." 16:59:34
And then further up in the E-mail string he 16:59:34
clarifies that he's talking about Patagonia's logo or 16:59:41
any substantially similar designs, like the logo that 16:59:43
Pattie has used with the mountain silhouette and the 16:59:50
belwe font. Did you not understand that language to 16:59:53
apply to Mr. Maddox's design? 16:59:55
A. That is in the context of third-party 17:00:00
partnerships. 17:00:02
Q. Where does Mr. Tadlock say that "I'm not 17:00:03
limiting this to the Hydroflask partnership. I'm 17:00:08
extending it to third-party partnerships, but I'm not 17:00:12
extending it to Pattie's or independent of 17:00:15
partnerships"? 17:00:19
A. I'm telling you my clear understanding, 17:00:20
walking away from that conversation and Rob's E-mails, 17:00:21
along with Patagonia's actions and/or lack of actions 17:00:25
since, with countless partnerships and countless 17:00:29
times, that these stickers have been distributed and 17:00:32
never sold in support of environmental causes. 17:00:36
Q. Okay. And taking you -- taking that, if 17:00:40
there was any question that you had after 2022 that he 17:00:45
was referring to your stickers and your use of them, 17:00:50
did you not clarify that in 2025 when he wrote you 17:00:54

Page 248

this letter with a picture of the sticker? 17:00:57
A. I do -- I can acknowledge that that's what he 17:01:12
E-mailed us. Nothing else. 17:01:27
Q. All right. And I assume that you're saying 17:01:30
that you could use the belwe font however you wanted 17:01:33
to as long as you called it artistic expression, but 17:01:36
you agreed you wouldn't use the belwe font in 17:01:41
connection with third-party partnerships. 17:01:44
Is that your understanding? 17:01:46
A. I did not use the belwe font. It was fan art 17:01:46
that I had distributed for free. The belwe font, of 17:01:50
note, does not appear anywhere on our merch, nor has 17:01:52
it ever nor will it ever nor does the brand name 17:01:55
Patagonia. My name, Pattie Gonia, is on my merch, 17:01:59
along with the use of the custom font Kilimanjaro. 17:02:03
Q. That's third thing Mr. Tadlock thought he had 17:02:08
reached agreement with you on in 2022 was that you 17:02:14
would not use Pattie Gonia in any form on product; is 17:02:17
that right? 17:02:21
A. Product with third-party partners, not with 17:02:21
my artistic expression and my merch. Again, my merch 17:02:24
is for my fans. I'm not trying to compete with 17:02:27
Patagonia nor confuse anyone. 17:02:36
And of note, my merch upcycles T-shirts 17:02:38
heading for landfills that have other designs 17:02:41

Page 249

underneath them. 17:02:44
Q. Patagonia sells product that's been reworked 17:02:46
or recycled as well, don't they? 17:02:51
A. I have no knowledge of that. 17:02:53
Q. You don't? 17:02:55
A. Nope. 17:02:57
Q. Okay. All right. You agree that the 17:02:58
T-shirts and sweatshirt that you sell as merch under a 17:03:04
Pattie Gonia label is more competitive than 17:03:09
Hydroflask's products, would you not? 17:03:12
MR. SCRENCI: Objection. Calls for a legal 17:03:15
conclusion. 17:03:17
You can answer if you know. 17:03:18
THE WITNESS: I do not understand what you're 17:03:23
asking. 17:03:24
BY MR. GILCHRIST: 17:03:25
Q. I'm asking if T-shirts and sweatshirts are 17:03:25
more competitive with Patagonia's products than water 17:03:27
bottles? 17:03:30
MR. SCRENCI: Objection to the form. 17:03:32
Misstates the prior question. 17:03:33
You can answer to the extent you understand. 17:03:34
THE WITNESS: I do -- I would not be able to 17:03:37
say. 17:03:40
(Pause.) 17:05:42

