# EXHIBIT 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATAGONIA, INC., | ) |
| | ) |
| Plaintiff(s), | ) Case No.: |
| | ) 2:26-cv-00586-RGK-RAO |
| vs. | ) |
| | ) |
| ENTREPRENEUR ENTERPRISES, INC., DBA PATTIE GONIA PRODUCTIONS, AND WYN WILEY, | ) |
| | ) |
| Defendants. | ) |

CONTAINS HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY INFORMATION
VIDEOTAPED VIDEOCONFERENCE
DEPOSITION OF JENNY DUGAN
WEDNESDAY, OCTOBER 14, 2026

Reported by:
Monice K. Campbell, CA CCR No. 14171, RMR, CRR
Job No.: 8499551

any other d/b/a other than Pattie Gonia 09:43:06
Productions?
A Not currently.
Q Did it in the past?
A Yes. But I wasn't there then, so I 09:43:16
don't know about that stuff.
Q What was it called in the past?
A You'd have to ask Wyn. I don't
know.
Q Is Entrepreneur Enterprises a member 09:43:39
of 1% for the Planet?
THE COURT REPORTER: A member of 1%
of what?
BY MR. GILCHRIST:
Q Sorry. 1% for the Planet. 09:43:47
A I do not believe so.
Q Do you have any ownership stake in
Entrepreneur Enterprises?
A No.
Q Do you have any responsibility to 09:44:19
determine whether or not there should be any
shareholder distributions from the company?
A I'm not sure -- I don't understand
the question.
Q Well, for example, if Entrepreneur 09:44:30



Enterprises makes a couple hundred thousand 09:44:34
dollars in a year, and it's in the -- after
the employees have all been paid, there's
still $200,000 sitting in the bank account,
do you make a decision about whether or not 09:44:46
to distribute that to Wyn or is that Wyn's
decision?
MR. SCRENCI: Objection to
foundation.
You can answer. 09:44:55
BY MR. GILCHRIST:
Q Obviously, that's a hypothetical. I
don't know how much money is sitting in the
account.
A That would be Wyn's decision. 09:44:59
Q Have you ever processed any
distributions to Wyn from the company outside
of his ordinary wages?
A No.
Q Do -- strike that. 09:45:15
How many employees are there of
Entrepreneur Enterprises?
MR. SCRENCI: I'm just going to
object to the extent it calls for legal
knowledge, but you can answer if you 09:45:28



understand. 09:45:29
THE WITNESS: Including Wyn, I
believe that would be four.
BY MR. GILCHRIST:
Q Is that Wyn, yourself, Grace, and 09:45:35
Michaela?
A Yes.
Q And do Michaela or Grace have job
titles or discrete job responsibilities?
MR. SCRENCI: Objection to form. 09:46:04
You can answer.
THE WITNESS: What does that mean,
Rocco, "Objection to form, you can answer"?
MR. SCRENCI: Sorry. Like Greg said
at the beginning of the deposition, I'll be 09:46:15
objecting. Unless I say "Don't answer
because this calls for privilege" or instruct
you to give a specific answer because of a
privilege concern, just ignore what my
objection is. It's a legal issue for me and 09:46:21
Greg to work out, not anything you need to
worry about.
THE WITNESS: Got it.
I believe we call them both
production assistants, but it's not like a 09:46:30



formal title. 09:46:34
BY MR. GILCHRIST:
Q And irrespective of title, do they
have particular job responsibilities?
A Yes. 09:46:45
Q What are they for each of them?
A Grace is in charge of all wardrobe
and also makes costumes, repairs costumes,
upcycles and reuses costumes.
And then Michaela did customer 09:47:13
service for the merch store and manages
merchandise when we are at shows, and then
also does a lot of help with packing for
shows, helps on shoots.
Grace also helps on shoots. 09:47:43
Q What responsibility or oversight do
you have of the merchandise sales?
A Can you be more specific?
Q Sure.
You mentioned that Michaela has 09:48:03
responsibility for customers -- had or has
responsibility for customer service. I
assume what you were talking about was the
merchandise website, and I think you also
said she has responsibility for merchandise 09:48:20

