# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION - LOS ANGELES

PATAGONIA, INC., )
)
Plaintiff, )
)
vs. ) Case No. 2:26-CV-0586-RGK-RAO
)
ENTREPRENEUR ENTERPRISES, )
INC., et al., )
)
Defendants. )

The videotaped deposition of ROBERT TADLOCK, taken before Christina M. Cummins, CSR and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, via Zoom, at 9:02 a.m. on the 23rd day of October, A.D., 2026.

Page 38

facts, and may call for privileged information as well. Make sure you don't reveal any discussions about legal advice, Rob. But if you understand the question, you can try to answer it.
A Yeah, I would say I'm involved in those decisions as part of my job to help the company make those decisions. I don't know -- I don't know about primary or not, but I'm certainly -- it's part of my job to help make those decisions.
BY MR. SCRENCI:
Q Is there a formal chain of command when it comes to making those decisions?
MR. GILCHRIST: Same objections about a lack of specificity and the question and the hypothetical. Again, you can answer if you have an answer, Rob.
A Yeah, I don't know what you mean by formal chain of command.
BY MR. SCRENCI:
Q Patagonia has taken actions to enforce its intellectual property in the past, correct?
A Yes.
Q It's filed petitions at the TTAB, correct?
A Yes.

Page 39

Q Who is the final authority that decides whether to file such a petition?
MR. GILCHRIST: Objection about what such a petition is with respect to any particular matter. It's vague. It lacks foundation. It's hypothetical. You can try to answer if you have an answer, Rob.
A Yeah, I'm not sure about final authority, but there are -- you know, the IP paralegal that works for me, we work with outside counsel. I'm involved. My boss is obviously involved at times. So I'm not sure about -- I don't know final authority. And it's different -- it's different at different times, I guess, so.
BY MR. SCRENCI:
Q Is your boss involved in every petition that Patagonia has filed at the TTAB regarding the institution of a TTAB proceeding?
A Meaning does she sign off, is that what you're asking?
Q Yeah.
A Is she aware of every single petition and there's a formal yes, this is approved, is that --
Q Yes, that's what I'm getting at.

Page 40

A Yeah, no, she's not involved in every single petition at the TTAB.
Q Are you involved at -- in every single petition at the TTAB?
MR. GILCHRIST: Objection, overbroad.
A Yeah, involved again I think is difficult. Like I help set the structure of the program, set strategy, but I'm not -- there's no affirmative yes, do this on every petition from me I don't believe.
BY MR. SCRENCI:
Q I think I forgot to ask this. In your current role, how many attorneys are there at Patagonia in its legal department?
A Currently?
Q Yes.
A I believe we are still at six globally. There's five in the U.S. and one in Europe. Hold on. Give me a second. I feel like I should know this off the back of my hand, but there's, yeah, five in the U.S. and one in Europe is right.
Q In your current position are any of your subordinates attorneys?
A Yes, there's one attorney that reports to me.
Q What is that attorney's role at Patagonia?

Page 41

A Commercial risk, contracts and governance.
Q How long has that employee been reporting to you?
A Since 2022 at some point, I don't remember exactly, but I believe it was 2022.
(Document marked as Deposition Exhibit 9 for identification.)
Q You can move on to, it's titled Exhibit 9 in Exhibit Share.
A Protecting Our Brand_Update?
Q Yes, that's correct.
A Okay.
Q Are you familiar with this document, Mr. Tadlock?
A Let me have a look. Yes. Well, hold on. Sorry, Rocco, there's stuff down below it that I'm not sure I -- it looks like there's -- I mean, if you go to page three, I think, do you see that, it looks like there's a pleading heading interspersed in there somehow?
Q Yes. I believe this is a preview pane of the hyperlink to the complaint that is in that post.
A Got it. Okay. That was the only thing that tripped me up. Generally I'm familiar with this

Page 42

document, yes.
Q This is a press release that Patagonia made when it filed the lawsuit in this case, correct?
MR. GILCHRIST: Objection, lacks foundation.
A Yeah, it's a statement, yeah. And I think it coincides with the day that we filed or shortly -- shortly thereafter.
BY MR. SCRENCI:
Q So it says in the second paragraph that we are not against art, creative expression or commentary about our brand, do you see that?
A I do.
Q Would you agree that Pattie has engaged in creative expression or commentary relating to the Patagonia brand?
MR. GILCHRIST: Objection, this calls for some sort of a legal opinion rather than any sort of facts. So -- and certainly don't reveal any communications, Rob, that you had about that issue with -- with outside counsel or internally with people at Patagonia.
A So the question that says Pattie Gonia engaged in art, creative expression or commentary about the Patagonia brand?

Page 43

BY MR. SCRENCI:
Q Yes.
MR. GILCHRIST: Yeah, I have the same objections. This is a -- this is sheerly for a legal opinion from a lawyer.
A So, I mean, I think we're -- we're aware, we were aware of Pattie Gonia. We were aware of, you know, the drag queen persona, the commentary about issues in the outdoor industry, public lands, climate, inclusion in the outdoors. Yes, Patagonia was aware of those things as of this date.
BY MR. SCRENCI:
Q So later on in that paragraph it says that Patagonia engaged in open dialogue with Pattie Gonia to discuss ways she could continue her environmental and social advocacy, brand deals and other work without infringing on our trademarks, do you see that?
A I do.
Q Do you understand that sentence I just read back to you to include the conversations that you had with Pattie Gonia?
A Yes.
Q And you would agree that those conversations were designed to discuss ways that Pattie Gonia can --

Page 44

could continue doing social advocacy then, correct?
MR. GILCHRIST: Objection, lacks foundation, and it's vague about what conversations you're talking about.
A Yeah, the conversations in 2022 and subsequently were an effort to really build a channel of communication and avoid a dispute and articulate certain principles related to the trademarks that we were concerned about. So I think that -- I think that ties back to this statement.
BY MR. SCRENCI:
Q An understanding of having those communications was so that there would not be issues with Pattie Gonia that would prevent her from doing environmental and social advocacy, correct?
A Right. I think, yes, there were -- we were obviously aware of Pattie Gonia, of what Wyn was doing with the character to talk about climate issues and inclusion and public lands. And, you know, I think -- I don't think, I know those conversations were meant and we communicated in those conversations, you know, these issues about trademarks that we wanted to make sure were on the table so that we could have a line of communication to -- in the hopes of avoiding -- of

Page 45

avoiding a dispute, yeah.
Q And the same is true in relation to brand deals, right?
MR. GILCHRIST: Objection, it's vague.
MR. SCRENCI: I'll rephrase that.
Q You entered into these conversations with Pattie Gonia about Patagonia's trademark rights with an understanding that Pattie Gonia would act in accordance with brand deals so as to not infringe Patagonia's trademarks, is that correct?
MR. GILCHRIST: Objection, it's vague.
A Yeah, I don't -- again, the point of those conversations and what was communicated was that we wanted to raise an awareness about these potential issues. We clearly knew about -- hold on, my computer has stopped. You guys still got me?
BY MR. SCRENCI:
Q Yes.
A Sorry. We were aware of, you know, the activism of the commentary in the outdoor industry about access to the outdoors. We knew about that. And, you know, understood the reference to our brand in that context. And we're not trying to stop that, but we were trying to communicate, you know, certain trademark

Page 46

principles in an effort to avoid a dispute to enable Pattie Gonia to do those types of things in a way that did not infringe our trademark.

Q In 2022 were you aware of Pattie Gonia's brand deals?

MR. GILCHRIST: Objection. I understand that this is a Patagonia document, but there's no foundation that Mr. Tadlock wrote it. And the question is vague when you're asking about what he knew in 2022 with respect to unspecified brand deals.

BY MR. SCRENCI:

Q Mr. Tadlock, you can answer my question if you understand.

A Yeah, I -- I -- what I can say is I was aware of Hydro Flask, and that's how the conversation came about. But I didn't -- I don't know the sort of extent of all the brand deals. I think from my perspective, you know, the Pattie Gonia character was talking about inclusion in the outdoors and climate change and public land issues that Patagonia also advocates for. And that was my primary understanding. That was my understanding of what, you know, what the character was about. But I knew about the Hydro Flask relationship, and I think

Page 47

that -- yeah, I knew about the Hydro Flask relationship.

Q Would you agree that it is important to -- for Patagonia to enforce its trademark rights?

A I'm not --

MR. GILCHRIST: Vague and overbroad.

A Yeah, it's hard -- it's hard for me to answer that. I'm not sure what you mean. I mean, we do enforce our trademark rights, but I'm not sure I understand the question.

BY MR. SCRENCI:

Q I think you answered it. You do enforce it, presumably because it's an important thing for Patagonia to do, correct?

MR. GILCHRIST: Again, it's unspecified and vague.

A Yeah, important I think is what I'm getting hung up on. We do do this. We spend substantial time and effort doing this. But we don't have a -- you know, we're making choices consistently about how and where we do it. So I'm not totally comfortable with we do it if it's important. It's a constant -- it's constant management, I guess, and it's limited in some ways. So I'm not -- I'm struggling with defining important or not.

