# EXHIBIT 4

Page 14

Q. Yes. So let me start with a more basic question.
What is your understanding of the intended or actual consumers of Patagonia's products, and more specifically, what are those consumers' general demographic characteristics?
MR. BRICKER: Objection. Compound, vague.
BY MR. SCRENCI:
Q. You can answer if you understood.
A. We refer to people who purchase our products as customers, not consumers, and -- Yeah. And we have general knowledge of, in some indications, who -- who they are, how many, for instance, we have purchasing our products.
Q. Do you have any other knowledge of customers' demographics?
MR. BRICKER: Objection. Vague.
BY THE WITNESS:
A. We have our several channel business, and so it would depend on how a customer purchases from us potentially on what we know about them.
BY MR. SCRENCI:
Q. So let's start with apparel.

Page 15

What are the general demographics for Patagonia's apparel customers?
MR. BRICKER: Objection to the -- may be outside of the scope of the -- of the topic based on our objections.
But, Ms. Kenna, if you have an answer that you can provide as an individual, go ahead.
BY THE WITNESS:
A. I'm -- I don't know the age range or necessarily the income status or ethnicity of all of our customers. I know we have customers all around the world. Our business in the U.S. is our largest business.
BY MR. SCRENCI:
Q. Does Patagonia track customers' purchasing habits?
MR. BRICKER: Objection. Vague.
BY THE WITNESS:
A. We wouldn't, I don't think, necessarily have a sense on all of the purchasing habits of all of our customers.
BY MR. SCRENCI:
Q. Does Patagonia conduct surveys of its customers?

Page 16

MR. BRICKER: Objection. Vague. Outside of the scope of the 30(b)(6) topics based on our objections.
If you know as an individual, Ms. Kenna, you can answer.
BY THE WITNESS:
A. Occasionally.
BY MR. SCRENCI:
Q. I guess what I'm trying to get at here is you've been designated subject to some objections in response to topic 8. I want to understand what your knowledge is of whatever you've been designated for, for topic number 8.
A. I understand. I'm not quite sure how you want me to respond to that.
Q. Well, I'm just asking what is your knowledge of the general demographic characteristics of the intended or actual customers of Patagonia's products?
A. Okay. We are a global business selling product across the U.S. in, I believe, just over 40 retail locations, several wholesale accounts, and many specialty dealers. We also have a robust e-commerce business. We also have stores and offices across Europe, Japan, Korea,

Page 17

Australia, New Zealand, and in South America in Chile and Argentina.
Our customers' ages vary from, I would imagine, older teenagers through, you know, 70-plus across various income levels, education levels, and ethnicities.
We provide -- or we sell technical sport apparel to support water sports, such as surfing and fishing, snow sports, such as skiing and snowboarding; mountain sports, such as climbing, trail running, mountain biking; we also have what we call for the moments in between apparel, such as T-shirts and hats, flannel shirts, things of that nature. That's roughly the scope of our apparel business.
Q. Let's move on to topic number 11.
In response, it states, "Patagonia will designate one or more witnesses to testify generally regarding tests, surveys, focus groups, and studies, if any, conducted by or on behalf of Patagonia, specifically to obtain consumer opinions concerning the visual appearance or graphical elements of the P6 logo."
Do you see that?

Page 34

Q. What is the most recent event hosted by 1% for the Planet that you've attended?
MR. BRICKER: I'll object that these are outside of the scope of the 30(b)(6) content subject.
But, obviously, you can answer, Ms. Kenna.
BY THE WITNESS:
A. I don't recall the most recent event, that I attended for 1% for the Planet. I don't recall. I -- Yeah.
BY MR. SCRENCI:
Q. I believe you testified that -- is it Yvon Chouinard co-founded 1% for the Planet; is that correct?
A. That's correct.
Q. Mr. Chouinard founded Patagonia, correct?
A. That's correct.
Q. Would you agree that the public closely associates 1% for the Planet with Patagonia?
MR. BRICKER: Objection. Outside of the scope of the 30(b)(6) topics, calls for speculation, vague.
BY THE WITNESS:

Page 35

A. There are thousands of companies in 1% for the Planet. I don't know if the public associates Patagonia necessarily as the founder of 1% for the Planet, especially outside of this country.
BY MR. SCRENCI:
Q. So I'm not asking as to Patagonia's role or, I guess, lack of role in founding 1% for the Planet. I'm just asking about whether the public associates Patagonia with 1% for the Planet as an organization generally.
MR. BRICKER: Objection. Outside of the scope of the 30(b)(6) topics, calls for speculation, vague.
BY THE WITNESS:
A. I -- I really -- I really don't know. Unfortunately, there's low awareness, I think, in the general public of 1$ for the -- for the Planet, including even among our customers, I believe.
BY MR. SCRENCI:
Q. So you don't believe the public associates Patagonia with 1 -- 1% for the Planet?
MR. BRICKER: Objection. Misstates the

Page 36

witness' testimony.
BY THE WITNESS:
A. I don't know if they do.
BY MR. SCRENCI:
Q. As to, I suppose, people who have heard of 1% for the Planet, do you believe that they recognize 1% for the Planet as being tied to Patagonia?
MR. BRICKER: Objection. Outside of the scope of the 30(b)(6) topics, calls for speculation, vague.
BY THE WITNESS:
A. If -- Within the environmental non-profit community or among some of the members of 1% for the Planet there could be awareness of Patagonia's role in founding and participating in 1% for the Planet.
BY MR. SCRENCI:
Q. Let's go to topic number 31. Let me know when you're there.
A. I'm there.
Q. After objections, Patagonia states, "Patagonia will designate one or more witnesses to testify generally about Patagonia's contributions to Sustainable Coastlines Hawaii