Page 250

BY MR. GILCHRIST: 17:05:43
Q. Okay. Further up in the string, you 17:05:43
understood that Mr. Tadlock was gently complaining 17:05:45
that all three things that were in the letter from 17:05:53
2022, in his understanding, were not being followed by 17:05:55
Pattie Gonia; is that right? 17:05:58
A. No. My understanding of his E-mail was that 17:06:00
he did a poor job his first time around. 17:06:02
Q. Okay. 17:06:18
A. Let me be clear. He did a poor job of 17:06:18
communicating and he did a poor job presenting the 17:06:20
brand. 17:06:25
Q. Okay. And -- never mind. 17:06:27
You wrote back to Mr. Tadlock; correct? 17:06:28
A. Could you remind me what exhibit we're on? 17:06:32
Q. 68. 17:06:35
A. Thanks. Let me pull it up. 17:06:39
Okay. I am there. 17:06:46
Q. All right. Do you see Mr. Tadlock's E-mail 17:06:50
February 10, 2025, and then above that is what I'm 17:06:56
calling or assuming is your response? 17:07:02
A. Yes. What page are we on again, please? 17:07:04
Q. It's on one -- your E-mail starts at the 17:07:07
bottom of the first page. 17:07:11
A. Okay. Yes, I'm here. 17:07:19

Page 251

Q. All right. And you're saying you're here 17:07:20
with Jenny, who you met on Zoom. 17:07:21
Did she participate in preparing this 17:07:23
response? 17:07:24
A. I do not recall. 17:07:25
Q. Did anybody else participate in helping you, 17:07:27
and if it was a lawyer don't tell me anything that 17:07:29
your lawyer told you. 17:07:32
A. I do not recall. 17:07:34
Q. Do you remember anybody else helping you with 17:07:45
this letter? 17:07:47
A. I do not recall. 17:07:49
Q. Okay. All right. You say you were just 17:07:51
about to reach out to Patagonia about Lost Arrow. 17:07:55
Do you see that? 17:08:03
A. I do see that part of that E-mail. 17:08:04
Q. What research had you done about Lost Arrow 17:08:07
that you were about to reach out about when you 17:08:10
received this E-mail from Mr. Tadlock? 17:08:12
A. I don't recall. 17:08:14
Q. Had you done any research about Lost Arrow 17:08:22
and Patagonia's relationship with it? 17:08:27
A. I don't recall. 17:08:29
Q. Lost Arrow had been sold by Patagonia three 17:08:30
years before Mr. Tadlock's letter; correct? 17:08:33

Page 252

A. I don't recall. 17:08:38
Q. Okay. Were you actually about to reach out 17:08:39
to Patagonia about Lost Arrow, or were you just saying 17:08:43
that in connection with responding to this letter? 17:08:47
A. I don't recall. 17:08:50
Q. Okay. Further down, you say, "In summary: 17:08:55
There's plenty of room for us both to play in this 17:09:11
play box. We trust that the brand Patagonia will stay 17:09:15
on their side." 17:09:21
Do you see that? 17:09:22
A. I do see that. 17:09:22
Q. Where did you expect -- what part of the play 17:09:24
box did you expect Patagonia to stay out of? 17:09:26
A. I don't recall. 17:09:31
Q. Okay. 17:09:33
A. This is of note, though. Rob did tell us on 17:09:43
Zoom calls with him that him and his daughter were big 17:09:48
fans of Pattie. So we did, you know, out of the 17:09:52
kindness of my heart offer him tickets to a show, as I 17:09:55
can see the bottom of this E-mail. 17:09:59
Q. You remember Mr. Tadlock saying that he and 17:10:01
his daughter were fans; is that correct? 17:10:04
A. Yeah. I remember that from one of our first 17:10:07
calls. 17:10:09
Q. Okay. Do you think that he could be a fan 17:10:11

Page 253

trademark? 17:16:15
MR. SCRENCI: So I'm going to make the same 17:16:17 objections again as to scope. If you want testimony 17:16:18 about this, Ms. Dugan is the one who's designated for 17:16:22 it. 17:16:27
BY MR. GILCHRIST: 17:16:28
Q. Okay. And let me personalize it because I 17:16:28 agree she was the one designated on this. 17:16:39
Did you provide Mr. Jonas with any factual 17:16:42 information regarding your use of the brand on 17:16:45 different goods and services? 17:16:48
MR. SCRENCI: Same objection. 17:16:51
And you can testify either "yes" or "no" to 17:16:51 the extent that you recall in your personal capacity. 17:16:55
THE WITNESS: I do not recall. 17:17:00
BY MR. GILCHRIST: 17:17:01
Q. Okay. Was Jenny the one who was responsible 17:17:01 within the company to deal with this trademark 17:17:05 application? 17:17:11
A. Yes. 17:17:14
Q. Okay. Did you discuss with anyone else, 17:17:15 other than Jenny, the advisability of applying for a 17:17:20 trademark? 17:17:25
A. I do not recall. 17:17:31
Q. Did you understand that applying for the 17:17:35