going to assume yes. 11:03:13
Q All right. Were you responsible for gathering the documents of a financial nature for turning over in the lawsuit?
A Yes. 11:03:23
Q Is this Merch Sales P&L a report that is prepared ordinarily or was this something that was prepared specifically for the lawsuit?
A I don't remember. 11:03:42
Q Well, do you typically receive from the accountants a separate P&L related to the merchandise sales?
A No.
Q And I take it that that answer is 11:03:55 similar for events and visual merchandising or social media advertising, that you're not creating separate P&Ls for your review in the ordinary course of business?
A No. 11:04:11
Q Has there been any effort within the company to make sure that the merchandise is reasonably profitable?
A No. Unfortunately, no.
Q All right. Did you participate in 11:04:38

Page 74

setting the prices of the products? 11:04:39
A No.
Q Who decided the prices?
A Wyn.
Q Did you discuss setting prices with 11:04:47 Wyn?
A No.
Q Did you prepare any information about what it was going to likely cost to prepare to produce the products? 11:05:01
A We spoke about that, yes.
Q Is it correct that T-shirts were $48 and sweatshirts were $75?
A I don't know. I'd have to see a reference document to confirm that. 11:05:22
Q What merchandise other than T-shirts and sweatshirts and hoodies have been sold that goes into this "Merchandise Sold" line, if anything?
A I think one time we sold some 11:05:47 stickers, some like ski -- winter ski stickers.
Q When was that?
A I'd have to look back on Instagram when we posted about that. I'm sure you guys 11:06:01

Page 75

have that somewhere. 11:06:03
Q Was that a one-time thing?
A Yes.
Q Do you know how many stickers you sold? 11:06:15
A No.
Q And I take it that the Merch & Fulfillment line, like it was on the P&L for the company, is the cost of the raw material products as well as the cost of the vendor 11:06:43 who is fulfilling the orders?
A Yes.
Q Okay. And do I gather correctly that apart from operating a merch website, that there's no advertising of the 11:07:04 merchandise other than through social media channels?
A Correct.
Q Do you keep track of how much merchandise you're selling via the website 11:07:18 versus how much you're selling at shows?
A No, not personally.
Q How much merchandise -- can you explain, just in general terms, how a merchandise booth gets set up and how the 11:07:44

Page 76

goods get sent there and who makes the 11:07:47 decisions about how much to send for a show?
A Yeah. I mean, it's really different every show. Usually venues have an area within the venue that's set for merch, 11:07:58 because all traveling artists sell merchandise. So there's usually a place for that in venues.
And currently that would be Michaela's job to ship the merchandise to the 11:08:11 venue or bring it with us as luggage and then set it all up.
Q Are there any visual materials that are used in order to sell the merchandise?
A No. 11:08:29
Q And do you know what, if anything else, is offered or displayed at shows other than the T-shirts and the sweatshirts and the one-time stickers?
A Sorry. Say that again. 11:08:49
Q Well, for example, are there any giveaways that are available at the merch booth, like stickers?
A No.
Q So is there anything other than the 11:09:13

Page 77



Veritext Legal Solutions
866-299-5127 calendar-ca@veritext.com www.veritext.com

T-shirts and the sweatshirts that are on 11:09:13
display at the merch booth?
A Sorry. Can you hold? My dog is harassing me here. I think I'm going to have to let them out really quick. Sorry. 11:10:10
They're not going to stop unless I let them out.
MR. GILCHRIST: Go for it.
(Pause in proceedings.)
THE WITNESS: Okay. I'm back. 11:10:11
Sorry. Can you repeat that one more time?
MR. GILCHRIST: I don't remember my question.
Can you read it back for me, Monice? 11:10:19
(Record read as follows:
"Q. So is there anything other than the T-shirts and the sweatshirts that are on display at the merch booth?")
THE WITNESS: To my knowledge, we 11:10:37
have never sold sweatshirts at a show.
They're just too bulky to travel with. And our cohost stickers get sold there at the booth typically, and that is it.
/ / /