Page 48

BY MR. SCRENCI:

Q You'd agree that Patagonia's position is that it needs to enforce its trademark rights in order to preserve its trademark rights, is that fair?

A Broadly speaking, yeah, that's fair.

Q To what extent do you disagree with that characterization, if at all?

MR. GILCHRIST: Now we're compounding the vagueness of the question with another question on top of it trying to draw distinctions through the vagueness. You can answer the question if you understand it, but it's not a good question.

A Yeah, I'm not -- I'm not sure I totally understand. I don't disagree with the broad principle, but I think in reality, you know, we're making judgments about resources and time and choices, and it's constant management, I guess. And so maybe that's why I'm struggling with the blanket statement. But broadly speaking I agree with the principle that it's important we protect our rights.

(Document marked as Deposition Exhibit 10 for identification.)

BY MR. SCRENCI:

Q So let's move to what's named Exhibit 10 in

Page 49

the Exhibit Share.

A Okay.

Q Do you recognize Exhibit 10 as the complaint in this case?

A It looks like that, yes.

Q You can take your time to review if you need to.

MR. GILCHRIST: It's a long document. Do you want him to review the whole thing or? I mean --

BY MR. SCRENCI:

Q Do you have any reason --

MR. GILCHRIST: You're just asking him to scroll through and make sure this is the right one, right?

MR. SCRENCI: That's correct.

MR. GILCHRIST: Okay.

A This looks like the complaint in this case, yeah.

BY MR. SCRENCI:

Q So going down to, it's paragraph 23, page 16 of the pdf, page 15 of the complaint numbering, let me know when you are there.

A Sure. Paragraph 23 you said?

Q Yes.

Page 54

(WHEREUPON, a recess was taken, after which the following proceedings were held:)

VIDEOGRAPHER: We are going back on the record. The time now is 10:33 a.m. Pacific time. This is the beginning of media unit number two.

BY MR. SCRENCI:

Q Are you ready to proceed, Mr. Tadlock?

A Right, I'm just -- yes.

Q Do you know when Patagonia first became aware of Pattie Gonia?

MR. GILCHRIST: Objection, it's outside the scope and calls for speculation. You can answer if you know.

A My understanding it was sometime in 2019.

BY MR. SCRENCI:

Q Does December 2019 sound correct to you?

MR. GILCHRIST: Objection, same objections as the last question.

A I don't know if I have it down to the month. But if there's something you've got that indicates that, I wouldn't dispute it.

(Document marked as Deposition Exhibit 11 for identification.)

Page 55

BY MR. SCRENCI:

Q All right. You can pull up Exhibit 11 in the Exhibit Share. There should be an exhibit sticker that says Exhibit 11 on this one as well.

A Okay. Hold on. Exhibit 11?

Q Yes.

A Okay. Okay, I've got it.

Q These are Patagonia's Responses and Objections to Defendants' First Set of Requests for Admission, correct?

A Correct.

Q I'll represent to you that they are. I'm not trying to trick you.

A Got it. I'm with you.

Q So if you go down to request for admission number three, it says that, admit that you knew or were aware of Pattie Gonia on or before December 5, 2019. Do you see that?

A I do see that.

Q And Patagonia admits that as of December 5, 2019 it was aware that Wyn Wiley used the Pattie Gonia name as a direct persona, is that correct?

A I see that. That's correct.

Q So Patagonia was aware of Pattie Gonia at least as of December 5th, 2019?

Page 56

MR. GILCHRIST: Objection to the form.

A Yeah, I think as of December 5th, 2019, Patagonia was aware that Wyn Wiley used the Pattie Gonia name as a drag persona, yeah. That date seems right. I don't have any reason to dispute that. That matches my understanding and memory.

BY MR. SCRENCI:

Q In fact, on or about December 5th, 2019, Patagonia agreed to match of a fifth of donations for Pattie Gonia's Sustainable Coastlines Hawaii fundraiser, is that correct?

MR. GILCHRIST: Objection, it lacks foundation. It's beyond the scope of this witness's 30(b)(6) testimony. If you know you can answer.

A Yeah, I can't offer anything more than what's stated here. I don't know the construct of the donation or those circumstances, but I can see what's here and don't have any reason to dispute that.

BY MR. SCRENCI:

Q You're the person that Patagonia designated to testify as to Patagonia's knowledge about its responses to the requests for admission, correct?

Page 57

A Subject to the objections, yeah.

MR. GILCHRIST: Right. Yeah, I mean, there's no way that Patagonia can prepare a witness to answer any question you might ask of hundreds of discovery responses, so the objection was what it was. He gave an answer anyway, so. And I'll note that you have a witness who's designated on this particular topic to talk about this particular donation, so. And it's not this witness.

(Document marked as Deposition Exhibit 12 for identification.)

BY MR. SCRENCI:

Q You can move on to Exhibit 12 in the Exhibit Share. Do you see Exhibit 12?

A I see -- yep, is that an email from me to a group of people on February 9th of 2022?

Q It is. It begins, Hi all. Pattie, thank you for the call today. Do you see that?

A I see -- I see that document.

Q It has Exhibit 12 stamped on it?

A Yes, down at the bottom.

Q Is this a true and accurate copy of an email that you sent to looks like Yiorgos Makris, Robin Vieira, and Pattie Gonia?

Page 58

A Let me just look at it to confirm. This looks like an email that I sent, yes.
Q Now, there are three bullet points numbered in this email, correct? Do you see those?
A I see those, yes.
Q It's asking to not use or otherwise display Patagonia's logos, that's number one, correct?
A Correct, that's number one.
Q Number two is to not use the "Belwe font" in the context -- in the content that is created including an example here, since Yiorgos asked about this when I called him this afternoon, and then it says Patagonia, I'm assuming that's the Belwe font in which Patagonia is shown there, right?
A Correct.
Q Did I read number two correctly?
A I think so, looks like it.
Q Then number 3, it says not use Pattie Gonia in any form on product, correct?
A Yes, that's number three.
Q And this -- these three bullet points were laid out in connection with Pattie Gonia's work with Hydro Flask, correct?
MR. GILCHRIST: Objection, vague.

Page 59

A Right. I remember that conversation being an introduction of these sort of trademark principles certainly in the context of the Hydro Flask relationship as the opportunity to talk about it. But, yeah, this was -- this was my effort to create a line of communication, offer some broad principles, really try to open the lines of communication to avoid a dispute and give some sort of parameters to help achieve that. And that was in the context of Hydro Flask, yeah, the work that they were thinking of doing together.
BY MR. SCRENCI:
Q So when you say parameters, just help me understand what you mean by parameters or principles I think you said.
A You know, we'd obviously known about Pattie Gonia the character and the commentary. And this was a -- you know, Hydro Flask reached out to us to talk about this. And it was an opportunity I think for us and for me in particular to introduce myself, you know, create a line of communication, introduce these issues of trademark.
And so, yeah, these were -- these were things I wanted to communicate to Pattie Gonia in particular to Wyn and Jenny and then in the context of this

Page 60

relationship to Hydro Flask as trademark issues that we were concerned about, but primarily I was trying to -- I was trying to open -- I was trying, what I did, what I communicated was, you know, that this was an effort to open a line of communication and avoid a dispute. And these were the types of things that we wanted to see to do that, to hope to do that.
Q And correct me if my characterization is wrong --
MR. GILCHRIST: Sorry, guys. Hang on a second.
THE WITNESS: That's an objection of some sort there.
MR. SCRENCI: I think we're going to need to call the Court, get them involved on that one. I don't know if I understand the objection.
MR. GILCHRIST: Come on, Rocco. That was the best objection all day. Sorry.
MR. SCRENCI: All right. Can we proceed?
MR. GILCHRIST: Yes. The dogs are gone.
MR. SCRENCI: That sounds good.
Q I'm trying to ask you a question here. I might be characterizing things, but I'm not trying to put words in your mouth. So if what I'm about to say is

Page 61

incorrect, you know, feel free to push back on it. I'm really just trying to get an understanding here.
When you're talking about, I guess, opening a line of communication and giving some principles about where Patagonia's coming from on things, it's with an expectation that Pattie Gonia, so Wyn and Jenny, are going to know how to conduct themselves accordingly in the future with I guess other partnerships more broadly than Hydro Flask, correct?
A Yeah. I mean, I don't view this as sort of like the global -- in every circumstance these are all the issues that might be out there. So I think that does more -- right, we didn't know everything that might be coming. We were talking about it in the context of this partnership which was, you know, as I recall related to recycling water bottles and supporting an NGO that Hydro Flask was doing. And so it was maybe the first of what I didn't expect to be the last conversation is a better way to frame it and an articulation of some of the things that we wanted them to be aware of to avoid a dispute. So yeah, so some of the things that they would be aware of going forward so that we didn't end up in a fight.
Q Fair to say at this time you had known about

Page 62

Pattie Gonia for at least two years, right?

MR. GILCHRIST: Vague about you, but you can answer.