Page 37

in 2019."
Do you see that?
A. I do.
Q. What did you do to prepare in connection with topic number 31?
A. I reviewed an e-mail about this provided by my attorneys.
Q. Can you describe that e-mail that you reviewed?
A. It was an e-mail between colleagues on our environmental action -- activism team and our action works team about a donation and a matching, a potential for a match.
Q. Who were those colleagues on the e-mail that you recall seeing?
A. One colleague was Sam Merch (phonetic). He's a current colleague. I believe he was the only colleague who is a current colleague. The other two were former colleagues, Whitney Clapper and Richard Thornton, I believe his name was.
Q. You can close out of Exhibit No. 7. I'd ask you to next pull up Exhibit 47. Let me know when you have it open.

Page 46

make one unified social media team, and so today, my team manages that, and so that includes the organic content that we post across social media in support of product, sport, environmental activism, and responsible business issues.
The regional teams manage their own social media handles. So, for instance, Patagonia Australia falls outside the purview of my team.
Q. And sounds like you post -- or Patagonia posts content on its social media pages, correct?
MS. CHAMBERS: Objection. Vague.
BY THE WITNESS:
A. Patagonia posts content on Patagonia's social media handles.
BY MR. SCRENCI:
Q. For instance, like an Instagram post is -- is what I'd be referring to. That's the type of content that -- one example of the type of content that Patagonia posts?
A. Yes.
Q. Does Patagonia every use its social media accounts to comment on other people's

Page 47

posts?
A. Occasionally.
Q. Do you know who is in charge of making those comments?
A. Yes.
Q. Who is that?
A. It's a guy named Nathan.
Q. To your knowledge, what is -- Strike that.
Yes, is that a new practice of Patagonia to comment on others' social media posts, or has that been happening for several years, let's say?
MR. BRICKER: Objection. Vague, compound.
BY THE WITNESS:
A. I don't know when it started happening.
MR. SCRENCI: That's fair. I think we can take a quick break to go off the record.
MR. BRICKER: Great. And I --
THE VIDEOGRAPHER: We're off the record at 12:16 p.m.
(Whereupon, a short break was taken.)
THE VIDEOGRAPHER: We're on the record

Page 48

at 12:25 p.m.
BY MR. SCRENCI:
Q. All right. Ms. Kenna, I want to begin by asking about Pattie Gonia.
Do you know who Pattie Gonia is?
A. Yes.
Q. Who is Pattie Gonia?
A. Pattie Gonia is a drag queen activist performer, social media influencer, created by Wyn Wiley.
Q. Have you met Mr. Wiley?
A. Yes.
Q. Do you remember when you met Mr. Wiley for the first time?
MR. BRICKER: Objection. Lacks foundation, outside of the scope of the 30(b)(6) topics.
You can answer.
BY THE WITNESS:
A. I believe the first time I met Wyn was at a 1% for the Planet summit.
BY MR. SCRENCI:
Q. Do you know if you were familiar with Pattie Gonia before you met Mr. Wiley?
A. Yes, I was.

Page 49

Q. And how did you first become familiar with Pattie Gonia?
MR. BRICKER: Objection. Vague.
BY THE WITNESS:
A. I don't -- I don't know really the precise moment. I believe that it was in connection to a trade show that our company used to attend called Outdoor Retailer, and I believe Wyn was there as Pattie Gonia at that trade show. I believe that's when they first became somewhat familiar to me.
BY MR. SCRENCI:
Q. What is your recollection of that Outdoor Retailer trade show as it relates to Pattie Gonia?
MR. BRICKER: Objection. Vague.
BY THE WITNESS:
A. Only that they were there in drag visiting the different booths of the -- from the different companies that were at the trade show. I can't recall if Pattie Gonia visited the Patagonia booth, but I have a vague recollection of knowing and probably seeing Pattie Gonia at the outdoor retailer trade show.
BY MR. SCRENCI:

Q. Do you know if you had ever seen Pattie Gonia on a social media platform prior to that Outdoor Retailer trade show?

A. I don't recall if I had seen them on social media before then or after, but I had seen Pattie Gonia on social media before that 1% for the Planet summit.

Q. Do you know why you were attending that 1% for the Planet summit, that which you saw Pattie Gonia?

MR. BRICKER: Objection. Vague, outside of the scope of the 30(b)(6) topics.

BY THE WITNESS:

A. Yes. I was there as a speaker.

BY MR. SCRENCI:

Q. Do you remember what you were there to speak about?

A. Yes. I was interviewing Yvon and Craig. It was a anniversary for 1% for the Planet.

Q. I'm going to introduce Defendant's Exhibit 48. You should be getting a notification in the exhibit share that it has been posted.

A. Okay.



(Whereupon, Defendants' Exhibit 48 was presented.)

BY MR. SCRENCI:

Q. Do you have it open?

A. It's just taking a moment. Yes.

Q. Now, on the first page, it has a bunch of legal document-related things, so I'm not going to ask you to be familiar with any of that, but if you go to the last page, it looks like it is a -- just a picture of a printout of a page. There appears to be a signature on it.

Do you see that?

A. Yes.

Q. Is that your signature?

A. Yes.

Q. Do you recall reviewing and signing the document that is marked as Exhibit 48?

A. I recall reviewing this document.

Q. On the last page, it says, "I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct, executed on August 19th, 2020, at Ventura, California."