trademark meant that you would have the exclusive 17:17:36 right to use Pattie Gonia on those goods and services 17:17:38 that were listed on your application? 17:17:42
A. I do not -- 17:17:44
MR. SCRENCI: Objection. Okay. Well, it's 17:17:45 been answered. 17:17:48
BY MR. GILCHRIST: 17:18:03
Q. Did you review the application before it was 17:18:03 filed? By "you," I mean you personally? 17:18:04
A. I don't recall. 17:18:09
Q. Okay. If you scroll down to Page 7, PDF 17:18:11 Page 7. 17:18:23
A. On Exhibit 70? 17:18:25
Q. Yep. 17:18:27
A. Okay. 17:18:29
Q. Did you see some sticker packs? 17:18:31
A. I do. 17:18:33
Q. Were these distributed? 17:18:36
A. Yes. 17:18:41
Q. When? 17:18:43
A. I don't recall. 17:18:44
Q. Were they distributed continuously for any 17:18:46 period of time? 17:18:50
A. I think this is a pretty limited run of the 17:18:53 sticker pack. 17:18:56



Q. Do you remember in what year they were 17:19:00 limitedly distributed? Distributed on a limited 17:19:05 basis? 17:19:10
A. I don't recall. 17:19:12
Q. Is there a reason that you used this sticker 17:19:20 pack, that you used the stickers? 17:19:21
A. Yes, because this would have been a sticker 17:19:25 pack that we actually sold, not gave away as a part of 17:19:27 our fundraisers. 17:19:30
Q. Okay. So you were selling sticker packs with 17:19:32 Pattie Gonia on them? 17:19:38
A. I do not recall. 17:19:40
Q. Okay. Do you know whether this sticker pack 17:19:43 was sold or not? 17:19:46
A. I don't recall. 17:19:49
Q. All right. Do you know when this sticker 17:19:50 pack was produced and distributed? 17:20:03
A. I don't recall. 17:20:07
Q. Was it before Jenny was involved with the 17:20:08 company? 17:20:10
A. To the best of my knowledge, no. 17:20:15
Q. Okay. Was it before the pandemic? 17:20:18
A. No. 17:20:25
Q. So it was after the pandemic? 17:20:29
A. To the best of my knowledge, yes. 17:20:32



Q. Okay. And then you've got a -- there's a 17:20:34 page of a website. "PATTIE GONIA MERCH." 17:20:47
Are those exemplary products that were being 17:20:56 offered? 17:21:00
MR. SCRENCI: Objection. Calls for a legal 17:21:03 conclusion. Outside the scope. 17:21:04
You can answer to the extent you know in your 17:21:07 personal capacity. 17:21:09
MR. GILCHRIST: I'm not sure what the 17:21:12 objection was. Given the objection, I'm going to try 17:21:13 again. 17:21:15
Q. I'm just asking if this image displays 17:21:17 examples of merchandise that you were selling? 17:21:21
MR. SCRENCI: That solves my objections. 17:21:28 Thank you, Greg. 17:21:30
MR. GILCHRIST: Okay. 17:21:30
THE WITNESS: Yes. This is a photo of our 17:21:42 merch store. 17:21:44
BY MR. GILCHRIST: 17:21:45
Q. If I understand the merch store correctly, 17:21:45 somebody will place an order for a size and a color, 17:21:49 and then they get what they get; is that correct? 17:21:52 They're not all the same; right? 17:21:55
A. Yeah. So for further clarification, we take 17:21:59 T-shirts and sweatshirt that are heading for 17:22:02

incineration in landfills, and we upcycle them by 17:22:05
screen printing a new design over them. And to the 17:22:09
best of my knowledge, people can pick a color and a 17:22:13
size, and they are given some sort of an item that 17:22:15
fits that color and size. 17:22:23
Q. Okay. So, for example, the yellow one 17:22:25
doesn't have another print that's superseded by your 17:22:33
print; correct? 17:22:39
A. In that photo, another underlying design does 17:22:42
not look present but it doesn't mean that it's not 17:22:47
present. It could be on the back. It could just be a 17:22:50
basic shirt that had no logo on it that was heading 17:22:55
for incineration. Like they don't all have other 17:23:00
print underneath. 17:23:02
Q. At some point did you make an arrangement 17:23:06
with Carhartt or any other brand to supply raw 17:23:07
materials for your upcycled merchandise? 17:23:18
A. We have used what's called "factory seconds" 17:23:22
in which we clarify that on the site as a different 17:23:28
product, where factory seconds that are oftentimes 17:23:32
sitting in warehouses, unused, because of incorrect 17:23:36
stitching or another quote/unquote "defect" that we 17:23:43
don't see as a defect. 17:23:45
We will take and utilize those already 17:23:47
existing products to upcycle them into my merch as 17:23:49