BY MR. GILCHRIST: 11:11:00
Q Who are the cohosts?
A Vera and Sequoia.
Q Can you explain their role in the show? 11:11:11
A They're cohosts of the show with Pattie.
Q Do they sell any other merchandise other than stickers?
A No. 11:11:22
Q How long has Vera and Sequoia been part of the show?
A I'm trying to think. Again, this goes back to how long have we been touring for. They've been part of the show since we 11:11:38
have had the official "SAVE HER!" tour.
Q Okay.
A Which I believe was last year and this year.
(Exhibit Number 78 was marked.) 12:03:21
BY MR. GILCHRIST:
Q Let me ask you to look at Exhibit 78 just quickly.
A Okay.
Q Do you have any intuition or 11:12:25



explanation for why the cost of goods sold in 11:12:27
'25 is virtually the same as '24 but the revenue is significantly less?
A It's probably just a mismatch of, you know, when we're -- again, I'm guessing 11:12:52
here, but if I had to guess, it would just be a mismatch of cash flows.
I think we could have bought and printed them in one year and so there was a lot of cost of goods sold there, and then, 11:12:55
you know, maybe they were in inventory to get sold the following year.
But, again, I'm just kind of guessing.
Q So all of these financial statements 11:13:15
that we've been looking at are all on a cash basis. Is that fair?
A Yes.
(Exhibit Number 79 was marked.)
BY MR. GILCHRIST: 12:04:44
Q I take it from your prior -- if you want, you can take a look at Exhibit 79 -- and let me ask you to look at it.
Discretionary.
A Okay. 11:13:46



Q This is the merchandise P&L that you 11:13:46
pulled for us in the lawsuit through May, is that right, for this year?
A Yeah.
Q And you indicated at some point 11:14:04
during your testimony that you're not really doing much in merch these days; is that right?
A Yes.
Q Is that because of the lawsuit? 11:14:10
MR. SCRENCI: I'm just going to instruct the witness not reveal any privileged communications.
THE WITNESS: Yes.
BY MR. GILCHRIST: 11:14:21
Q Did you participate in decisions to not continue merchandise sales after the lawsuit was filed --
A Yes.
Q -- on the website? 11:14:37
Don't -- as Mr. Screnci said, do not tell me anything that you discussed with your lawyers. But did you have discussions with Wyn about that decision?
A Yes. 11:14:48

BY MR. GILCHRIST: 12:03:03
Q Let me ask you to look at Exhibit 58. And just for this purpose, I'll show you the email in due course, but I'll represent to you that there are emails 12:03:25 corroborating that the conversation that you and Hydro Flask and Patagonia met occurred on February 9th, 2022. And this email or invitation apparently is for a meeting prior to that. 12:03:55
And so my question is whether you remember anything about a prelegal -- a pre-huddle on a legal call that you had with Wyn, yourself, and Whitney Clapper prior to meeting with Patagonia's lawyer? 12:04:12
A No, I really don't. Sorry.
MR. SCRENCI: Wait a second before you answer so I can object.
THE WITNESS: So sorry.
MR. GILCHRIST: Did you want to make 12:04:27 an objection?
MR. SCRENCI: The question's been answered, so...
BY MR. GILCHRIST:
Q All right. Do you remember talking 12:04:33



with Whitney Clapper about Hydro Flask's 12:04:39 concerns about Patagonia IP?
A I don't.
Q Have you talked to Whitney Clapper recently? 12:04:55
A No.
Q Have you ever talked to Whitney Clapper about the lawsuit?
A No, not that I remember.
Q Do you remember having a meeting 12:05:24 with Rob Tadlock from Patagonia?
A Yes.
Q And it was a telephone meeting?
A I think it was Zoom.
Q Who attended the meeting? 12:05:39
A I only remember Rob, but there might have been more people in there.
Q Who attended the meeting from Entrepreneur Enterprises?
A Wyn and I. 12:05:57
Q Did anybody come from Hydro Flask?
A I don't remember.
Q What do you remember about the meeting?
A I mean, I remember that we had it. 12:06:18