A Yeah. I mean, I don't dispute that we the company and me were aware of Pattie Gonia as a drag queen and a commenter and an activist and raising issues really that line up in a lot of ways with the issues that Patagonia advocates for. So we were aware of Pattie Gonia by 2019. I don't dispute that. And this was three years later. Well, not quite, I guess. A little over two.

BY MR. SCRENCI:

Q A little over two.

A Yeah, a little over two would be a better description, yeah.

Q How would, I guess, Patagonia be familiar with Pattie, in what medium would that familiarity come from?

MR. GILCHRIST: Objection, this is beyond the scope of this witness's 30(b)(6) testimony and is, therefore, vague.

A I'm not totally sure, so let me try and answer and then sort of correct me if I'm not doing it right. I mean, you know, awareness, I think -- I believe like Pattie was in drag. Pattie Gonia was in drag at OR,

Page 63

which is the outdoor industry trade show, I don't remember all the circumstances of what was addressed there, but generally raising issues of climate change. That would have been one example, I think.

Online would be another medium of, you know, talking about issues, raising money as we saw for nonprofit organizations. And so I think those are two mediums. One would be as a performance in drag and another would be in drag or raising money for a nonprofit on an issue of -- I actually don't know exactly what the issue in Hawaii was, but, you know, generally speaking climate, public lands, conservation.

BY MR. SCRENCI:

Q And --

A Is that what you mean by medium?

Q Yeah, I guess, and then the next question is that when you say online, is that primarily through Instagram?

MR. GILCHRIST: Objection, lacks foundation.

A Yeah, I -- certainly I think that was one of them. I don't know all the platforms. And I don't -- I don't claim to know every post or every circumstance of every post. So I don't want to overstate what I understood of my awareness. But I think, yes, Instagram

Page 64

would be an example of social media, I think.

BY MR. SCRENCI:

Q Now, this Exhibit 12, this email from you, this may be among the first emails you might have personally sent to Pattie. But would it be fair to say that Patagonia already had some form of relationship with Pattie Gonia prior to your reaching out?

A I think there's a lot in there. So Patagonia in relationship, I agree that there were communications among people at Patagonia, certain individuals on certainly like whether there was going to be money available for this nonprofit. So I don't dispute that there were communications among people within Patagonia and Pattie Gonia before 2022. But to the extent that that means that Patagonia had a relationship, I don't know that I'd characterize it that way.

(Document marked as Deposition Exhibit 13 for identification.)

Q Now let's move on to Exhibit 13. Let me know when you're on Exhibit 13.

A Okay. I'm there.

Q Looks like this is an email you sent after the first one that popped up some let's say six days later, is that fair?

Page 65

A Let me just have a look, test my math. That seems right. It was a February 15 -- it looks to be a February 15th, 2022 email, yes, from me.

Q Looking at that top email in the chain, does this look like a true and accurate representation of an email that you sent on February 15th, 2022 to Pattie Gonia, Robin Vieira and Yiorgos Makris?

A It does look like that. And just one -- I think the Pattie Gonia email goes to both Wyn and Jenny, so to the extent that needs to be clarified, I understand they both were a part of the communication.

Q Yes. And thank you for that clarification.

So in this email it says, Patagonia would ask that the parties not use Patagonia's logos or any substantially similar design like the mask meme logo we discussed that used the mountain silhouette and Belwe font. Do you see that?

A I do see that.

Q Do you know what the mask meme logo you were referring to in this email is?

A I do. It was one of the things we talked about in the call as an example of the use of our logo that we wanted to stop and sort of an immediate acknowledgment of the failures of email that I had to

Page 66

clarify it six days later. But in the call we talked about there was a post from the Pattie Gonia account that was I think tracking COVID numbers. You know, in those days it was are we up, are we down, what variant. And it was some chart with a version of the Patagonia logo but Pattie Gonia instead of Patagonia in it with some commentary like only one more, you know, we almost got my logo or something like that. I forget the exact wording of the social media post, but that was one we talked about as an example in the call of something that we wanted not to have.
Q Just to be clear, that was in connection -- strike that.
You wanted that not to happen as to the work that Pattie was doing with Hydro Flask, correct?
MR. GILCHRIST: Objection, lacks foundation.
A Yeah. Thanks for that clarification. My memory of that was that was an example of something we didn't want Pattie Gonia doing with Hydro Flask or otherwise, yeah.
BY MR. SCRENCI:
Q Do you know where you learned of the mask meme logo?
A I don't -- I don't remember. I don't remember

Page 67

how I -- I don't remember that.
Q Yeah, it was, I mean, 2022 at the latest, right? That's a while ago, fair?
A I mean, 2022 is however many years ago it was. But yeah, I just don't remember with all of the things that I have now seen when I saw that one or whether I saw that one in particular.
Q This might be a silly question. It's been asked of my client as well. How would you define meme?
A Meme? Commentary, something that garners attention. I'm not sure I have a good definition. And I'm not sure why it was -- I don't know why we called it the mask meme here, if that's how it was phrased in the conversation or not. So not a great definition for you.
Q You did your best. That's all I can ask.
A Thank you.
(Document marked as Deposition Exhibit 14 for identification.)
Q Now, can you move on to Exhibit 14 in the Exhibit Share? Let me know when you're there.
A Yes, I'm there. I see it.
Q Is this an email that you sent on February 10th, 2025 to the Pattie Gonia Gmail account?
A It looks to be, yes.

Page 68

Q Looks to be a true and accurate copy of that email, correct?
A Yes.
Q Begins Dear Pattie, I hope you are well. It has been what feels like a few lifetimes since we spoke in 2022, do you see that?
A I do.
Q Is it fair to say this is the first time that you and -- strike that.
This is the first time that you had reached out to Pattie since 2022?
MR. GILCHRIST: You're talking about Rob Tadlock, not Patagonia, right?
BY MR. SCRENCI:
Q I'm talking -- yes, you personally.
A I don't remember any -- any other communication between these emails, no, not sitting here.
Q You said a few lifetimes in that first sentence. I'm assuming that's to convey it's been a long time since you last spoke with Pattie, correct?
A I think I was being a little self-effacing in that I had little kids and I was, you know, in that stage. I obviously didn't articulate that here, but

Page 69

it's, you know, it's three years later, yeah, give or take, right, almost exactly.
Q I think you testified earlier something to the effect of you wanted to start an open line of communication between Patagonia and Pattie Gonia, correct?
A I think that was one of the goals of the conversation in 2022 and one of the things I communicated, yeah.
Q And from this 2025 email, it seems to suggest that there wasn't an open line of communication at least in that intervening period, correct?
MR. GILCHRIST: Objection, lacks foundation. It's vague and ambiguous in the context of which you're making these assumptions.
A Yeah, I don't know if I -- I mean, I don't know -- I don't know what makes it an open line of communication or not. I don't think that there was anything that meant that there was no ability to communicate.
BY MR. SCRENCI:
Q I'm just using your own sort of description of what your -- one of your intents was in 2022. So I guess what is your understanding of an open line of



Veritext Legal Solutions
www.veritext.com 888-391-3376

Page 70

communication?
A You know, that we -- we'd gone into that conversation, I'd gone into that conversation in good faith and, you know, trying to articulate these concerns from the point of view of the company to get them on the table, to, you know -- as we did discuss, we are enforcing our trademarks often. We generally try to work it out with almost everybody before we end up in a dispute. And kind of that's our standard protocol.
But I think here in particular because, you know, Pattie Gonia the character was advocating for issues that, you know, we also advocate for. There were other contacts throughout the business. I felt like it was -- it was a goal of just establishing the connection. So that was -- and that's what I did in the communication. That's what I did in the conversation was to introduce myself, you know, articulate these issues. These follow-ups were meant to lay that stuff out, invite conversation if there was any uncertainty as a means to create a line of communication to avoid a dispute. So that's what I -- that's what I meant when I said that. That's what I communicated in 2022. I don't know how to characterize it beyond that.
Q So in the second sentence of this email it

Page 71

says, I'm writing to you now because I saw the recent announcements about product sales of T-shirts featuring "Pattie -- "Pattie Gonia" branding as well as more sales of the stickers including Pattie Gonia's logo, do you see that?
A I do.
Q So those were the concerns that prompted this email in February of 2025, correct?
A Yeah, I think we learned about the website, the sale of T-shirts using the Pattie Gonia branding on the front. And that prompted a little more looking into what had been going on. And so those were two things that I called out that, yeah, had my attention as sort of a change of what I understood we talked about.
Q You're aware that between 2022 and 2025 Pattie Gonia had partnered with other third parties in connection with promotion of their brands or services, correct?
MR. GILCHRIST: Objection, vague, unspecific.
A Yeah, I'm not -- I'm not sure I can agree to that broad characterization.
BY MR. SCRENCI:
Q Pattie Gonia partnered with The North Face in 2023, correct?