Do you see that?

A. Yes.



Q. And it's your signature that follows that statement, correct?

A. That's correct.

Q. Do you recall signing this document?

A. I'm certain that's my signature. I don't recall actually signing it because that was a few years ago, but I'm sure it's my signature and that I signed this document.

Q. So I would like to direct your attention to paragraph 7 in here. Let me know when you're there -- Actually, sorry about that.

Direct your attention to paragraph 5, and let me know when you're in paragraph 5.

A. Okay. I'm there.

Q. If you read through paragraph 5, towards -- it's the middle of that paragraph to line 23 of page 2, it says, "By 1991, Patagonia was donating at least $1 -- $1 million per year, and by 2012 -- which I understand is an important year with respect to certain aspects of our lawsuit with Anheuser-Busch, LLC -- we reached an annual donation level of $5 million based on 1% donations alone. The company also funds other grants and makes donations separate from this commitment."



So those numbers, $1 million per year -- per year by 1991 and $5 million annually by 2012, are those accurate numbers, to the best of your recollection?

MR. BRICKER: Objection. Outside of the scope of the 30(b)(6) topics.

You can answer if you remember.

BY THE WITNESS:

A. I'll -- Based on -- I'll -- I'll believe that what's here is accurate and true, yes.

BY MR. SCRENCI:

Q. Okay. Now directing your attention to paragraph 7.

A. Okay.

Q. Beginning -- This is on the fourth page, starting just at the end of line 2 on the page.

It says, "In my experience, the public closely associates the organization with Patagonia and Mr. Chouinard -- the majority of people who have heard of 1% for the Planet, it now has close to 4,000 business members in addition to its non-profit members, based on my conversations with those responsible for

Page 70

calling members of Congress on behalf of the issues that matter to those non-profits.

In my experience, based on the conversations that I have with non-profits and our customers and community members, people do associate us with the issues that matter to the non-profits that we support within this network.

BY MR. SCRENCI:

Q. They also associate the 1% for the Planet organization itself with Patagonia, correct?

MR. BRICKER: Objection. Misstates the witness' testimony, misstates the document.

BY THE WITNESS:

A. The non-profits associate us, perhaps, with 1%. The non-profits within the 1% for the Planet network probably do associate Patagonia with the organization 1% for the Planet. Strike the word "probably."

I think in most cases, they do associate Patagonia, the organization -- the non-profits within 1% for the Planet associate Patagonia the company with the organization 1% for the Planet.

BY MR. SCRENCI:

Page 71

Q. Has Patagonia tried to do anything to dispel whatever association non-profit members in 1% for the Planet have created or whatever association they make between 1% for the Planet and Patagonia?

MR. BRICKER: Objection. Vague, outside of the scope of the 30(b)(6) topics.

If you know, you can answer, Ms. Kenna.

BY THE WITNESS:

A. Not to my knowledge.

BY MR. SCRENCI:

Q. I'm going to introduce -- Actually, strike that. I just want to change gears here a little bit.

I believe earlier you testified about attending a 1% for the Planet event at which Pattie Gonia also attended; is that correct?

A. That's correct.

Q. And I believe you testified that you led a discussion with Mr. Chouinard and perhaps somebody else at that 1% for the Planet event; is that correct?

A. That's correct. It was the two founders of 1% for the Planet, Craig Matthews

Page 72

and Yvon Chouinard.

Q. All right. I'm going to introduce Exhibit 49. It should pop up for you in the exhibit share. Let me know when you have it open.

(Whereupon, Defendants' Exhibit 49 was presented.)

THE WITNESS: Okay.

MR. BRICKER: Let me take a minute to review this, Rocco.

MR. SCRENCI: Okay.

MR. BRICKER: Okay.

BY MR. SCRENCI:

Q. All right. Ms. Kenna, do you have Exhibit 49 open?

A. I do.

Q. Are you familiar with this document?

A. Yes.

Q. What is this document?

A. This is a briefing document from my team to help me prepare for an event, in this case the conversation that I was hosting with Yvon and Craig at the 1% for the Planet summit that they had in 2022 for their 20th anniversary.

Page 73

Q. Is this the type of document that Patagonia prepares in the ordinary course of its business?

A. Yes, they look --

MR. BRICKER: Objection. Vague.

BY THE WITNESS:

A. -- different today, but this is standard.

BY MR. SCRENCI:

Q. If you scroll to page 4 out of 5 in the PDF, you'll see about halfway down the page, it says Appendix; do you see that?

A. Yes.

Q. And it has something for "Jenna - Keynote Conversation."

Do you know what that's in reference to?

MR. BRICKER: Objection. Outside of the scope of 30(b)(6) topics.

You can answer if you know, Ms. Kenna.

BY THE WITNESS:

A. Jenna was a speaker at this summit as well on a different day, and oftentimes my team, in preparing me for an event, will let me know

if -- or whoever the speaker is, if there are other Patagonia speakers expected at that event.
BY MR. SCRENCI:
Q. And it looks like Ms. Johnson's title, at least as of the date of this document, was Head of Patagonia, Inc.; is that correct?
A. I -- I believe her title is Brand President.
Q. Is Ms. Johnson still with Patagonia?
A. She is.
Q. And is her current title Brand President?
A. I think so.
Q. If you don't know, that's fine then. I'm just trying to figure it out myself:
Under Ms. Johnson's keynote conversation, there is a separate heading that says Panel Discussion.
Do you see that?
A. Yes.
Q. And I believe if you need to zoom in, there is a plus and minus in the top left of the exhibit share that should enable you to do that if you need.
A. Okay. Thank you.