well. 17:23:53
Q. Okay. 17:23:54
A. We've never had a specific like arrangement 17:23:55
with a brand like Carhartt, to the best of my 17:23:58
knowledge. We have bought factory second Carhartt 17:24:05
T-shirts from other like wholesalers. 17:24:10
Q. Okay. Who's responsible for sourcing the 17:24:13
product? 17:24:22
A. Me, Jenny, and occasionally Macayla. 17:24:23
Q. And what outside resources do you use to find 17:24:33
opportunities to buy worn apparel? 17:24:37
A. Our personal relationships with thrift shops 17:24:40
here in Bend, Oregon, where we live, so that there's 17:24:42
the least amount of carbon footprint involved, or via 17:24:46
like simple Internet searches to like factory seconds, 17:24:51
factory misprints, whatever. 17:24:57
Q. Okay. If it's a second quality product, you 17:25:01
do something to denote that on your website? 17:25:05
A. "It's a second quality product"? What do you 17:25:09
mean? 17:25:13
Q. Well, a product that was rejected by -- for 17:25:13
example, when you were describing Carhartt, you said 17:25:15
you were getting factory seconds. I assumed that that 17:25:18
meant that it had been rejected as a first quality 17:25:20
product by Carhartt. 17:25:24



A. Yes, again, so I never had like a direct 17:25:28
exact relationship with at a -- 17:25:34
(Indiscernible cross-talk.) 17:25:40
THE WITNESS: -- but to answer your question, 17:25:40
to the best of my knowledge, they are listed as 17:25:42
different categories of items because people either 17:25:45
really love the screen print underneath, or they 17:25:45
really don't. 17:25:48
BY MR. GILCHRIST: 17:25:50
Q. Okay. Do they get a choice, when they're 17:25:50
buying, about whether your artwork is superimposed or 17:25:52
appears over top of a screen print with another brand? 17:26:04
A. I'm confused as to the question. 17:26:07
Q. I'm just asking if people get a choice about 17:26:09
whether the original shirt was blank or had some other 17:26:11
logos on it? 17:26:15
A. You mean they get the choice if they a pick a 17:26:17
factory second or a -- I forget exactly what we call 17:26:23
it, like an upcycled vintage shirt or sweatshirt. 17:26:25
Q. Who did the artwork for the Pattie Gonia 17:26:29
hiking club design? 17:26:33
A. Jordy did. He's the owner of Dave's 17:26:35
Printing, who we print with. 17:26:44
Q. Did you provide any input on how you wanted 17:26:45
the design to look? 17:26:47



A. I believe I provided feedback to the design. 17:26:49
Q. Were there other designs that you considered? 17:26:54
A. I don't recall. 17:26:59
Q. Okay. You also include stickers with this 17:27:00
image on them now in your sticker packs; is that 17:27:06
right? 17:27:18
A. In some of the sticker packs, I believe so. 17:27:18
Q. Now, I know that on the PATTIEMERCH.COM 17:27:20
website now, the product is indicated as sold out. 17:27:23
Are you still selling the product at shows? 17:27:29
A. As a courtesy and a gesture of good faith to 17:27:35
try to amicably resolve this lawsuit, we have closed 17:27:42
our online web store. I do not believe I have to do 17:27:47
that, but I did do that out of gesture of good faith. 17:27:50
We do sell merch at our shows still, to our 17:27:54
fans as it is fan engagement at shows. 17:27:59
Q. You have a -- you have a new website 17:28:16
address -- or a website with a new address -- is that 17:28:19
correct? -- for merchandise? PATTIEMERCH.COM? 17:28:22
A. Yes. As another gesture of good faith, and 17:28:28
as we've mentioned in public efforts to try to resolve 17:28:31
this case, we have had no problem renaming our merch 17:28:33
store from Pattie Gonia Merch to Pattie Merch. 17:28:36
Q. Do you still use the Pattie Gonia Merch logo 17:28:44
in any context? 17:28:49