I remember that Rob was really friendly. I 12:06:20 don't -- I mean, you would have to ask me something more specific.
Q Well, I'm asking what was said at the meeting, if you remember. 12:06:30
A What we said at the meeting.
MR. SCRENCI: Objection. Foundation.
You can answer if you remember.
BY MR. GILCHRIST: 12:06:37
Q I can ask you more specifically.
What, if anything, was said about Hydro Flask's reasons for wanting the meeting?
Whether you said it or Hydro Flask 12:06:47 said it, what was said about why you were meeting?
A I don't remember any specific words around any of that. I just -- I know that we were having the meeting because we were doing 12:06:58 work with Hydro Flask, and they wanted some kind of sign-off or approval that Patagonia was, like, okay with it. And so we said sure, and then we had the meeting with Rob.
I mean, honestly, we were on the 12:07:25



Zoom for like an hour. So I just -- without 12:07:26 you really telling me specifically what you want to know about, I just -- I wouldn't know where to really start.
That conversation was what year? 12:07:36 I don't even know what year it was. Was that 2020?
Q The emails say it was on February 9th, 2022.
A So that was like four years ago. I 12:07:44 mean, we have done so many deals since then, like that doesn't really -- doesn't really stick out in my mind.
I think if you ask me specific questions, I might be able to answer, but 12:07:52 like an open-ended, what did you talk about for an hour, I can't.
Q I'll ask you -- I wasn't there, so it's hard for me to know what was said.
A Yeah. 12:08:02
Q But I can try to narrow it down.
Was there any discussion about Pattie Gonia's use of logos on stickers?
A I don't think we discussed that at that meeting. 12:08:20





Veritext Legal Solutions
866-299-5127 calendar-ca@veritext.com www.veritext.com

Q Was there any discussion of 12:08:21
Pattie Gonia's use of designs that looked
like Patagonia's logo?
A I honestly don't remember.
Q Okay. Was there any discussion of 12:08:36
something that was described as a meme mask
logo?
A I don't know what that means. I've
seen that in some emails since then, and I
really don't know what it's referring to. 12:08:52
If you know, I'd love to know, but I
don't know what that's referring to.
Q Did you have any discussions about
particular fonts in the meeting?
A Again, like -- so there's like the 12:09:18
Zoom call and then there's been emails, and
I don't really remember what happened in what
thing.
I know at some point they said
something about not using their font. 12:09:28
Q So I'm asking --
A It was either at the meeting or in
the follow-up email.
Q Pardon me for interrupting.
I'm trying to ask for your 12:09:40

Page 114

recollection of what was said at the meeting. 12:09:41
I understand there were emails after, and I
understand --
A Yeah.
Q -- that might blur over time. But 12:09:48
as you sit here today, I'm asking you what
you remember from the meeting.
A I don't remember that -- I don't
remember discussion about --
Q During the meeting? 12:10:04
THE COURT REPORTER: You cut off
there.
THE WITNESS: I'm trying to
remember. I mean, I know there was a
follow-up email that kind of recapped it. 12:10:10
Maybe it would be good to look at that.
BY MR. GILCHRIST:
Q I'll show you that in a minute.
Let me ask you this: Did you
discuss at the meeting, in the Zoom call, 12:10:23
what work Wyn planned to do with Hydro Flask?
A Yes.
Q What was discussed about that?
A I believe we discussed what the
social media marketing campaign was that we 12:10:39