Page 72

MR. GILCHRIST: Objection, vague. Go ahead.
A Yeah, I understand -- I recall there was a Pride video. So if that's what you're referring to, yeah, there was -- that was -- that happened, if that's the partnership you mean.
BY MR. SCRENCI:
Q Are you not understanding what I'm asking about when I say that there's a partnership?
A I just don't know if there's anything else. Like I -- what I'm aware of was the Pride -- the work they did around Pride together. I don't -- so I guess what I'm saying is I don't know if there was anything else. That's what I'm hedging on. But I'm aware of that, yeah.
Q And to your knowledge did Patagonia reach out to Pattie about the partnership with The North Face for the Pride campaign?
MR. GILCHRIST: Objection. I'll object that the word vague -- or the word partnership is vague. You can go ahead.
A Yeah, I don't -- I'm not aware of any outreach related to that Pride campaign.
BY MR. SCRENCI:
Q So at the bottom of this first page of

Page 73

Exhibit 14 it says, the examples I've seen from social media posts include products that implicate each one of these points that I thought we'd agreed upon. Do you see that sentence?
A I see that sentence.
Q So evidently you or someone at your direction looked at Pattie's social media to find examples to put in this email, correct?
MR. GILCHRIST: I'm going to object to the characterization, but you can answer.
A Yeah, I mean, we -- I believe these are social media posts, and yeah, I saw these as part of preparing the email.
BY MR. SCRENCI:
Q Now scrolling to the second page after the picture, it says, Patagonia remains supportive of your work but must insist that the Pattie Gonia persona not be commercialized and continue to adhere to the commitments made in 2022. Do you see that?
A I see that, yeah.
Q So Patagonia was supportive of Pattie's at least environmental advocacy work, is that fair?
A I think that's fair.
Q And then the next sentence after the one I

read from the email just now says, unfortunately these latest product sales force Patagonia's hand, and so I'm asking that you discontinue sales of T-shirts and stickers or any product using the Pattie Gonia branding or design substantially similar to Patagonia's logos. Do you see that?

A I do.

Q So you just didn't want Pattie to sell products that have Pattie Gonia branding or designs on them, fair?

MR. GILCHRIST: Objection on the way the question's phrased. It's argumentative.

A Yeah. Again, I mean, I think this was a beginning of a change of the use of the name into a more commercial space using it as branding on apparel. That was a different -- that was a change. That was different than sort of our conception of the environmental advocacy as you mentioned. And so I -- certainly that was the thing that got our attention. That was the fact, the event that prompted this note. And so that's what was addressed here.

But again, I don't think, if you look at the next sentence, I'm asking to work this out. I'm asking for a call. But we did call out the sale of T-shirts



and the use of our logo or the, you know, the Pattie Gonia in the P-6 is what I was calling out specifically here.

Q Now, at some point you came to learn that Pattie Gonia filed a trademark application for Pattie Gonia, correct?

A Correct.

Q Before filing the lawsuit but after learning about the trademark application, did you or anyone at Patagonia to your knowledge try to reach out to Pattie Gonia?

A About this issue?

Q About the potential for filing a trademark infringement lawsuit.

MR. GILCHRIST: Objection to the extent, Rob, that this calls for you to talk about any communications that you had with your clients. But you can answer specifically about whether you know about any communications during that interval, though I will object that this question is argumentative in the context of other communications that haven't been shown to the witness. But you can go ahead and answer.

A Right. I don't think there was any



communication after the March email. I'm not aware of any communication about these issues after the March email and until the day we filed the lawsuit.

MR. SCRENCI: That's all I was getting at. Thank you.

(Document marked as Deposition Exhibit 15 for identification.)

Q You can go to Exhibit No. 15, and let me know when you're on Exhibit 15.

A Okay. Sorry, I just got to make it a little bigger here as I stick my face in the screen to see it. Okay. I've got it.

Q Do you know what this Exhibit 15 is?

A It's a big document, so it's not immediately familiar to me. Do you want me to -- do you want me to look at all 38 before I respond or -- I'm not sure what this is.

Q You can scroll down to, in the pdf it is going to be page 33.

A Sorry, I'm getting there. Okay.

Q Looks like it has, I don't want to mess up this last name, is it Hilary Dessouky?

A You got it. You got it right.

Q Legal, February 2022.



A Yeah, that's right.

Q Is that Patagonia's general counsel, Ms. Dessouky?

A Correct.

Q I believe that this is a document that's provided to, if not just the CEO, the board of directors of Patagonia. Without I guess getting into anything specific you may or may not do regarding advising the board of directors, just generally speaking, do you have input on such a document that would be provided to the board of directors?

MR. GILCHRIST: I'll object that there's no foundation that this document was ever shown to the board of directors. I don't think it was, but you can answer the question without regard to that preamble if you want, Rob.

A Yeah, I'm not sure who -- who this document was prepared for. So I don't know if this went to the board or who the recipients of this were, if it was just a leadership note. So I don't know the answer to that as to this document. I am -- I have been involved in the past on various issues and, you know, communications to the board, yes.

Page 86

know exactly what you mean because you've used survey and then the version of this survey interchangeably. But I will stipulate or represent that that is the Bates number on documents that we produced. But you can go ahead, Rob.
A Yeah, I don't -- I don't know.
BY MR. SCRENCI:
Q Are you familiar with what Patagonia's target audience or customer is?
A It's not my -- I have some -- I have some familiarity. I think it changed -- how we describe it has changed over time. But some understanding, but it's -- yeah, I have some understanding.
(Document marked as Deposition Exhibit 18 for identification.)
Q If you can now move on to what I've marked as Exhibit 18 in the Exhibit Share. And let me know when you are there.
A Okay. I'm there.
Q These are Patagonia's Supplemental Objections and Responses to Entrepreneur Enterprise, Inc.'s First Set of Interrogatories Nos. 2 and 5, correct?
A I see that, yes.
Q If you take a moment to just read

Page 87

interrogatory No. 2 as it is written on the page.
A Okay. I've read the interrogatory.
Q Now, if you go down to the supplemental response beginning at the top of page six of the pdf, it says, specifically Patagonia asserts infringement and dilution of its rights in the following marks in connection with the goods and services identified below. Do you see that?
A I do.
Q Now, I believe it is the registration number 6665425, last row in I guess first page of the table, do you see that?
A I do see that in the table.
Q One of the, I guess, the goods or the services referred to in connection with that mark includes education and entertainment services, namely organizing and conducting ambassador programs and related events in the nature of recreational activities and sporting events to drive positive social and environmental change for educational purposes. Do you see that?
A I do see that.
Q So is it your understanding that Patagonia contends that Pattie Gonia infringes Patagonia's trademark rights in connection with I guess that class

Page 88

of services I just described?
MR. GILCHRIST: I'm going to object that this is calling for a legal opinion. I think it's fair to ask this witness factual questions about what registrations are owned, but when you're asking a lawyer for what contentions are being made about what is and isn't infringing, I think you're asking for opinion questions rather than facts.
So I think it's also fair for you to say whether or not we make certain contentions, but this is outside the scope of the 30(b)(6) testimony and at least with respect to being able to prepare to answer a specific question.
But with those objections in mind, Rob, you can testify about facts that you're aware of that might answer this question.
A I mean, yes, we've asserted this trademark in the complaint. I think I can answer that.
BY MR. SCRENCI:
Q You can close out of that exhibit.
Is it fair to say that Patagonia has supported Pattie's advocacy in the past?
MR. GILCHRIST: Overbroad and vague.
A Yeah, support, what do you mean by support?

Page 89

BY MR. SCRENCI:
Q I guess encouraged Pattie with Pattie's advocacy?
MR. GILCHRIST: Lacks foundation.
A Yeah, I don't know if there's a company line we're aware -- we've been aware of Pattie Gonia's advocacy, sure.
BY MR. SCRENCI:
Q Patagonia has helped Pattie grow Pattie's platform for advocacy, correct?
MR. GILCHRIST: Objection, lacks foundation, vague.
A Yeah, I don't -- I mean, I know that there are instances of engagement between people at the company and Pattie Gonia on various things, but I don't know that I can characterize it the way that you did that broadly.
(Document marked as Deposition Exhibit 19 for identification.)
BY MR. SCRENCI:
Q Can you open Exhibit 19 in the Exhibit Share? Let me know when it's open.
A Okay. It's open.
Q Now, this is story titled Making the Oath.