Q. Down where it says Moderator, it says Alison Huyett; is that -- is that correct?
A. Huyett, yes.
Q. Huyett, H-U-Y-E-T-T, Huyett.
And is Ms. Huyett still at Patagonia?
A. She is.
Q. Next to Ms. Huyett's name, it says Patagonia Environmental Campaigns Engagement Manager.
Was that her job title at that time?
MR. BRICKER: I'll object to all -- all the questions on -- about this document so far and it sounds like going forward as outside of the 30(b)(6) topics.
But, Ms. Kenna, you can answer these questions and --
MR. SCRENCI: And for -- Sorry. For ease, we can just have a standing objection to --
MR. BRICKER: Okay.
MR. SCRENCI: -- scope if, you know, you don't want to waste more time on that.
MR. BRICKER: That's fine.
BY MR. SCRENCI:
Q. So just on this document, it says,



"Patagonia Environmental Campaigns Engagement Manager."
Do your recollection, was that Ms. Huyett's job title at the time?
A. I'll assume that information is correct. I -- I don't recall exactly. She's not on that team any more. She's still on my team, but she's not on that team anymore.
Q. Then under Panelists, one of the panelists says "Alyssa Bautista, Patagonia Santa Monica Environmental Grants and Social Media Coordinator and Environmental Scientist."
Is Ms. Bautista still with Patagonia?
A. I don't know.
Q. Do you know who Ms. Bautista is?
A. Not beyond what's in this document. It looks like she's what we refer to today as the environmental activism leader. Each of our stores have a designated activism lead, and their job is to work with the non-profit that that particular location has selected to be a grantee. It's one of three grants programs that the environmental activism team coordinates, but I don't know every retail employee or every activism lead in all of our



retail locations.
Q. Can you recall any other Patagonia employees other than the ones we've named in this document attending the 1% for the Planet conference in 2022?
A. I -- I seem to remember driving to this event with Yvon and a woman who worked for him at the time as -- she was like his scheduler. And I -- I don't know if she stayed for the whole event or if she just drove down with us. I don't recall, but that's the only other employee that I remember being at this event.
Q. And just for the record, to make sure we're on the same page, is this the event, I believe you testified earlier, about meeting Pattie Gonia/Wyn Wiley for the first time?
MR. BRICKER: Objection.
BY THE WITNESS:
A. That's correct.
MR. BRICKER: Misstates the witness' testimony.
BY MR. SCRENCI:
Q. What do you recall about Pattie Gonia's attendance at this 2022 1% for the Planet conference in Los Angeles?

where the two founders were being honored, that would be an example of the kind of exception that we would make for sponsoring an event.
I'll assume in this e-mail that Tanner has the information correct and Yvon spoke at the 2019 summit and Greg spoke at the New York summit, and it wouldn't surprise me in this instance that we would sponsor at some level that particular event.
MR. SCRENCI: We can take a five-minute break now.
MR. BRICKER: Great. Thanks.
THE VIDEOGRAPHER: We're off the record at 1:43 p.m.
(Whereupon, a short break was taken.)
THE VIDEOGRAPHER: We're on the record at 1:51 p.m.
BY MR. SCRENCI:
Q. All right. Ms. Kenna, before we look at the next exhibit, I just wanted to go back to something I was asking about earlier.
I think you said you met -- to your recollection, you met Pattie for the first time at the 2022 global summit for 1% for the Planet,



correct?
A. Correct.
Q. I believe you also testified that your recollection was that Pattie was going to be doing some sort of performance at that summit; is that correct?
A. Correct.
Q. Is it your understanding that Pattie was going to be giving a drag performance at the 1% for the Planet global summit in 2022?
A. Correct.
Q. Do you believe that -- Strike that.
Do you have an understanding as to whether Pattie was paid in connection with their performance at the 2022 global summit for 1% for the Planet?
MR. BRICKER: Objection. Lacks foundation.
BY THE WITNESS:
A. I -- I have no idea if Pattie was paid for their performance at that summit.
BY MR. SCRENCI:
Q. We'll go to the exhibit share and open Exhibit 55.
MR. BRICKER: 55?



MR. SCRENCI: Yes.
(Whereupon, Defendants' Exhibit 55 was presented.)
BY MR. SCRENCI:
Q. Let me know when you have it open.
A. Okay.
Q. So it looks to be at the top just an e-mail from you to Mary Martin; is that correct?
A. That's what it looks like to me, yes, from me to Mary Martin.
Q. Who is Mary Martin?
A. Mary Martin is a former employee of the company. She was the executive assistance to our former CEO and our current CEO, but she retired a couple years ago.
Q. This e-mail from you to Ms. Martin is dated March 2nd, 2022, correct?
A. Correct.
Q. And the e-mail below it is an e-mail from -- appears to be Amy Horton to you and Bruce Old, correct?
A. Correct.
Q. Ms. Horton is with the Outdoor Industry Association, it appears, correct?
A. That's correct.