Page 115

were doing with them. And they had questions 12:10:43
about whether that was going to involve
putting the name Pattie Gonia on a product,
and we said no.
Q Okay. What did you say or what was 12:10:58
described at the meeting by anybody about
what initiative or campaign was being
promoted by the work that Pattie Gonia was
going to do for Hydro Flask?
A I think there was some discussion of 12:11:17
some type of like -- maybe a beneficiary of
some of that work, but I don't remember who
it was. I mean, I know there was like
discussion.
It was like -- I mean, there was -- 12:11:31
I feel like Rob kind of had a -- yeah. I
mean, Rob was kind of telling us a little bit
of like, I guess, what Patagonia, the
company, felt was, like, acceptable and not
acceptable in terms of like the type of work 12:11:51
that we do, and was using this partnership
with Hydro Flask like as an example.
And yeah. I mean, I think the only
things that I remember them telling us, you
know, specifically that they didn't like was 12:12:10

Page 116

putting the name Pattie Gonia on, like, other 12:12:15
people's products.
Q Okay.
A But since we don't personally have,
like, a logo or anything, there wasn't really 12:12:25
any discussion around -- did you ask about a
logo? There wasn't discussion like around a
logo, but there was discussion around putting
like the name Patagonia -- Pattie Gonia on
products. 12:12:42
Q So I take it from your response that
there was -- you do recall a discussion about
whether or not Hydro Flask planned to put the
name Pattie Gonia on any products?
A Yes. 12:12:54
Q And Rob said that he did not want
that to happen?
A Rob said -- yes. Yes, he did. And
I didn't -- I'm trying to think what else he
said about that. 12:13:05
Yeah, I think his main concern was
putting names -- like the name Pattie Gonia
on like third-party products, like on clients
of ours' products.
But he didn't say anything about, 12:13:22

Page 117



Veritext Legal Solutions
866-299-5127 calendar-ca@veritext.com www.veritext.com

like, obviously he totally greenlit the 12:13:24
Hydro Flask partnership, so he definitely was
not expressing any concern for that deal or
any prior or future deals about us just
generally working with partners. 12:13:35
Just said that Patagonia, the
company, did not want to see the Pattie Gonia
name on like third-party products.
Q Did you talk about third-party
products or did you talk about products? 12:13:49
A My understanding is that it was
third-party products because it was
specifically in relation to us working with
commercial partners.
Q What was said in the meeting about 12:14:06
putting the name on products?
A Again, Rob said he did not want to
see the name Pattie Gonia going on products
of our commercial partners.
Q Did you tell Rob during the meeting 12:14:16
that Pattie Gonia expected at some point to
put its name on its own merchandise?
A No. It wasn't something that had
been contemplated at that time.
Q Well, you did -- 12:14:35

Page 118

A As I said before, that didn't come 12:14:36
up until we were touring, because touring
merchandise is a very specific thing related
to touring, and that's what our merchandise
is. 12:14:45
Q Well, you sell merchandise on the
website as well, correct?
A Yep. Just like every other touring
artist.
Q Yeah. My question is whether it was 12:14:53
discussed in the --
A No. It was not. It wouldn't have
come up unless they had asked us about it.
Q And do you remember anything in the
discussion where Rob limited his concerns 12:15:05
about the name appearing on merchandise to
merchandise that was put out by third parties
as opposed to Pattie herself?
A Again, there was no distinction came
up, because what he was talking about was our 12:15:20
commercial partnerships such as Hydro Flask
being an example of that.
Q Anything else that you remember that
was discussed during the call, the Zoom call?
A No, not particularly. I mean, I'm 12:15:56

Page 119

sure if you had specific questions, I might 12:15:58
have answers. But no, I mean, not
particularly.
Q You mentioned that you came away
from the meeting feeling that Mr. Tadlock had 12:16:09
greenlit the Hydro Flask partnership that you
had planned.
A Well, he definitely did.
Q Did you have any understanding when
you left the conversation about anything else 12:16:22
that Mr. Tadlock had greenlit or approved?
A Can you restate the beginning of
that question or the whole question, I guess?
Q Did you have -- did you come away
from the Zoom call with the impression that 12:16:41
Mr. Tadlock had approved anything other than
a Hydro Flask partnership?
A Yeah. I mean, I definitely felt
like that whole meeting, that the reason he
took that meeting, it was kind of like his 12:16:56
chance to like tell us everything he wanted
to tell us about, you know, Patagonia's
feelings about us.
Because we hadn't really had a
conversation with anybody other than, you 12:17:06