Page 90

This was at one point hosted on Patagonia's website, correct?
A I believe so, yes.
Q This story is talking about four individuals including Pattie Gonia who brought a new initiative to the outdoor community, correct?
A This refers to The Outdoorist Oath, I believe. And I think that appeared on -- on part of the Patagonia website.
Q And Pattie Gonia is a founding member of The Outdoorist Oath, correct?
MR. GILCHRIST: Did you say Pattie Gonia is?
BY MR. SCRENCI:
Q Pattie Gonia is a founding member of The Outdoorist Oath, correct?
MR. GILCHRIST: Lacks foundation. You can answer if you know.
A I think that's what's communicated here is that Pattie Gonia is one of the founders. I don't know the details of that in particular, but I agree that that's how this is presented in this article, in this exhibit.
BY MR. SCRENCI:
Q The Outdoorist Oath relates to advocacy that

Page 91

Pattie Gonia is engaged in, right?
A Advocacy that Pattie Gonia's engaged in?
Q Pattie Gonia, yes.
A I think that's broadly true. I have a general understanding of The Outdoorist Oath, so I don't want to overstate, but I understand Pattie Gonia was involved in the founding of it and -- yeah.
Q So -- and then it says The Oath was formed to provide an educational foundation -- let me direct you to where I'm saying that, so --
A Thank you.
Q -- strike first.
Second page of the pdf, I guess the first large paragraph on that page, about halfway through, middle of the page, it says, The Oath was formed to provide an educational foundation as well as a framework for individuals to investigate questions like how can I be a better steward of the landscapes I recreate in. Do you see that?
A Recreate is how I would -- but recreate is an interesting take on that in some ways. That's true, too. I see that, yes.
MR. GILCHRIST: Can you -- can you call out where you're reading again, Rocco? Because I can't

Page 92

find it.
MR. SCRENCI: Yes. So second page of the pdf there is a large paragraph on the page that begins --
THE WITNESS: First full paragraph.
MR. GILCHRIST: I got it. I got it. I was on the wrong page. Thank you.
BY MR. SCRENCI:
Q So this was a story that Patagonia chose to share, correct?
A Yeah, this is an article that was on the Patagonia website and was available, so yeah, it was shared.
Q Patagonia approves of The Outdoorist Oath, correct?
MR. GILCHRIST: Lacks foundation, but you can answer.
A Yeah, we can -- generally I think yeah. I don't -- I don't know that I speak for what's Patagonia in that. We the company certainly posted this on our website. The Outdoorist Oath is, you know, focused on issues that we are also focused on. So I, I don't know, I'm uncomfortable with sort of the broad statement yes. We're aware of it. We published this. I don't think we

Page 93

would publish it generally if we didn't support it. Yeah.
BY MR. SCRENCI:
Q Is there any part of the oath -- The Outdoorist Oath that Patagonia does not support?
MR. GILCHRIST: Lacks foundation.
A Yeah, I don't know all the parts of The Outdoorist Oath, and I don't know what everybody here knows about it or whether they agree with everything or don't agree with everything. I'm not -- I can't answer that.
BY MR. SCRENCI:
Q To your knowledge has -- strike that.
When you spoke earlier about advocacy and work that Patagonia doesn't have a problem with that Pattie Gonia does, is The Outdoorist Oath included within that I suppose type of advocacy that Patagonia the company doesn't have a problem with?
MR. GILCHRIST: Vague.
A Generally speaking I think yeah, The Outdoorist Oath is an example of the advocacy that Pattie Gonia has been doing that's generally in line with what Patagonia the company is doing and that we were aware of and, yeah.

Page 102

(Document marked as Deposition Exhibit 23 for identification.)
Q You can move on to Exhibit No. 23.
MR. GILCHRIST: My Exhibit Share isn't working, by the way. I don't know if you guys are having trouble. I'm back. I mean, it's working again.
A Okay. I see No. 23.
BY MR. SCRENCI:
Q This is an Instagram post by Pattie Gonia, correct?
A It looks to be -- yes, it looks that way.
Q No reason to dispute it's an Instagram post by my client, right?
MR. GILCHRIST: Lacks foundation, but you can...
A I'll take your word for it. I don't -- yeah, I have no reason to dispute that it is what you're telling me it is.
BY MR. SCRENCI:
Q And you have no reason to dispute that this was posted on December 1st, 2020, correct?
MR. GILCHRIST: Lacks foundation.
A Yeah, no reason to dispute that.

Page 103

BY MR. SCRENCI:
Q And this is a document produced by Patagonia in this matter, correct?
A I don't know, to be honest with you. But if you tell me it is, that --
Q You see the Bates number on the bottom right corner?
A Actually not. Maybe I zoomed it in too much. Sorry. I zoomed in too far. Yeah, okay, I see the PAT-PG Bates stamp. So it appears to be something that Patagonia produced, yeah.
Q Now, in this photo my client is holding up a sticker, is that right?
A It looks to be a sticker, yeah.
Q Now, is this what you've been -- strike that.
Is this design for the sticker what you've described as Patagonia's logo?
MR. GILCHRIST: Vague.
A I think this is an example of a logo that would be substantially similar to our logo. It would fit that description to me, yeah.
(Document marked as Deposition Exhibit 24 for identification.)

Page 104

BY MR. SCRENCI:
Q Move on to Exhibit No. 24 and let me know when you're on it. It will have the yellow sticker in the bottom right corner that says Exhibit 24.
A Okay. It just finished loading. I see it.
Q So these are exhibits that Patagonia had provided along with its request for admission to defendants. Just because there are obviously exhibit numbers as to the original presentation of this exhibit, for ease I will refer to Exhibit 24 dash, and then following the dash will be the exhibit number within the original document. Do you understand what I'm getting at?
A I think I do, yeah.
Q So if I say go to Exhibit 24-10 and let me know when you're there, can you please do that?
A Yep. I'll let you know when I'm there. Okay. I think I'm there.
Q Are you seeing a design that looks like the sticker we saw in the last exhibit we looked at, Exhibit No. 23?
A It does look similar to the -- to the design of the sticker in the last exhibit, yes.
Q And Exhibit 24-10 appears to be an Instagram

Page 105

post on the Pattie Gonia Instagram page, correct?
MR. GILCHRIST: Objection, lacks foundation.
A Yeah, I don't have any reason to dispute that.
BY MR. SCRENCI:
Q And the date on the page is November 11th, 2018, correct?
A I see that at the bottom, yes.
Q You have no reason to dispute that this was posted on the Pattie Gonia Instagram on November 11th, 2018, correct?
MR. GILCHRIST: Lacks foundation.
A I do not.
BY MR. SCRENCI:
Q Now if you go to Exhibit 24-12, do you see that?
A I do, yes.
Q And this appears to be a post on the Pattie Gonia Instagram page dated March 15th, 2019, is that correct?
MR. GILCHRIST: These questions lack foundation and it's a reading exercise if you're asking this witness to say what the dates are on certain documents. I'm not sure I'm understanding the point here, Rocco.

A That's not familiar to me. Yeah, I don't know that one.
Q So let me ask this. Does Patagonia offer financial services?
A I think we need to be -- what do you mean by financial services?
Q Like money lending.
A We -- we have loaned money to others. We have -- we have invested in other companies. So I don't know if that's what you mean by financial services, but we have done both those -- we have loaned money to people, yeah.
Q Does Patagonia have a credit card that it offers?
A To consumers?
Q Yes.
A No, we do not have a credit card that we offer to consumers.
Q To your knowledge has Patagonia ever contacted Pattie Gonia about this Instagram post depicted in Exhibit 34?
A I'm not aware of Patagonia reaching out to Pattie Gonia about this particular post, to discuss this post that's Exhibit 34 here, no.



Q I believe you testified earlier that Patagonia monitors -- strike that.
Patagonia works to protect its brand, correct?
MR. GILCHRIST: Overbroad. You can answer.
A Yes.
BY MR. SCRENCI:
Q At a high level does that include monitoring other brands or companies that use similar brand names to Patagonia?
MR. GILCHRIST: Vague.
A Yeah, monitoring, we certainly learn about things through various channels, and we will monitor things sometimes once we're aware of them. But I'm not sure I follow that particular phrase.
BY MR. SCRENCI:
Q I guess I'm just trying to understand, Patagonia clearly learns from somewhere about brands that potentially infringe on Patagonia's intellectual property, correct?
A Correct.
Q And is that something that is handled exclusively by the legal department or are there other departments within Patagonia that might be involved with that monitoring?



MR. GILCHRIST: Object to monitoring, but you can go ahead.
A Yes, I think as to whether something is an enforcement issue, that's the legal department's function. It may come in from other parts of the business or from customers or, you know, any sort of number of places. But there's no other department that's responsible for making choices about enforcement, if that's the question. Sorry.
(Document marked as Deposition Exhibit 35 for identification.)
BY MR. SCRENCI:
Q Would you please pull up Exhibit 35? Let me know when you have that open.
A Okay. I see Exhibit 35.
Q What are these or what is Exhibit 35?
A I'm not --
MR. GILCHRIST: Let me just make an object -- I mean, there's dozens of pages it looks like. So obviously if you know what this is, please give him an answer. But I just want to make sure that you're aware that this goes on and on.
A Right. I believe these are, and I see at the top is says you are impersonating Traci Escamilla, who's



the senior IP paralegal that works on our team. This I think is an internal -- you see brand guidelines there on the top left?
BY MR. SCRENCI:
Q Yes.
A It's an internal document that is an effort to give teams guidance on consistent use of various creative assets I would say including -- well, you see the first one is the Belwe wordmark, and I think there are other examples in here, different sizing of the P-6 mark as we referenced, which is the Patagonia mark, the fish, flying fish as we call it, the fish fork. So I think it's internal design guidelines is kind of how I would describe this document.
BY MR. SCRENCI:
Q So I guess who -- who's the intended audience for the brand guidelines?
A You know, my first reaction was to say the whole company, but I think primarily it's our creative team, so people building marketing assets. I suspect product teams also get this about what goes on what products and where it goes. I think those would be the two primary audiences that I can think of.
Q I think you said, and correct me if I'm wrong