Q. What is the Outdoor Industry Association?
MR. BRICKER: Objection. Vague, lacks foundation.
BY THE WITNESS:
A. It's one of the Outdoor Industry's main industry groups, and we are a member of it.
BY MR. SCRENCI:
Q. Do you recall the context of this e-mail thread depicted in Exhibit 55?
A. No.
Q. Do you recall in Patagonia's participation in a summit with the Outdoor Industry Association?
MR. BRICKER: Objection. Vague, lacks foundation.
BY THE WITNESS:
A. I recall one of their summits in Washington, D.C., that Ryan, our CEO Ryan Gellert, spoke at. I don't know if that is what this e-mail is about.
BY MR. SCRENCI:
Q. You see at the top of Ms. Horton's e-mail, there are attachments mentioned?
MR. BRICKER: Objection. Misstates the

BY MR. SCRENCI:
Q. Let me know when you have it open.
A. I have it open.
Q. This is a pretty long e-mail chain, so I can give you the chance to just look through it.
A. Okay.
Q. Let me know when you've had a chance to review it.
A. Okay.
Q. Does this refresh your recollection as to whether you saw the article in Exhibit 19 that I showed you before it was posted to Patagonia's website?
A. No. I -- I don't dispute that this was an e-mail that I sent. I still don't recall reviewing it.
And just based on the questions that I was asking about it, it -- it was not about the content of the post; it was about the overall commitment to this initiative, but -- Yeah.
Q. That's fair. So let me direct -- direct you to bottom of page 2 to page 3 of the PDF. It's an e-mail from Shady Hakim. It's



S-H-A-D-Y Hakim. Do you see that?
A. Yes.
MR. BRICKER: So we're at Bates number 492 to 493; is that right?
MR. SCRENCI: That is correct.
MR. BRICKER: Thank you.
BY MR. SCRENCI:
Q. Sorry, Ms. Kenna, did you say that you were -- you saw that?
A. Yes.
Q. So in the last full paragraph of this e-mail, it says, "Teresa, Jose, and Pattie are important industry players, and this is a new initiative that will get some air time at the next OR."
Do you see that?
A. Yes.
Q. Do you agree with Mr. Hakim's assessment that Pattie is an important industry player?
MR. BRICKER: Objection. Calls for an opinion.
BY THE WITNESS:
A. Could you be more specific by important industry player?



BY MR. SCRENCI:
Q. I suppose, as I understand this, and it's talking about OR, which I believe is Outdoor Retailer, it would be in the outdoor industry.
Would that be a fair interpretation?
MR. BRICKER: Objection. Calls for speculation, lacks foundation.
BY THE WITNESS:
A. I would say there are not very many advocates in the Outdoor Industry, unfortunately, for more inclusive outdoor industry, and Pattie, Jose, and Teresa are prominent in their advocacy for sure in our industry for a more inclusive outdoors.
BY MR. SCRENCI:
Q. So -- And, again, you -- Feel free to disagree with me. I'm not trying to put words in your mouth.
Would you agree that Pattie was a prominent figure in promoting equality, at least within the outdoor community, as of December 7th, 2021?
MR. BRICKER: Objection. Lacks foundation, vague.



BY THE WITNESS:
A. I would characterize Pattie as a very visible advocate for a more inclusive outdoor industry.
BY MR. SCRENCI:
Q. As of December 7th, 2021?
MR. BRICKER: Objection. Asked and answered.
BY MR. SCRENCI:
Q. You can answer again. I just want to be clear about the date that you're referring to in your answer.
A. Yes, I would say that Pattie was a visible advocate for a more inclusive outdoors, outdoor industry, especially in the wake of George Floyd's murder and the Black Lives Matter protests, and therefore certainly in 2021.
Q. And when you're talking about inclusion in the outdoor industry, would that be encompassing inclusion of members of the LGBTQ+ community?
A. Yes, among other non-dominant groups.
Q. Would you say that Pattie Gonia was a program prominent figure in promoting

Page 114

2021.
Do you see that e-mail?
A. Yes.
Q. So it says, "Even if the blog is not considered an explicit endorsement, I think we should have a better understanding of what it is before we use our channels to share about it."
Do you see that? It's the last sentence in the first paragraph in your e-mail.
A. I do.
Q. So you at least had some understanding that there would be a blog post about the Outdoorist Oath, correct?
MR. BRICKER: Objection. Lacks foundation.
BY THE WITNESS:
A. Yes.
BY MR. SCRENCI:
Q. Did you believe that the blog post would be an implicit endorsement of the Outdoorist Oath?
MR. BRICKER: Objection. Vague.
I don't know what I was thinking on December 7th, 2021, but I can see what I wrote here, that, "Even if the blog is not considered

Page 115

an explicit endorsement, we should have a better understanding of what it is before we put it on our channels."
We spend a lot of time and we're very careful about what we put on our website and also how our name might show up on other people's websites, and -- and that's why I was asking this question, but I can't answer what I thought then, I -- other than what I can see in this note.
Q. Is it fair to say that your concern would be that you don't want to put something out there that could be seen as an endorsement, even if it isn't explicitly an endorsement, without first really understanding what it is you are putting out there?
MR. BRICKER: Objection. Compound, argumentative.
BY THE WITNESS:
A. I would -- I would want to be sure that we could fulfill the obligations of anything that we were putting on our website, if there were obligations to be fulfilled with it, and that we understood the full context of, in this case, a particular program of what we were

Page 116

supporting. That's a -- that's a part of my job is to make sure that we understand the full context of things before we add our name to it.
BY MR. SCRENCI:
Q. One more question on this document, and sorry for jumping around here.
Back to Mr. Hakim's e-mail, the one immediately below the one that we were just discussing that you sent, again in that last paragraph it says, "I see no issue in previewing the and their initiative on our channels. It is something our customers and community would benefit from knowing about."
Do you see that?
A. Yes.
Q. Do you agree that the initiative of the Outdoorist Oath was something that would benefit Patagonia's customers and community?
A. I -- I do think --
MR. BRICKER: Objection. Lacks foundation.
BY THE WITNESS:
A. I think to respond to that, I would want to look again at the commitment within the Outdoorist Oath. I certainly believe our