Page 120

know, the other times that the company had 12:17:09
reached out to us to partner with us on
things. It's like we had never -- nobody had
ever expressed any concern on anything.
I mean, they were writing blog posts 12:17:21
about us. They were commenting on our
Instagram, saying like, "You go, girl," and
things like that. So like as far as we knew,
we were -- everything was great.
And so that was like getting and -- 12:17:34
being put in front of their legal team, I was
like, okay, well, this is going to be where
they tell us, you know, anything that they
just don't like about how we're operating.
And so we got done with that meeting 12:17:46
and we were like: Great. All good.
Q Did you ask Mr. Tadlock to tell you
anything that they didn't like about your
operation or did you just assume that?
A I don't remember asking him that. 12:17:56
Q And this came up because Hydro Flask
asked for the meeting, correct?
A It appears that way from the
communications.
Q Is that how you remember it? 12:18:09

Page 121

Q Do you agree that the stickers that 12:38:42
Pattie has distributed have designs on them
that are substantially similar to Patagonia's
logos?
MR. SCRENCI: Objection to the 12:38:54
extent that it calls for legal knowledge.
You can answer if you have a
factual basis for that answer.
THE WITNESS: I don't have legal
knowledge to make that distinction. 12:39:05
BY MR. GILCHRIST:
Q I'm not asking for legal knowledge.
I'm asking whether you think they're
substantially similar.
A I think they're similar. 12:39:15
Q Okay. And then the other
question -- the next thing was: "Not use the
Belwe font."
Do you agree that the stickers and
the patches that are used on costumes that 12:39:26
has Pattie Gonia written out is in Belwe
font?
A Yes.
Q And Number 3 was: "Not use
Pattie Gonia in any form on product." 12:39:44



Correct? 12:39:46
A Correct. And, again, like, this was
all in the context of commercial work, so we
thought that they were -- our understanding
was that they were referring to when we're 12:40:04
working with partners; which we never used
the sticker graphic or the Belwe font in any
commercial partner work, nor did we ever put
Pattie Gonia's name on any commercial
partnership products, to my knowledge. 12:40:31
Q After this correspondence was
exchanged, Pattie Gonia has continued to
distribute stickers and to use patches on
costumes that have designs that you agree are
similar to Patagonia's logos, correct? 12:40:54
A Yes. But that was not commercial
partnership work.
Q Okay. Is there anything in this
that -- where you indicated to Mr. Tadlock
that, okay, we agree to this but only in the 12:41:08
context of commercial partnerships. We
reserve the right to continue doing these
things separately from what we call
commercial partnerships.
A No. Because from the phone call 12:41:21



that we had from him, it seemed very centered 12:41:24
around commercial/partnership work.
Q Okay.
A And it's not like he sent us some
complete recap where it detailed all of this 12:41:35
out. I mean, if he had, I guess maybe we
would all be a little bit more on the same
page.
I mean, frankly -- well, anyways.
Yeah. I just... 12:41:46
Q You agree that --
A I don't know if he was being
intentionally vague with the recap or, you
know, so they would move the goalposts later
on. I'm not sure about why he wasn't more 12:41:58
specific. But -- or if he was intentionally
vague on our call with him so that they
could -- you know, we could cross some like
undrawn line at a later date and get in
trouble. 12:42:13
Like, I really don't understand his
attention -- intention for that.
I mean, in retrospect, you know...
It seemed very straightforward and
it seemed like we were all on the same page 12:42:22