Page 150

here, something along the lines of it's important to have consistency, is that correct?
A I don't know if I characterized it as important, but I think that's what -- that's what this document is intending to do is to encourage consistent use of designs for sort of clarity and, you know, cleanliness, so presentation of the brand. So I don't know if it's important in what context, but I think that's the intent of the document is to give clear direction on what should be used how and where for a consistent presentation, which I understand our teams prefer.
Q Do you know why your teams prefer clear and consistent usage of the various information in this document?
MR. GILCHRIST: Don't answer that with respect to any legal issues about trademarks or brand protection or development.
A Okay. And, yeah, this is -- this is not my area. We have had inconsistent use in the past. Some parts of the business are doing things that other parts aren't aware of. So I think that's one reason. And I think one reason is just their -- their feeling of consistent presentation of the brand is helpful. But

Page 151

again, that's beyond my scope.
BY MR. SCRENCI:
Q Do you know how long these brand guidelines as depicted in Exhibit 35 have been in effect?
A I don't know that.
Q If you go down to page two in Exhibit 35, see the P-6 Fitz Roy Skyline?
A Yes, I see that, woven label?
Q Yes. It says the Fitz Roy Skyline artwork should only be reproduced using the approved colors designated here. Do you see where it says that?
A I do see that.
Q And the colors designated here, you'd say that's black, white, a shade of blue, a shade of orange, and a shade of purple?
A I see those colors in the document, yeah.
Q And you understand that those would be the approved colors designated here being referred to with respect to the P-6 Fitz Roy skyline woven label?
A I mean, I see here it's the P-6 Fitz Roy skyline is a woven label, so that's a particular execution of this design. And then that last sentence says, the colorways used in this artwork are the approved legacy colorways for the Patagonia brand. So

Page 152

I -- I can agree with that statement.
Q And can you agree with the statement that the Fitz Roy skyline artwork should only be reproduced using the approved colors designated here?
A I don't -- I don't know that I could agree with that. I think legacy colorways is important in this. And this is one execution of this, you know, this logo. But I think it's -- this is the legacy colorways I think is important in that statement.
Q Yeah, and it's in reference to the colors being depicted immediately to the right, correct?
A I think that's right, yeah.
Q Red is not one of those colors depicted to the right, correct?
MR. GILCHRIST: Objection, vague.
A Red is not -- you know, there's orange but not -- I don't see red. Some people get pretty specific about what PMS 172 means and how you would describe that. And I don't know what the color description is on that, but I agree, I wouldn't say that that's red.
BY MR. SCRENCI:
Q You wouldn't say that's yellow either, right?
A Again, not to me, but these are pretty specific designations, yeah.

Page 153

MR. SCRENCI: Why don't we take a ten-minute break now.
MR. GILCHRIST: Okay.
VIDEOGRAPHER: We're going off the record. The time now is 1:37 p.m. Pacific time, and this concludes media unit number three.
(WHEREUPON, a recess was taken, after which the following proceedings were held:)
VIDEOGRAPHER: We are going back on the record. The time now is 1:46 p.m. Pacific time. This is the beginning of media unit number four.
(Document marked as Deposition Exhibit 36 for identification.)
BY MR. SCRENCI:
Q Okay. Mr. Tadlock, if you could pull up Exhibit No. 36. Let me know when you have it open.
A Thirty-six?
Q Yes.
A Okay. Okay. I see it.
Q Based on the Bates stamp at the bottom right corner, do you agree that this is a document produced in this case?
A It appears to be, yes.

Page 154

Q Produced by Patagonia in this case?
A I think that's right, yeah.
Q If we scroll down to page 11 of 164 in this pdf.
A Okay.
Q See it says Pattie Gonia on the page?
A So right at the top below that image, the sort of handle, is that what you mean?
Q Yeah. Yes.
A I see that.
Q We can agree that this is a post on my client's Instagram page, correct?
MR. GILCHRIST: Lacks foundation. You can answer.
A No reason to dispute that.
BY MR. SCRENCI:
Q See that it says, It's finally here! The HOKA x Cotopaxi collaboration is LIVE. Available at REI?
A I see that.
Q I think you testified earlier that HOKA sells shoes, correct?
A Yeah, based on the image there's backpacks, too, I think. So yes, I know they sell at least shoes. We're getting really aware of HOKA.

Page 155

Q How about Cotopaxi, are you familiar with Cotopaxi?
A Yes.
Q What does Cotopaxi sell?
A I think Cotopaxi sells outdoor apparel, backpacks, bags, things like that.
Q Would you consider them a competitor of Patagonia?
A I mean, they're in the outdoor -- they're in the same market as we are, yeah. I don't know -- I don't know if we think they're a competitor or if we don't. But they certainly are in the same industry, I'll give you that.
Q And it says available at REI. Does Patagonia sell items at REI?
A Yes.
Q Does it sell clothes at REI?
A Yes.
Q Does it sell backpacks at REI?
A Yes.
Q Now if you would scroll all the way down to 163 of 164.
A Good grief. Okay.
Q And see the date on this post, March 30th, 2021?
MR. GILCHRIST: Objection, there are multiple dates on this post, including two on this page.
A Right. I see what -- below the heart and the quote box I see March 30, 2021.
BY MR. SCRENCI:
Q Any reason to dispute that this post was posted on Instagram on March 30th, 2021?
MR. GILCHRIST: Okay.
A I don't have any reason to dispute that, no.
BY MR. SCRENCI:
Q When you spoke with my client in 2022, was this post mentioned?
A I don't recall this post -- I don't recall the conversation including a discussion about this post.
Q Do you recall discussion about Pattie's work with HOKA and Cotopaxi?
A I don't -- I don't recall whether -- I don't recall whether it was discussed or not.
Q Do you recall whether Patagonia objected to Pattie's promotion of the collaboration between HOKA and Cotopaxi?
MR. GILCHRIST: The question assumes facts not in evidence, lacks foundation.

Page 156

Page 157

A Outside of my conversation with Wyn and Jenny in 2022?
BY MR. SCRENCI:
Q I suppose at any time.
A I'm -- I'm not aware of -- sorry, I don't remember how you characterized it. I don't think we object -- I don't recall Patagonia objecting specifically about this -- this post.
Q This post is promoting a collaboration between HOKA and Cotopaxi, correct?
MR. GILCHRIST: Lacks foundation.
A Yeah, that's certainly the topic of the post is the collaboration it sounds like.
BY MR. SCRENCI:
Q And -- and it's promoted as a collaboration, correct?
MR. GILCHRIST: You're asking him to read it as a consumer as if he had seen it?
BY MR. SCRENCI:
Q Do you understand my question, Mr. Tadlock?
MR. GILCHRIST: I'll object that it lacks foundation. It's vague.
A Yeah, it's certainly talking about the collaboration and in detail. I see -- I'm just looking

Page 158

at the text here. Yeah.
BY MR. SCRENCI:
Q Do you see where it says giveaway in the caption to the post?
A I don't -- I don't see giveaway, sorry.
Q The middle, halfway through on page 11, the caption, it says providing for this community so... giveaway.
A I see it. Now I see it, yes.
Q It says like + comment on this post to be entered to win a shoe + bag combo. Two lucky winners. Do you see that?
A I see that.
Q This is -- this post is promoting at least a giveaway of a shoe and bag combo, correct?
A Yeah, I can agree to that, yeah. I think. I mean, that's what I see here.
Q Then near the bottom of the caption it says, the collaboration is available at our exclusive retail partner @REI. Get 'em before they're gone. Do you see that?
A I see that.
Q You would agree that REI was a partner of Pattie Gonia, correct?

Page 159

MR. GILCHRIST: I'll object that these questions put together that way lack foundation and are argumentative, but you can answer.
A A partner of --
MR. GILCHRIST: He already answered, but go ahead.
A Sorry. Rocco, is the question that Pattie Gonia and REI were in partnership?
BY MR. SCRENCI:
Q Yes.
A Yeah, I don't dispute that -- that they were. It says here that -- I assume the our in this includes Pattie, HOKA, and Cotopaxi, and that REI was the exclusive retail partner. So, yeah, I don't have any reason to dispute that.
(Document marked as Deposition Exhibit 37 for identification.)
Q Let's move on to Exhibit 37. Let me know when you're there.
A Okay.
Q You have no reason to dispute that this is an Instagram post on the Pattie Gonia Instagram page dated November 17th, 2020, correct?
A Yeah, no reason to dispute that.