Page 117

customers and community would benefit from a more inclusive outdoors, but I'd need to look at the oath before responding to your question about that.
BY MR. SCRENCI:
Q. Given the fact that the blog was, in fact, published by Patagonia, is it fair to say that you would have approved it?
MR. BRICKER: Objection. Lacks foundation.
BY THE WITNESS:
A. Not necessarily. I don't approve every story that shows up on our website.
BY MR. SCRENCI:
Q. Fair. Let me rephrase that.
What I'm trying to get at is, given the fact that this was, in fact, published on Patagonia's website, it would be fair to agree that it was something that Patagonia at some level thought would benefit Patagonia's customers and community by knowing about the Outdoorist Oath?
MR. BRICKER: Objection. Asked and answered, lacks foundation, calls for speculation. Because of the way that you --

I understand that we're -- under my standing objection, because of the way that you asked the question, Rocco, also, reiterate the objection that it's outside the scope of the 30(b)(6) topics.

BY MR. SCRENCI:

Q. Do you have an answer, Ms. Kenna?

A. We take a lot of care before we publish things on our website, and somebody made the decision that this was important for our customers and community to see.

I don't recall reviewing it before it went up. I might have. I don't recall that. I was not a part of the decision that said it was going to be important.

I can see from this e-mail thread I thought it was important for under -- us to understand as a company the full scope of what the Outdoorist Oath was about before we endorsed it.

BY MR. SCRENCI:

Q. We can move on to Exhibit 59. Let me know when you have Exhibit 59 open.

(Whereupon, Defendants' Exhibit 59 was presented.)



THE WITNESS: Okay.

BY MR. SCRENCI:

Q. Now, this is an e-mail thread with e-mails from Whitney Clapper and, I believe, Hans Cole; is that correct?

A. Yes.

Q. Who is Hans Cole?

A. Hans Cole is a former employee of the company, and he previously led our environmental activism team.

Q. And you are copied on this e-mail thread, correct?

A. That's correct.

Q. If you go to the e-mail dated January 12th, 2022, from Ms. Clapper to Mr. Cole, there's, looks like, a link to the blog.

Do you see that?

A. Yes.

Q. Do you have an understanding what the -- what the staging link is being used for?

A. Yes.

Q. What is that?

A. It's a type of preview link that we use before something goes live on our website.



Q. Given that you're copied on this e-mail thread, would you have clicked on the preview link?

A. It's possible.

MR. BRICKER: Objection. Speculation, lacks foundation.

BY THE WITNESS:

A. It's possible. Admittedly, I don't click on every link that is sent to me to -- to review. I -- Sometimes I have to rely on my team members and -- and colleagues for -- for that.

BY MR. SCRENCI:

Q. It's fair. And this is so long ago, you probably don't remember, right?

A. I -- I don't recall if I clicked on this link on January 12, 2022.

Q. So the second number is -- in this e-mail says, "Attached is the blurb for employees that I'll share with Tessa, Rebecca + CX to share accordingly -- please send over any edits."

Do you have an understanding of what that blurb for employees would be?

MR. BRICKER: Objection. Foundation.



BY THE WITNESS:

A. I don't recall the specifics of that blurb, but it's very common practice before we share something externally that we share a version internally, perhaps with further context about why we're, you know, saying a certain thing or why we have a certain campaign or, in this case, why we're putting up a blog for a story.

BY MR. SCRENCI:

Q. I may be misremembering, but I think earlier in your deposition, you spoke about your role concerning internal communications with Patagonia; is that correct?

A. That's correct.

Q. Would commuted -- communicating these types of stories internally be part of your job responsibilities at the time of this e-mail?

MR. BRICKER: Objection. Vague.

BY THE WITNESS:

A. Tessa, who's named by Whitney, is one of the leaders of the internal communications team, and so she definitely would have been somebody to edit a blurb like the one described here for employees. She would review it and

getting at is how you are posting -- you, as in Patagonia, are posting things on your blog that are in some way important to its customers or community at large.

And I'm trying to understand, is the purpose of that because ultimately it contributes to the reputation Patagonia has, which is an important part of its marketing generally speaking?

MR. BRICKER: Objection. Vague, compound, calls for speculation.

BY THE WITNESS:

A. I'll -- I don't know how to say it another way other than I really do believe that it's incumbent on all the companies in the outdoor industry to advocate for a more inclusive outdoors.

It's not something that the industry has -- has led on, and -- and I think -- I believe deeply for nature to be protected, we need all kinds of people recreating in it and advocating for its protection.

I don't see that belief system as a reputational issue; I see it as -- as a real obligation. Justice is also one of our core



values as a company, and so in -- in that sense, this is us living up to one of our stated values, advocating for a more just society and outdoors.

BY MR. SCRENCI:

Q. You can close out of that exhibit.

Do you recall at some point Patagonia being approached by Hydro Flask in connection with a partnership that Hydro Flask wanted with Pattie Gonia?

MR. BRICKER: I'll object to the -- to the extent that that calls for attorney-client privileged information.

You can answer that question yes or no, Ms. Kenna.

BY THE WITNESS:

A. Yes.

BY MR. SCRENCI:

Q. You can pull up Exhibit 62 in the exhibit share when you have a minute, when you're able. Let me know when you have Exhibit 62 open.

(Whereupon, Defendants' Exhibit 62 was presented.)