and many, many, many more years went by 12:42:26
before any concern was raised. And so, yeah,
I mean, it's hard for me to --
Q Mr. Tadlock asks you to agree to
three things and you kept doing all three of 12:42:42
them; isn't that right?
MR. SCRENCI: Objection to form.
Objection to foundation.
You can answer.
THE WITNESS: No. As I said, we did 12:42:50
not do any of those things in relation to any
of our commercial partnerships.
BY MR. GILCHRIST:
Q Well, we can agree to disagree about
whether these were done in connection with 12:42:57
your commercial partnerships.
But you did not at any point in
time, if you thought Mr. Tadlock's email was
vague or holding back or reserving the right
to move the goalposts, you didn't do anything 12:43:20
in response to his invitations to clarify the
understandings that the parties had reached;
is that correct?
A We thought we -- sorry. Go ahead.
MR. SCRENCI: Objection to form. 12:43:26

potentially jog your memory about the timing 01:07:05
of the announcement when Pattie Gonia began
offering merchandise.
Is it consistent with your
recollection that it was in approximately 01:07:17
September of 2024?
A Yes. Based on the post, I would say
so, yes.
Q Let's look at Exhibit 68. And I'll
say that this contains a string on which some 01:07:50
of the emails we already looked at occur.
So if you scroll up from the bottom,
I think that you will see that after the
email that was sent by Pattie Gonia saying
"Thank you for the clarification, Robert," 01:08:12
Mr. Tadlock sends an email on February 10,
2025, to Pattie, and that's the one I want
you to focus on first.
So do you have that in front of you?
A Yes. 01:08:32
Q Okay. Did you receive this email at
the time it was sent, approximately?
A I believe so.
Q And in this email, Mr. Tadlock
recounts the agreements that he thought were 01:08:48

Page 150

made before, and he speaks more formally 01:08:51
about why he's concerned about the fact that
the stickers are still being distributed and
now you're selling merchandise.
Do you see that? 01:09:08
A I do see the email.
Q Okay. What discussions did you have
internally at Entrepreneur Enterprises about
this email after you received it?
A I don't remember really any 01:09:37
specifics of it. I'm sure we discussed it,
but I don't remember.
Q Were you surprised to receive it?
A Yeah.
Q You -- strike that. 01:09:57
When you had -- when you made the
decision -- I understand you say that it's
like other artists who are touring -- to
offer merchandise, did you have any
discussion internally at Entrepreneur 01:10:14
Enterprises about: Hey, you know,
Mr. Tadlock was pretty adamant that we not
put "Pattie Gonia" on merch. Should we clear
that up before we offer merchandise with
Pattie Gonia on it? 01:10:38

Page 151

A No. 01:10:39
Q Now, when you received this email,
you then sent a response, correct?
A Yes. I believe we did, sent in
here, yeah. 01:10:58
Q It should be the next one up.
A Yep.
Q Did you write this response?
A I don't recall. It appears to be
from Wyn and I. 01:11:11
Q Did you participate in drafting it?
A Yes.
Q Is there anywhere in here where you
respond to Mr. Tadlock's concern about using
the name Pattie Gonia on merchandise with any 01:11:40
statement that says: Hey, we understood we
weren't supposed to use Pattie Gonia on
merchandise, but only if it was in a
third-party partnership?
A I don't know. 01:11:58
Do you want me to read through --
Q Sure.
A -- and see?
There does not seem to be a
reference to that. 01:13:20

Page 152

Q Okay. There's a discussion about -- 01:13:26
in response to this email from Mr. Tadlock
about concerns that Entrepreneur Enterprises
has about Patagonia's prior relationship with
Lost Arrow. 01:13:48
Do you see that?
A I do.
Q What, if anything, had Entrepreneur
Enterprises done to research or learn about
Lost Arrow before receiving this letter? 01:14:04
A I'm not familiar with that.
Q Had you heard of Lost Arrow before
you got this letter or before you wrote this
response?
A Yeah, I was aware that they'd owned 01:14:22
that military supply company, but that was
about it.
Q Okay. There was nothing new in
February of 2025 about Lost Arrow that you
were learning? 01:14:34
A Not me personally. Wyn maybe had.
Q To your knowledge, were there any
plans afoot to publicize a criticism of
Patagonia for its cultural appropriation of
the name Lost Arrow? 01:15:01