Page 160

Q This post indicates that Pattie Gonia is a sponsored athlete by @hokaoneone, correct?
A I see it says here, never in my life did I ever think I would be a sponsored athlete, but HOKA -- hokaoneone has taken care of me so well this year, I see that, but I don't know -- I don't know anything beyond what's written right here.
Q This post also indicates that there is a giveaway associated with the post, right?
MR. GILCHRIST: Document says what it says, but you can read it, Mr. Tadlock.
A Yeah, I see -- I mean, at the bottom it says we stan hokaoneone and today, they're giving away three pairs of their new TenNine hiking shoes, is that right? I see that there.
BY MR. SCRENCI:
Q And then at the top it says giveaway closed, so presumably at some point the shoes were in fact given away, is that fair to infer based on this post?
MR. GILCHRIST: Objection, asks for an opinion, lacks foundation.
A Yeah. I mean, I see that it says that there. I don't know why it's closed, but I get that it's closed.

Page 161

BY MR. SCRENCI:
Q Is that --
A Sorry, but anyway, I see that it says that. I'm not sure what that means.
Q I think the implication is that there was a giveaway at one point, perhaps when it was originally posted, and then subsequent to the giveaway taking place, it was edited to indicate that the giveaway had closed.
A Right. So this would have been a subsequent edit after the original post. Does the edit happen on the same day -- anyway, you're beyond my expertise. Is the -- November 17th or is that after and does it update or does it keep the original --
MR. GILCHRIST: Rob, he gets to ask questions. You don't get to ask questions.
THE WITNESS: Sorry. Sorry.
MR. SCRENCI: You don't have to speculate about when it opened and when it closed.
THE WITNESS: I'll stop.
(Document marked as Deposition Exhibit 38 for identification.)
BY MR. SCRENCI:
Q If you'll move on to Exhibit 38. Let me know

Page 170

A Yeah, I mean, I think this appears to be about Smartwool's Second Cut project. I don't know what the Second Cut project is. So -- but it looks to be about that project and Smartwool.
BY MR. SCRENCI:
Q Did Patagonia to your knowledge ever object to a partnership between Pattie Gonia and Smartwool?
A Not -- like we didn't respond to this post if that's the question. Did we ever object to Smartwool in particular?
Q Yes.
A I don't know that we objected calling out Smartwool in particular.
(Document marked as Deposition Exhibit 40 for identification.)
Q Move on to Exhibit 40.
A Okay.
Q You'll notice that this is a post on my client's Instagram, the Pattie Gonia Instagram, August 2nd, 2023, correct?
A I see that here. No reason to dispute it.
Q This post is announcing a partnership with The North Face and REI on their Nature is Magic collection, correct?

Page 171

A That's what it says here, yeah.
Q You'd agree that this is an advertisement for The North Face and REI?
A I don't -- I don't know that I could agree to that. I mean, it's a social media post where they're called out and the partnership is called out. I can agree to that.
Q #ad?
A Yeah, I see that there.
Q Do you believe the intent is for it to be an advertisement?
A I don't know the intent.
Q Fair enough. Did Patagonia ever object to this post or the partnership with North Face and REI depicted in this post?
A I'm not aware of --
MR. GILCHRIST: Vague and -- go ahead. When you say ever, do you mean before the complaint was filed, Rocco?
MR. SCRENCI: Yes, for clarity, before the complaint was filed.
MR. GILCHRIST: Thank you.
A Yeah, and I'm not aware of outreach about this specific post or this partnership in particular.

Page 172

(Document marked as Deposition Exhibit 41 for identification.)
BY MR. SCRENCI:
Q Move on to Exhibit 41, please. Let me know when you have it open.
A I see it.
Q No reason to dispute that Exhibit 41 depicts a post on the Pattie Gonia Instagram dated March 12th, 2025, correct?
A Yeah, correct, no reason to dispute that.
Q This post refers to @stio, s-t-i-o, is that correct?
A I see that.
Q Are you familiar with Stio?
A I am.
Q They make ski jackets and clothes, right?
A I think that's right, yeah.
Q Does Patagonia sell ski jackets?
A We do.
Q Would you consider Stio to be a competitor of Patagonia?
A Yeah, in the same industry, selling the same products, yeah.
Q To your knowledge prior to the filing of the

Page 173

complaint did Patagonia ever object to this collaboration between Pattie Gonia and Stio?
MR. GILCHRIST: I think you may have misspoke, Rocco, but I'm not sure. I think you said following the filing of this complaint rather than the post.
MR. SCRENCI: Let me strike my question and re-ask it in that case.
Q Prior to the filing of the complaint, are you aware of any instance in which Patagonia objected to this collaboration between Pattie Gonia and Stio?
A Yeah, this is the timing of the exchange of -- the followup exchange of letters, right? But I'm not aware of a communication specifically about this post, no.
(Document marked as Deposition Exhibit 42 for identification.)
Q Going to introduce Exhibit 42. Let me know when you have that and are able to open it.
A Okay. I see it.
Q Does Exhibit 42 depict a message from Patagonia in which it says we're in, we're willing to match one-fifth of the total?
MR. GILCHRIST: Lacks foundation.

Page 174

A Yeah, I see that statement with what looks to be the Patagonia logo next to it.
BY MR. SCRENCI:
Q Fair to say that Patagonia was supporting the fundraiser that Pattie Gonia was promoting here?
A Yeah. I mean, it looks like we're matching one-fifth of the total of the fundraiser. I don't know what the fundraiser is, but I don't dispute that this is a post from our account and that we did that.
MR. SCRENCI: Just take a second here to upload another exhibit.
(Document marked as Deposition Exhibit 43 for identification.)
BY MR. SCRENCI:
Q I believe Exhibit 43 should be marked for you now. Are you able to access Exhibit --
A Yes.
Q Are you familiar -- familiar with the document marked in Exhibit 43?
A Let me look at it for a second. Yeah, is this part of the website, the history of Patagonia on Patagonia.com?
Q Yes, it is.
A Yeah, I'm generally familiar with this, yeah.

Page 175

Q The information on Patagonia's website would be accurate about the history of Patagonia, correct?
A I mean, we do our -- you're going to object, right?
MR. GILCHRIST: No.
A Yeah, we do our best to make it accurate. I can't vouch for everything that's on there, but I think the statement about the history of the company like this should be accurate.
BY MR. SCRENCI:
Q So if you go to page three of the pdf?
A Okay.
Q Then the third paragraph on the page begins to most people, do you see that?
A I see it.
Q It says, to most people, especially then, Patagonia was a name like Timbuktu or Shangri-La, far off, interesting, not quite on the map, is that correct?
A I see that there, yeah.
Q It says Patagonia brings to mind, as we once wrote in a catalog introduction, "romantic visions of glaciers tumbling into fjords, jagged windswept peaks, gauchos and condors," is that correct?
A I see that there, yeah.

Page 176

Q And is that the company Patagonia's position on what Patagonia brings to mind?
MR. GILCHRIST: Lacks foundation.
A Yeah, I don't know if I can testify on behalf of the company on what Patagonia brings to mind, but I know that I've seen that description in sort of talking about why the name was chosen.
BY MR. SCRENCI:
Q I believe you're designated to testify as to Patagonia's knowledge regarding the selection and creation of the Patagonia marks, are you not?
MR. GILCHRIST: I don't remember that being exactly the designation, but maybe you can point us to the 30(b)(6) designation that you're talking about.
A Right, I don't remember the exact scope of the 30(b)(6) topic --
MR. SCRENCI: I'll withdraw that.
THE WITNESS: Okay.
MR. SCRENCI: I'll withdraw that question.
MR. GILCHRIST: Sorry, Rocco, what exhibit? I just flipped out of it. What are we on now?
MR. SCRENCI: I think that was Exhibit 42.
MR. GILCHRIST: Thank you.

Page 177

THE WITNESS: That was 43.
MR. SCRENCI: Oh, my apologies, 43.
MR. GILCHRIST: Got it.
MR. SCRENCI: As you can tell, I also slipped out of it. We'll mark Exhibit 44.
(Document marked as Deposition Exhibit 44 for identification.)
BY MR. SCRENCI:
Q Will you please open it and let me know when it is open?
A Okay. I have it open.
Q Do you recognize the email in Exhibit 44?
A I do, yes.
Q This is an email that you sent to Yiorgos Makris and Robin Vieira of Hydro Flask, correct?
A Correct.
Q It says that --
MR. GILCHRIST: There's several emails. You're referring to the top one or most recent in time?
MR. SCRENCI: Yes, I'm referring to the top one.
MR. GILCHRIST: Okay.