THE WITNESS: Okay.



MR. BRICKER: Can I take a look -- minute to look through this, Rocco?

MR. SCRENCI: Yes.

MR. BRICKER: Okay.

BY MR. SCRENCI:

Q. Now, there's some stuff in here that is redacted for privilege, so I just want to make sure that you don't, to the extent that you remember, divulge any of the privileged information in this document.

What I'm interested in is in Exhibit 62, there is an e-mail from you dated January 18th, 2022.

Do you see that?

A. Yes.

Q. And in that e-mail, it says, "Three different thoughts -- none of which are particularly helpful."

And the first one says, "I think it is really awkward for us to advise on this."

It's just with the caution of don't divulge anything communicated to you or from you to an attorney, why did you think it was really awkward for us to advise on this in the context of these e-mails?



MR. BRICKER: Yeah, and I'll object to the extent it calls for communications with or advice you received or sought from counsel, Ms. Kenna. If you can answer that question without -- if you can answer that question without including advice that you sought from counsel or advice you received from counsel, you can answer it, otherwise don't answer it.

BY THE WITNESS:

A. Let me say I don't remember writing this e-mail. I don't dispute it. I -- Looking at the full context of the e-mail, another company asking the head of PR if that company should have a partnership is going to be awkward for us to advise on regardless, and that's why I wrote that.

BY MR. SCRENCI:

Q. Then the next point says, "It was interesting to hear Ryan and Shady's take on Pattie last week. They were very different."

First of all, would the Ryan in this context be Ryan Gellert?

A. Yes.

Q. And it says in the next sentence, "Ryan saying Pattie takes jabs at us and makes fun of

document, you see a cover page that says, "VF, Purpose. Driven. Environmental & Social Responsibility Report, Fiscal Year 2023"?
A. Yes.
Q. Are you familiar with what this document is based on that title?
A. I -- I don't recall this document, but it appears to be VF Corporation's environmental and social responsibility report.
Q. Do you know why you would have a copy of VF Corporation's environmental and social responsibility report?
A. I look at other companies' environmental and social responsibility reports. I also am the instigator of Patagonia's first what we called a work in progress report, which was our take on an ESG report, and that was published last year.
I don't -- I can't recall every report I've ever looked at. I -- I don't recall, actually, this one, but I do look at them and would have potentially saved one or sent it to my colleagues.
Q. VF Corporation, they own The North Face, correct?



A. Right, they're the parent company to The North Face, yes.
Q. And VF Corporation is the parent company to Smartwool, correct?
A. I would need to double-check that. I don't know all the companies within VF Corporation.
Q. Would you consider The North Face to be one of Patagonia's primary competitors?
MR. BRICKER: Objection. Vague.
BY THE WITNESS:
A. Primary competitors is a strange term, and we -- There's not -- there's not many -- I don't know that there's any companies in our industry that support the totality of -- or the same sports that we support.
That makes defining competitors a little challenging at times, and certainly any notion of a prime primary competitor, because if they were going to be a primary competitor, they would need to compete against our products in everything from surf to trail running. And I don't think The North Face has, like, surf, for instance.
BY MR. SCRENCI:



Q. With respect to the outdoor apparel and gear space, would you consider The North Face to be a primary competitor?
MR. BRICKER: Objection. Vague.
BY THE WITNESS:
A. I -- I think I would give the same answer.
BY MR. SCRENCI:
Q. So, in your own words, you wouldn't want to describe them as a primary competitor in at least the outdoor apparel and gear space, correct?
A. We -- we would describe The North Face as a competitor in certain categories that we make products for.
Q. I'll ask again.
Would you describe them as a primary competitor in the outdoor apparel and gear space?
MR. BRICKER: Objection. Asked and answered.
BY THE WITNESS:
A. I don't have a different answer. We compete with them in certain sport categories, such as climbing.



BY MR. SCRENCI:
Q. So you would not then describe them as a primary competitor in the outdoor apparel and gear space, correct?
MR. BRICKER: Objection. Asked and answered, and argumentative, compound too.
BY THE WITNESS:
A. I don't have a different answer.
BY MR. SCRENCI:
Q. I understand that you have given an answer about how you would describe them.
I'm trying to understand with respect to outdoor apparel and gear, does your definition mean that The North Face is a primary competitor of Patagonia?
MR. BRICKER: Objection. Vague, asked and answered.
BY THE WITNESS:
A. We compete with The North Face in certain sport categories around technical apparel.
BY MR. SCRENCI:
Q. Will you reopen Exhibit 48, please.
A. 48.

A. Okay.
Q. Who is Kate Rutherford?
A. Kate is an employee of the company. I don't know her current role. She is -- she's -- she was one of our ambassadors, and -- and then she was working for the company directly as an employee. And I don't know what her specific role was at this time.
Q. She says in this e-mail, "Personally I'd love to work with Pattie, they have such a powerful voice on the outdoors environment and social justice," correct?
A. That's correct.
Q. So at least one Patagonia employee was interested in having some form of partnership with Pattie; is that fair to say?
A. That's fair to say.
Q. Scroll up a little bit. It's on the first page. It's an e-mail from you dated Wednesday, June 18th, 2025, at 1:32 p.m.
Do you see that?
A. I see that.
Q. It says, "Corey and Crystal are missing the point of what I'm trying to get at."
Do you know what you were trying to,



quote, "get at"?
A. The point that Patagonia as a brand and as a rule doesn't pay for social media influencers. We have an ambassador program, and that's probably as close as you would get to social media influencers, but our ambassadors are hired for very specific reasons, and that is they exist within our core sport communities, and their primary relationship with us is to -- to test product.
Q. I'll introduce Exhibit 69. Let me know when you have it open, please.
(Whereupon, Defendants' Exhibit 69 was presented.)
BY THE WITNESS:
A. Okay.
BY MR. SCRENCI:
Q. Do you see the e-mail you sent on June 20th, 2025, at 11:44 a.m.?
A. Sorry, on June 25th?
Q. June 20th, 2025.
A. Yes, sorry, which is the time stamp for the e-mail you're referring to?
Q. 11:44 a.m. It's the --
A. Yes, I do.