Page 153



Veritext Legal Solutions
866-299-5127 calendar-ca@veritext.com www.veritext.com

Q Have you ever found circumstances 02:24:40
where she indicated Wyn had agreed to things
when he had not agreed to them?
A I'm not aware of that.
Q And this document came from your 02:24:59
files, correct?
A It looks like, yes. It says "To
pattiegonia@gmail.com."
Q Does Pattie Gonia ever license its
name to partners? 02:25:27
MR. SCRENCI: Objection to the
extent it calls for legal knowledge.
You can answer if you have an
understanding.
THE WITNESS: I don't know legally. 02:25:42
BY MR. GILCHRIST:
Q I'm not asking you -- I mean, you
know what a license is, right?
A I do. I just don't know if we've
ever given one. Like, I don't feel that we 02:25:50
have, but maybe under some legalese in some
contract we did. But I don't think so, no.
Q Sneaky lawyers, okay.
You don't remember any licenses that
Pattie Gonia has given to partners? 02:26:09

Page 186

A I guess I just don't really know 02:26:12
what a license is. So I think I have to just
revert back to like -- licensing. I don't
know. I'm not -- again, I think Rocco's
right. I don't understand what a license is 02:26:24
well enough to say whether we did that.
Q Has Pattie Gonia ever objected to
the use any of its partners have made of the
Pattie Gonia name?
A Not to my recollection. 02:26:36
Q Does Pattie Gonia do anything
systematic to review how partners use
Pattie Gonia's involvement in their own
social media or public statements about any
campaigns in which Pattie is involved? 02:26:59
MR. SCRENCI: Object to form.
You can answer.
THE WITNESS: What is the first part
of your question? Was it like do we have a
process for that? 02:27:14
BY MR. GILCHRIST:
Q Yes. Do you make any attempt to
monitor how your partners use Pattie Gonia's
name in their own coverage of the campaign or
social media? 02:27:27

Page 187

A No, because I don't think that -- I 02:27:33
don't think that -- I don't know. That
doesn't -- I don't think that really happens,
to my knowledge.
Q When one of your sponsors engages 02:27:42
Entrepreneur Enterprises to do a campaign,
you don't think that they broadcast the
campaign on their own social media channel?
A I mean, I guess -- yeah, I guess
they do. No, there's just no process for 02:27:55
that. There's no formal like a box that I
check to go check that.
Q Has Entrepreneur Enterprises ever
made stickers available at shows or personal
appearances of Wyn? 02:28:57
A Yes.
Q And how do they do that?
A Like if he has a college speaking
event, sometimes we'll hand them out.
Q What other circumstances are they 02:29:09
available?
A I could say there's not like a
formal policy around that.
Q Are they sometimes handed out at
hikes or events? 02:29:28

Page 188

A Yes. 02:29:29
Q Pride celebrations?
A I don't recall us handing them out
at a Pride celebration.
Q This topic may be more or less moot, 02:30:05
but let's look at 71 again.
A Okay.
Q Let's look at Number 26.
A Okay.
Q Are you the witnesses -- the witness 02:30:53
that's here to testify for Entrepreneur
Enterprises on Topic 26?
A I'm just seeing what this topic is.
Yes.
Q What role does Entrepreneur 02:31:27
Enterprises have in collecting money in
connection with fundraisers that it is
involved in?
A We do not typically collect money.
Our fundraisers usually run through GoFundMe 02:31:49
so that we do not collect the money.
Q So are there any circumstances in
which Entrepreneur Enterprises does collect
the money?
A I'm trying to think of an example. 02:32:08

Page 189



Veritext Legal Solutions
866-299-5127 calendar-ca@veritext.com www.veritext.com