Page 178

BY MR. SCRENCI:
Q It says, we've had discussions internally to develop a point of view, and I'm hopeful it allows Pattie and Hydro Flask to have some certainty so that your relationship and Pattie's broader work can move forward without any disruptions, see that?
A I do.
Q And is that an accurate reflection of the discussions you had internally at Patagonia?
MR. GILCHRIST: Don't -- don't discuss your internal discussions. You can talk about what you stated to Mr. Makris, but don't talk about whether what you said here is a reflection of some internal conversation you had with your clients.
A I'm not sure I can answer the question then. I see what's written here. I don't know what I have beyond what's written.
BY MR. SCRENCI:
Q Was your intent in communicating with Hydro Flask and Pattie to enable certainty regarding the Pattie and Hydro Flask relationship?
MR. GILCHRIST: You can answer with respect to what you communicated.
A Yeah, my recollection of the conversation with

Page 179

Wyn and Jenny was to give the outline of broad principles to give them clarity to move forward with the partnership and an awareness of the trademark issues that, you know, we wanted to raise. As I said before, I wanted -- that conversation I communicated, it was a, you know, a way to open a channel of communication and try to avoid a dispute into the future. That's what -- that's what I communicated to Pattie, to Wyn and Jenny.
BY MR. SCRENCI:
Q It mentions Pattie's broader work in that -- in this email, correct?
A I see that here.
Q Based on the Instagram post that we looked at today, Pattie's broader work included partnerships with numerous third parties, correct?
MR. GILCHRIST: Objection, lacks foundation, misstates the testimony, and infuses the language in this email to somebody else with Instagram posts that the witness testified he hadn't seen. So it's argumentative.
MR. SCRENCI: I think that's a speaking objection, Greg, and I think you made a number of speaking objections throughout this deposition. So just caution that this is Mr. Tadlock's deposition.

Page 180

If he doesn't understand it, he can tell me. If there's an objection to the form or the foundation, you can say so. But characterizing my question in a certain way gives the witness improper guidance on what the answer could be.
MR. GILCHRIST: No, it gives -- it gives the witness guidance to the extent that the question is unfair, which is why I objected. So I take your -- I'll take your comment under advisement, but maybe you can ask questions that don't ask him to read things and are fair.
A Sorry, could you ask that one again?
BY MR. SCRENCI:
Q As of February 8th, 2022, did Pattie's broader work include working with third-party companies?
MR. GILCHRIST: Same objections, and lacks foundation.
A Right. I mean, I've seen -- I've seen the posts here and the dates associated with them. I don't dispute any of that, that that was happening, yeah.
BY MR. SCRENCI:
Q Was it Patagonia's intent that that broader work that has just been described there could move forward without any disruptions?

Page 181

MR. GILCHRIST: Objection. You can discuss what you stated here. You can discuss what you stated in your conversations with Wyn and Jenny. You should not be testifying about your intentions or what you talked about internally if you had any such conversations regarding Pattie's broader work.
MR. SCRENCI: Just for clarity, what's the basis for the no testimony as to intentions?
MR. GILCHRIST: Because his intentions -- let's go off the record for a second. No, we can stay on the record. I'm sorry. It's fine.
His intentions reflect his legal impressions and conceivably reflect -- and almost certainly reflect his advice to his clients about these particular issues. And, you know, what he stated, what he saw, what he had seen as opposed to what you've shown him here today are relevant to questions that you're entitled to ask him.
But what he intended and what he discussed internally as the company's lawyer dealing with a trademark issue are either privileged or work product. So that's the basis for the objection.
And so when you're asking him whether his intention included some Instagram post that he's

Page 186

(WHEREUPON, a recess was taken,
after which the following
proceedings were held:)
VIDEOGRAPHER: We are going back on the record. The time now is 2:45 p.m. Pacific time. This is the beginning of media unit number five.
(Document marked as Deposition Exhibit 45 for identification.)
BY MR. SCRENCI:
Q Mr. Tadlock, I've added Exhibit No. 45 to the Exhibit Share. Will you please open it and let me know when it is open for you?
A Okay. I've got it open.
Q I will represent to you that this is a screenshot of pattiemerch.com. Are you familiar with pattiemerch.com?
A Yes.
Q Is your understanding that this is the website formerly known as pattiegoniamerch.com?
A I believe that's right, yeah.
Q Do you believe that any merch sold by my client is a threat to public health?
MR. GILCHRIST: Objection, lacks foundation. And just for the record, when you say it was

Page 187

formerly known as pattiegoniamerch.com, my belief is that it's still live and resolves to this page or something that looks like it. But your particular question right now lacks foundation.
A Yeah, can you ask that again? Sorry.
BY MR. SCRENCI:
Q I can lay a foundation for it. Do you have an understanding whether my client has sold upcycled apparel through pattiegoniamerch.com?
A I think as represented, the products were secondhand upcycled. That was most of the products. I don't actually know, but I understand that's how it was represented.
Q The products depicted in the complaint, for example, at page 15, and I can refer back to Exhibit 10 if that would help you better understand.
A Yeah, I think I know what we're talking about. Let me just get back there real quick. So Exhibit 15 -- or Exhibit 10 page 15?
Q Yeah, page 15 of the complaint. It's page 16 of the pdf if you're looking at the number at the bottom.
A So the T-shirts and sweatshirts there?
Q Yes. Is it your understanding that those were

Page 188

sold through pattiegoniamerch.com at one point?
A I believe that's right.
Q Do you believe that any of the shirts depicted in Exhibit 10 are a threat to public safety?
MR. GILCHRIST: Again, there's no foundation that he would have any reason to know.
A I don't know, but I'm not -- I'm not sure I could -- I don't know.
BY MR. SCRENCI:
Q You are familiar with these, right, in the sense that they're included in the complaint, correct?
MR. GILCHRIST: The images?
A The product images? Sorry.
BY MR. SCRENCI:
Q Yes.
A Yeah. Yes, I'm familiar that -- that those images of the products that were on pattiegoniamerch were included in the complaint.
Q You have no underlying knowledge then of the -- what was actually being sold, is that what I'm understanding here?
A I mean, beyond what I -- what I saw, I can't recall anything beyond, yeah, what was represented and what I saw on the website, I don't think.

Page 189

Q To put it more simply, you never held one of these products then, correct?
A I don't believe I have. I don't think so.
Q Based on what you are familiar with with these products, do you have any reason to believe that they are a threat to public health or safety?
A I don't know.
Q You don't know either way?
A Right, I don't know. I don't have any reason to believe that.
Q Patagonia hasn't gotten any complaints regarding merch sold by Pattie Gonia, has it?
A Not that I'm aware of.
Q I believe when we were going through your 30(b)(6) topics, one of them related to consumer confusion, is that correct?
A I recall that, yeah.
Q I think you said something along the lines of you reviewed customer service documents in preparation for that topic?
A I recall that, yeah.
Q Do you recall which customer service related documents you reviewed in connection with that topic?
A They were logs of customer chats or customer

emails or calls, I forget exactly how -- I think there were some of all of them, calls, chats, emails. So I looked at those logs.

Q Were those logs -- strike that.

Was the content within those logs at all mentioning The North Face collaboration with Pattie Gonia?

A I believe there were -- there were a few that related to the Pride campaign that they did together. Yeah, there were -- there were one or two or a couple of them. I can't remember exactly how many.

Q Do you remember any other -- the content of any other logs besides those relating to the Pride campaign with The North Face?

A About the North Face in particular?

Q No, about anybody else in particular.

A I can't remember the specifics sitting here. I have to look at those documents.

Q Were any of them in relation to Pattie Gonia's merchandise or clothing being sold by Pattie Gonia?

A I don't remember any of the customer service contacts being about the Pattie Gonia merchandise.

Q I don't recall if you answered this earlier, but were you personally aware of the collaboration



between Pattie Gonia and The North Face relating to the Pride campaign?

A I am now. I don't recall when I learned about it. I think I -- anyway, I certainly am now. And I don't remember whether I knew about it at the time. I think I was, yeah.

Q Certainly Patagonia was aware if there were customer service logs that related to that Pride campaign, correct?

A I -- I agree there were -- yeah, there were others in the company who were aware of that, that Pride campaign with The North Face.

Q And prior to the filing of this lawsuit, Patagonia never reached out to Pattie Gonia concerning their Pride fit -- Pride campaign with The North Face, correct?

A Yeah, not -- I don't -- I don't know -- not that I'm aware of, no, not that I recall.

Q So you didn't personally reach out to Pattie Gonia regarding the Pride campaign with The North Face?

A The 2023 campaign?

Q Yes.

A I did not reach out to Pattie Gonia about that campaign.



Q What about the 2022 campaign?

A I don't recall reaching out about the 2022 campaign either.

Q Do you recall reaching out to Pattie Gonia about any campaign with The North Face?

MR. GILCHRIST: Assumes facts.

A Yeah, as a standalone issue, no, I don't recall raising the Pride campaign with The North Face.

MR. SCRENCI: Okay. I have no further questions.

MR. GILCHRIST: Okay. I don't have any questions. Thank you, Rocco. Thank you, Christina. Thank you, Bob.

VIDEOGRAPHER: We are going off the record. The time now is 2:55 p.m. Pacific time, and this concludes today's testimony given by 30(b)(6) designee and individually of Robert D. Tadlock.

MR. GILCHRIST: Do you need anything from us, Christina or Bob?

VIDEOGRAPHER: Christina can go first in terms of your transcript orders, and then I'll take video orders if you have them --

COURT REPORTER: Would you like that transcribed, Rocco?



MR. SCRENCI: Yes, and no need for the video at this point.

COURT REPORTER: And, Mr. Gilchrist, did you need a copy?

MR. GILCHRIST: We do. And we don't need a copy of the video yet either.

VIDEOGRAPHER: Sounds good.

(WITNESS EXCUSED.)