Q. Okay. Yeah. So it says, "Hey Shane, here's a statement you can use from me."
And then it proceeds, "Patagonia, the outdoor apparel brand, does not have an official relationship with Pattie Gonia. We applaud Pattie's advocacy to make the outdoor industry more inclusive and her work to engage our community in the protection of our planet."
Do you see that?
A. Yes.
Q. Does that statement accurately capture Patagonia's position about Pattie Gonia's advocacy?
MR. BRICKER: Objection. Vague.
BY THE WITNESS:
A. Yes.
BY MR. SCRENCI:
Q. Does Patagonia support Pattie's advocacy to make the outdoor industry more inclusive?
A. Can -- can you qualify what you mean by support?
Q. Approves of Pattie's advocacy to make the outdoor industry more inclusive?
MR. BRICKER: Objection. Vague,



compound.
BY THE WITNESS:
A. As I said in this statement to the Washington Post, we certainly applaud Pattie's advocacy to make the outdoors more inclusive. I believe I said that earlier today too.
We really have a lot of work to do to make the outdoor industry more inclusive, and there's not that many people doing this work, and support, applaud Pattie's advocacy to -- to make it -- to make our industry more inclusive.
BY MR. SCRENCI:
Q. And is the same true about Pattie's advocacy to engage our community in the protection of our planet?
A. We're going to welcome all allies who are advocating for the protection of our planet. We also need more people advocating for that too, and so would be strange if we didn't support people who were advocating for the protection of our planet. We encourage everybody who wants to advocate for the protection of our planet.
Q. Introducing Exhibit 70 to the exhibit share. Please let me know when you've had it

MR. BRICKER: Objection. Vague.
BY THE WITNESS:
A. It depends on how you would define regularly. It is not -- it has never been a part of my daily news consumption.
BY MR. SCRENCI:
Q. When Patagonia tracks earned media or earned advertising, would Outside online be one of the sources that to the extent Patagonia's mentioned would show up in Patagonia's monitoring of earned media?
A. So the way that earned media coverage tracking works, at least for us, is we're not specifying certain outlets; we're looking for any mentions of us regardless of which outlet it is. But yes, presumably we would see coverage of us in Outside Magazine. That would be flagged in our clips.
Q. I'm going to introduce Exhibit 72 to the exhibit share. Let me know when you have it open.
(Whereupon, Defendants' Exhibit 72 was presented.)
BY THE WITNESS:
A. Sorry, 72?



BY MR. SCRENCI:
Q. Yes.
A. I don't -- I don't see a 72.
MR. BRICKER: It just showed up for me. You might have to refresh your folder.
MR. SCRENCI: Yeah.
THE WITNESS: Ah, yes, okay.
BY MR. SCRENCI:
Q. Do you have it open?
A. I do.
Q. Do you see on the first page, it says published April 2nd, 2021?
A. Yes.
Q. I'll represent to you that this is an article that I pulled from Outside online. I believe you can click on the hyperlink on the bottom if you want to verify yourself, but it does indeed say that it was published April 2nd, 2021.
MR. BRICKER: This hasn't been produced, Rocco.
MR. SCRENCI: It's a public document.
MR. BRICKER: You haven't produced it.
MR. SCRENCI: We will produce it.
BY MR. SCRENCI:



Q. Do you have any reason to dispute that this is an article that was published on April 2nd, 2021?
MR. BRICKER: Objection. Lacks foundation.
BY THE WITNESS:
A. No.
BY MR. SCRENCI:
Q. This article is titled HOKA and Cotopaxi Collaborate on Colorful Gear for Good.
Is that correct?
MR. BRICKER: Same objection.
BY THE WITNESS:
A. That's correct.
BY MR. SCRENCI:
Q. Does HOKA compete with Patagonia in terms of footwear?
MR. BRICKER: Objection. Vague.
BY THE WITNESS:
A. No, Patagonia doesn't make -- Well, we have one fishing boot, but we don't have running shoes, which is what HOKA specializes in. So they're not a competitor.
BY MR. SCRENCI:
Q. Does Cotopaxi compete with Patagonia in



terms of outdoor gear such as backpacks?
A. Yes.
Q. If you scroll down to the -- sorry, the third page of the PDF, there's a paragraph that begins with, "But perhaps."
Let me know when you're there.
A. Okay.
Q. "But perhaps the coolest part of the release is the story behind the production of the new products. To spread the word about the way this gear came to life, HOKA and Cotopaxi have teamed up with queer environmentalist and photographer Pattie Gonia.
Do you see that?
A. Yes.
Q. Were you aware of a partnership between Pattie Gonia and HOKA and Cotopaxi?
MR. BRICKER: Objection.
BY THE WITNESS:
A. No.
MR. BRICKER: Lacks foundation.
BY THE WITNESS:
A. No.
BY MR. SCRENCI:
Q. Then on the next page, do you see what