GREGORY S. GILCHRIST (Cal. Bar. No. 111536)
RYAN BRICKER (Cal. Bar No. 269100)
SOPHY J. TABANDEH (Cal. Bar No. 287583)
KOURTNEY SPEER (Cal. Bar No. 348243)
VERSO LAW GROUP LLP
565 Commercial St., 4th Floor
San Francisco, CA 94111
Telephone: (415) 534-0495
Email: greg.gilchrist@versolaw.com
ryan.bricker@versolaw.com
sophy.tabandeh@versolaw.com
kourtney.speer@versolaw.com

Attorneys for Plaintiff
Patagonia, Inc.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

PATAGONIA, INC.,

Plaintiff,

v.

ENTREPRENEUR ENTERPRISES, INC. DBA PATTIE GONIA PRODUCTIONS and WYN WILEY,

Defendants.

Case No.: 2:26-cv-00586-RGK-RAO

**PLAINTIFF PATAGONIA, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Date: December 14, 2026
Time: 9:00 a.m.
Crtrm.: 850, 8th Floor
Judge: Hon. R. Gary Klausner

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1
II. SUMMARY OF UNDISPUTED FACTS .......... 2
A. Patagonia's Marks .......... 2
B. PattieGonia .......... 3
C. The Parties' Discussions .......... 4
D. Events Leading to the Lawsuit .......... 4
III. SUMMARY JUDGMENT STANDARD .......... 5
IV. THE PATTIE GONIA MARK INFRINGES PATAGONIA'S MARKS .......... 6
A. Patagonia Owns Valid, Protectable Marks .......... 6
B. All *Sleekcraft* Factors Demonstrate Likely Confusion .......... 6
1. Strength of the Patagonia Marks .......... 7
2. Similarity of the Parties' Marks .......... 7
3. Proximity of Goods and Services .......... 9
4. PattieGonia's Intent .......... 10
5. Actual Confusion and Survey Evidence .......... 11
6. Other Factors .......... 12
7. Totality of Confusion Factors .......... 13
V. SUMMARY JUDGMENT SHOULD BE GRANTED ON PATTIEGONIA'S LACHES DEFENSE .......... 13
A. Patagonia Acted Reasonably in Response to PattieGonia's Evolving Use .......... 14
B. PattieGonia's Unclean Hands Bars Laches .......... 17
C. PattieGonia Cannot Demonstrate Prejudice .......... 18
VI. CONCLUSION .......... 19

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*adidas-Am., Inc. v. Payless Shoesource, Inc.*,
546 F.Supp.2d 1029 (D. Or. 2008) .......... 13, 16, 18

*AMF Inc. v. Sleekcraft Boats*,
599 F.2d 341 (9th Cir. 1979) .......... 6, 9, 10

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 5

*Anheuser-Busch, Inc. v. Balducci Publ'ns*,
28 F.3d 769 (8th Cir. 1994) .......... 11

*Au-Tomotive Gold Inc. v. Volkswagen of Am., Inc.*,
603 F.3d 1133 (9th Cir. 2010) .......... 17

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,
457 F.3d 1062 (9th Cir. 2006) .......... 5

*Baron App, Inc. v. OpenAI, Inc.*,
820 F.Supp.3d 881 (N.D. Cal. 2026) .......... 11

*Bauer Bros., LLC v. Nike, Inc.*,
159 F.Supp.3d 1202 (S.D. Cal. 2016) .......... 5, 17

*Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*,
550 F.3d 465 (5th Cir. 2008) .......... 17

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 5

*Charles Schwab & Co. v. Hibernia Bank*,
665 F. Supp. 800 (N.D. Cal. 1987) .......... 13

*Conversive, Inc. v. Conversagent, Inc.*,
433 F.Supp.2d 1079 (C.D. Cal. 2006) .......... 13

*DC Comics v. Towle*,
989 F.Supp.2d 948 (C.D. Cal. 2013) .......... 14, 17

*E. & J. Gallo Winery v. Grenade Beverage, LLC*,
670 Fed.Appx. 634 (9th Cir. 2016) .......... 7

*Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*,
880 F.3d 1109 (9th Cir. 2018) .......... 14

*Gianni Versace, S.p.A., v. Versace 19.69 Abbigliamento Sportivo SRL*,
328 F.Supp.3d 1007 (N.D. Cal. 2018) .......... 6, 10, 11

*GoTo.com, Inc. v. Walt Disney Co.*,
202 F.3d 1199 (9th Cir. 2000) .......... 7

*Harley Davidson, Inc. v. Grottanelli*,
164 F.3d 806 (2d. Cir. 1999) .......... 10, 18, 19

*Hokto Kinoko Co. v. Concord Farms, Inc.*,
810 F.Supp.2d 1013 (C.D. Cal. 2011) .......... 5

*Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*,
559 F.3d 985 (9th Cir. 2009) .......... 14

*Jack Daniel's Props., Inc. v. VIP Prods. LLC*,
599 U.S. 140 (2023) .......... 10, 15

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
304 F.3d 829 (9th Cir. 2002) .......... 14

*JouJou Designs, Inc. v. JOJO Ligne Internationale, Inc.*,
821 F. Supp. 1347 (N.D. Cal. 1992) .......... 7

*Marketquest Grp., Inc. v. BIC Corp*.,
316 F.Supp.3d 1234 (S.D. Cal. 2018) .......... 13

*Miller v. Glenn Miller Prods., Inc.*,
454 F.3d 975 (9th Cir. 2006) .......... 14

*Monster Energy Co. v. BeastUp LLC*,
395 F.Supp.3d 1334 (E.D. Cal. 2019) .......... 17

*Nat'l Customer Eng'g Inc. v. Lockheed Martin Corp.*,
No. CV 96-8938 DDP (ANx), 1997 WL 363970 (C.D. Cal. Feb. 14, 1997) .......... 14, 17

*Nissan Motor Co. v. Nissan Comput. Corp*.,
378 F.3d 1002 (9th Cir. 2004) .......... 5, 12

*OpenAI, Inc. v. Open A.I., Inc.*,
719 F.Supp.3d 1033 (N.D. Cal. 2024) .......... 14

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc*.,
469 U.S. 189 (1985) .......... 6

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co*.,
324 U.S. 806 (1945) .......... 17

*ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic and Sports Physical Therapy P.C.*,
314 F.3d 62 (2d Cir. 2002) .......... 16

*Punchbowl, Inc. v. AJ Press, LLC*,
90 F.4th 1022 (9th Cir. 2024) .......... 15

*Rogers v. Grimaldi*,
875 F.2d 994 (2d Cir. 1989) .......... 15

*S. Cal. Darts Ass'n v. S. Cal. Darts Ass'n, Inc.*,
No. CV 12-01899-RGK (JCGx), 2013 WL 12121536 (C.D. Cal. Feb. 22, 2013) .......... 6, 7

*Sara Lee Corp. v. Kayser-Roth Corp*.,
81 F.3d 455 (4th Cir.1996) .......... 16

*Synoptek, LLC v. Synaptek Corp.*,
309 F.Supp.3d 825 (C.D. Cal. 2018) .......... 6, 7, 8

*Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*,
311 F.Supp.2d 1023 (D. Or. 2004) .......... 16

*W. Coast Corvettes, Inc. v. MV Mktg., Inc.*,
No. SACV 12-0269 DOC(RNBx), 2012 WL 12882014 (C.D. Cal. Dec. 13, 2012) .......... 5

*Warner Bros. Entm't v. Global Asylum, Inc.*,
No. CV 12-9547 PSG (CWx), 2012 WL 6951315 (C.D. Cal. Dec. 10, 2012) .......... 11

**Statutes**

15 U.S.C. § 1115(b) .......... 6

**Rules**

Fed. R. Civ. P. 56(a) .......... 5

Local Rule 11-6 .......... 1

**Other Authorities**

3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
§§ 23:52, 24:24 (5th ed.) .......... 8, 9

# I. INTRODUCTION

Defendants Entrepreneur Enterprises, Inc. dba Pattie Gonia Productions and Wyn Wiley (collectively "PattieGonia") deliberately capitalized on the famous PATAGONIA trademark to develop their drag and outdoor activist persona, and later a trademark to sell services and products. Plaintiff Patagonia, Inc. ("Patagonia") learned of PattieGonia's play on its name and like-minded activism in 2019. In 2022, Patagonia told PattieGonia the minimum guardrails needed to avoid the misimpression Patagonia was sponsoring PattieGonia: no PATTIE GONIA on products, no imitating Patagonia's logos, and no use of Patagonia's distinctive font. PattieGonia confirmed their understanding but made no changes and instead developed a commercial business. They launched their own apparel products, advertised with—as they described it—a "rip off" Patagonia logo, and filed a trademark application asserting exclusive rights to their own far-ranging commercial PATTIE GONIA brand.

Having built the Pattie Gonia identity as a "joke" or "pun" on the Patagonia brand, PattieGonia provides no real evidence disputing that commercial use of the name is likely to be confusing. The parties' goods and services are identical or highly similar and both parties deliver their goods and services with a concerted commitment to environmental responsibility and the outdoors. All the recognized *Sleekcraft* confusion factors favor summary judgment of infringement, punctuated by consumers' posts showing their confusion that Patagonia was responsible for PattieGonia's activities and surveys showing substantial proportions of consumers were confused about whether Patagonia was associated with PattieGonia's apparel (24%) and copycat stickers (34%).

PattieGonia now claims Patagonia's attempts to have a productive dialogue rather than an immediate lawsuit provide a defense. They invoke "laches" as an escape hatch from their decision to convert "parody" into an infringing commercial enterprise. There is no laches. Laches requires unreasonable delay and Patagonia did not delay. When PattieGonia took concrete steps away from parody and advocacy, Patagonia tried to resolve the dispute and promptly sued when it could not. At every stage, PattieGonia

knew their appropriation of Patagonia's marks would be infringing if they made commercial use of the name. But PattieGonia ignored the assurances they gave to Patagonia, introduced products under the PATTIE GONIA brand, and thumbed their nose at Patagonia when offered the chance to explain. PattieGonia can claim no surprise, much less equitable immunity, when Patagonia sued.

Even now, PattieGonia tries to have it both ways. When they called a Patagonia store the "motherland," Patagonia was supposed to understand it as parody. But when PattieGonia collaborated with a water bottle company to advocate against single-use bottles, Patagonia was supposed to presume that PattieGonia was brand-building and sue immediately. PattieGonia cannot fault Patagonia for trying to avoid a dispute and accept the purported "joke" at face value only to insist now that Patagonia should have treated those same activities as infringement requiring immediate litigation. Ultimately, PattieGonia loses its laches defense anyway for having "unclean hands" because PattieGonia deliberately misappropriated Patagonia's goodwill from the outset.

Patagonia seeks partial summary judgment that PattieGonia's trademark uses are infringing and that Patagonia's claims are not barred by laches. The specific proposed findings are described in the accompanying Proposed Order.

## II. SUMMARY OF UNDISPUTED FACTS[1]

### A. Patagonia's Marks

Patagonia started business in 1973. SUF 1. Patagonia sells apparel, outdoor products, and gear and has sold billions of dollars of PATAGONIA products in recent years. SUF 3. Patagonia has built its reputation over decades as an unabashed advocate for the environment, and its founders recently donated the company to a purpose trust and nonprofits supporting the environment. SUF 10–11. Beyond an apparel business, it advocates for environmental causes and organizations, provides education, produces books and movies, and sells secondhand clothing. SUF 17–21.

[1] The facts and evidence supporting this motion are set forth in the Statement of Uncontroverted Facts ("SUF") and summarized here.

Patagonia is one of the most trusted brands in the United States and has earned numerous awards for corporate responsibility and its environmental mission. SUF 12–16.

Patagonia owns venerated trademarks, including the PATAGONIA trademark and a logo—called the "P-6"—that displays distinctive belwe font and artwork: . These trademarks ("Patagonia Marks") are more than 50 years old and are federally registered for a wide variety of goods and services. SUF 1.

**B. PattieGonia**

Wyn Wiley conceived the PattieGonia name in September 2018, and first posted on social media under the "pattiegonia" handle on October 3, 2018. SUF 23. Days later, Wiley posed outside a Patagonia store, saying PattieGonia was visiting the "motherland." SUF 25. On November 11, 2018, PattieGonia posted "fan art" consisting of two copycat versions of the P-6 logo, asking followers which they preferred. SUF 26-27. In small quantities at first and substantial quantities later, PattieGonia gave away stickers bearing the copycat logo. SUF 38–39. PattieGonia did not sell them because they did not want the "real Patagonia" to come after them. SUF 28.

PattieGonia acquired a following, began appearing publicly in drag, and posted commentary about inclusivity in the outdoors and climate issues. SUF 29, 33A. Media coverage described PattieGonia's name as a pun on the Patagonia brand. SUF 29.

In 2019, PattieGonia appeared at Outdoor Retailer, an industry event also attended by Patagonia, where members of Patagonia's leadership learned about PattieGonia. SUF 33A. Also in 2019, PattieGonia arranged for Patagonia to make a donation to an organization supporting the Hawaii coastline. SUF 33B.

In January 2022, PattieGonia and two other activists founded the "Outdoorist Oath," an initiative committed to inclusivity in the outdoors. Patagonia reported the Oath in its blog. SUF 34.

### C. The Parties' Discussions

In February 2022, Hydroflask, the water bottle manufacturer, approached Patagonia to discuss its plan to collaborate with PattieGonia. Hydroflask described an initiative to address single-use plastic bottles. Patagonia told Hydroflask it would respond but wanted to discuss with PattieGonia first. SUF 53–55.

On February 9, 2022, Patagonia's Deputy General Counsel met with Wyn Wiley and Jenny Dugan, the principals responsible for PattieGonia. Patagonia communicated to PattieGonia it wanted to address the proposed collaboration, open a line of communication, and outline basic trademark principles in the hope of avoiding a dispute. The parties also discussed a copycat logo PattieGonia had used a few weeks before. SUF 56.

After the meeting, Patagonia confirmed it would not challenge the Hydroflask collaboration, expressed willingness to discuss future concerns, and enumerated three understandings restricting PattieGonia's activities. PattieGonia would not:

1. Use PATTIE GONIA *in any form* on product;
2. Use Patagonia's logos or *substantially similar* logos;
3. Use Patagonia's distinctive belwe font (SUF 57–61).

After these exchanges, Patagonia learned about a 2023 collaboration between The North Face and PattieGonia to celebrate "Summer of Pride." SUF 65.

### D. Events Leading to the Lawsuit

In December 2024, Patagonia learned that PattieGonia was selling merchandise at www.pattiegoniamerch.com. The site used a logo with "PATTIE GONIA MERCH" and PattieGonia promoted it on social media. PattieGonia sold secondhand t-shirts and sweatshirts bearing "PATTIE GONIA HIKING CLUB." SUF 66.

After investigating, Patagonia wrote PattieGonia in February 2025 regarding the online store and posts showing sticker designs and costume emblems that copied Patagonia's P-6 logo. Patagonia reminded PattieGonia of the 2022 commitments. SUF 67–68. PattieGonia responded by claiming a "different" understanding of those

restrictions but without any explanation. PattieGonia deflected to an irrelevant exposé PattieGonia was planning addressing Patagonia's long-completed sale of technical gear to the military. SUF 69A. (In fact, this likely was a ruse. SUF 69B.) Patagonia invited PattieGonia to a meeting, but PattieGonia did not respond. SUF 70–71.

On September 21, 2025, PattieGonia applied to register the PATTIE GONIA mark for a variety of goods and services (SUF 50), including many that are identical or related to those covered by Patagonia's incontestable trademark registrations. SUF 110. On January 21, 2026, Patagonia sued for trademark infringement and dilution. PattieGonia denies infringement and has asserted laches. SUF 47, 72–73.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment should be granted when there is no genuine dispute of material fact. Fed. R. Civ. P. 56(a). Because PattieGonia bears the burden of proof on laches, Patagonia carries its summary judgment burden by pointing to the absence of evidence supporting the defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986). If PattieGonia cannot come forward with specific facts presenting genuine, material disputes for trial, the laches defense should be rejected. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bauer Bros., LLC v. Nike, Inc.*, 159 F.Supp.3d 1202, 1216 (S.D. Cal. 2016); *Hokto Kinoko Co. v. Concord Farms, Inc.* 810 F.Supp.2d 1013, 1036 (C.D. Cal. 2011), *aff'd*, 738 F.3d 1085 (9th Cir. 2013).

Summary judgment is proper on infringement claims when the evidence does not show genuine disputes about likely consumer confusion. *E.g., Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1075–76 (9th Cir. 2006) (reversing denial of summary judgment); *Nissan Motor Co. v. Nissan Comput. Corp.*, 378 F.3d 1002, 1019 (9th Cir. 2004) (affirming summary judgment). "[W]here … a rational trier of fact would have to conclude that confusion is 'probable,'" summary judgment should be granted. *W. Coast Corvettes, Inc. v. MV Mktg., Inc.*, No. SACV 12-0269 DOC(RNBx), 2012 WL 12882014, at *11 (C.D. Cal. Dec. 13, 2012) (internal quotations and citations omitted).

## IV. THE PATTIE GONIA MARK INFRINGES PATAGONIA'S MARKS

The Court should grant partial summary judgment finding that PattieGonia has infringed the Patagonia Marks. To prevail, Patagonia must establish (1) a valid, protectable trademark and (2) that PattieGonia's PATTIE GONIA mark and logo are likely to cause confusion. *Gianni Versace, S.p.A., v. Versace 19.69 Abbigliamento Sportivo SRL*, 328 F.Supp.3d 1007, 1014 (N.D. Cal. 2018).

### A. Patagonia Owns Valid, Protectable Marks

Patagonia owns incontestable federal registrations for the Patagonia Marks. SUF 1. Under 15 U.S.C. § 1115(b), Patagonia's incontestable registrations constitute conclusive evidence of the validity of the registered marks and Patagonia's ownership of the marks. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 189–90 (1985).[2]

### B. All *Sleekcraft* Factors Demonstrate Likely Confusion

The Ninth Circuit evaluates likely confusion under the *Sleekcraft* factors. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979). The factors include the: (1) strength of the Patagonia Marks; (2) similarity of the marks; (3) proximity or relatedness of the parties' goods or services; (4) evidence of actual confusion; (5) marketing channels used; (6) degree of care likely to be exercised by purchasers; (7) intent in adopting the challenged marks; and (8) likelihood the parties' offerings will expand. *Id.*

A party need not prevail on every factor to obtain summary judgment. *Synoptek, LLC v. Synaptek Corp.,* 309 F.Supp.3d 825, 836 (C.D. Cal. 2018). "Instead of mechanically determining the number of factors that weigh in favor of each party, the court must consider what the analysis of the factors, as a whole, reveals about the likelihood of consumer confusion." *S. Cal. Darts Ass'n v. S. Cal. Darts Ass'n, Inc.*, No. CV 12-01899-RGK (JCGx), 2013 WL 12121536, at *4 (C.D. Cal. Feb. 22, 2013), *aff'd*,

---

[2] PattieGonia makes hazy allegations that Patagonia's trademarks are invalid for descriptiveness. Dkt. 19 at 10 (defenses 2, 3). *Park 'N Fly* disposes of these defenses.

762 F.3d 921 (9th Cir. 2014) (granting summary judgment); *E. & J. Gallo Winery v. Grenade Beverage, LLC,* 670 Fed.Appx. 634 (9th Cir. 2016) (affirming summary judgment where five of the eight *Sleekcraft* factors favored infringement). All relevant *Sleekcraft* factors weigh in favor of finding likely confusion.

**1. Strength of the Patagonia Marks**

The stronger the mark "the greater protection the mark is accorded by trademark laws." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000). Strength is assessed based on the mark's conceptual strength and commercial strength in the marketplace. *Id.*

Conceptual strength measures whether a mark is descriptive, suggestive, arbitrary, or fanciful. *See Synoptek*, 309 F.Supp.3d at 838–39. "The strongest marks … are 'arbitrary' or 'fanciful.'" *Id.* The Patagonia Marks do not describe or suggest any of Patagonia's goods and services and are arbitrary and thus conceptually strong.

Patagonia's marks are entitled to broad protection because they have been used for more than 50 years, achieved billions in sales, and are the object of public acclaim. SUF 1–21; *see JouJou Designs, Inc. v. JOJO Ligne Internationale, Inc.,* 821 F. Supp. 1347, 1353–54 (N.D. Cal. 1992) (substantial advertising expenditures and sales "compelling evidence" of commercial strength); *S. Cal. Darts*, 2013 WL 12121536, at *5 (granting summary judgment where long use made marks strong in darts community).

**2. Similarity of the Parties' Marks**

The marks' similarity always is important. *Synoptek*, 309 F.Supp.3d at 836. More points of similarity means a greater likelihood of confusion. *Id.* In assessing similarity, the Ninth Circuit applies three principles: (1) similarity in appearance, sound, and meaning; (2) how marks in their entirety appear in the marketplace; and (3) similarities count more heavily than differences. *Id.*

The PATTIE GONIA mark is similar to the Patagonia Marks on all three dimensions. The marks are essentially identical phonetically and in appearance. SUF

107. Courts have found likely confusion where two marks were phonetic equivalents and varied by a few letters or a space. *See, e.g. Synoptek,* 309 F.Supp.3d at 838 (finding 'Synaptek' and 'Synoptek' similar in sound and appearance). Consumers have commented they did not notice *any* difference, much less a substantial one, in the marks. One stated "I've been so confused about this Patagonia stuff and then I realized the name is different 🫣 bro this whole time I thought that design was just an lgbt version of the Patagonia logo never noticing that the logo was not the Patagonia logo." Other consumers say similar things. SUF 100–103

PattieGonia's deliberate imitation of Patagonia's logo is also likely to cause confusion. The marks are nearly identical in commercial impression. *See* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:52 (5th ed.) (the overall impression on customers includes "both parties' entire presentation" to consumers).




PattieGonia must agree these designs are similar as they identify theirs as a "knock off" or "rip off" logo. SUF 38B–C.

### 3. Proximity of Goods and Services

Confusion is more likely when the parties' goods and services are sufficiently related that consumers are likely to believe they originate from or are otherwise affiliated with the same source. *Sleekcraft*, 599 F.2d at 348 n.10; McCarthy, *supra*, § 24:24 ("related" means related in consumers' minds in the sense that consumers "are likely to believe that such goods… are somehow connected with or sponsored by a common company"). Competition between the parties is not necessary. *Id*. at § 24:13.

Here, a comparison of the parties' uses of their marks show they cover a virtually identical universe of goods and services. SUF 110. In addition to overlapping goods like apparel and stickers, both parties provide services in advocacy for the environment and inclusivity; educational programs; recreational, community, and social initiatives; and entertainment. SUF 42–46; 111–116. Patagonia also coordinates events with its authorized brand ambassadors for recreation and environmental education. SUF 17. Because both parties actively promote environmental causes, affiliation confusion is more likely.

PattieGonia promotes other companies' brands and products, always in the context of their advocacy for inclusivity and the environment. SUF 51. Patagonia, too, works with carefully selected brand partners on social and environmental initiatives, including on initiatives sponsored by some of the same companies PattieGonia promotes. SUF 16. Consumers (to whom PattieGonia has been advertising with copycat logos and costumes) accordingly are likely to assume—as consumers have reported (SUF 80-104)—that Patagonia has authorized PattieGonia's brand collaborations. SUF 51.

Other companies desiring a reputation for environmental issues also can trade on Patagonia's reputation by engaging PattieGonia to promote their products or brands. For example, PattieGonia recently collaborated with a used phone business, Back Market. The campaign shows how a new phone burdens the environment. Back Market's marketing director publicly thanked both PattieGonia and Patagonia. She

noted the campaign was patterned after a prior Patagonia environmental campaign, remarking that Patagonia "achieved in the apparel industry exactly what we hope to achieve in tech." SUF 117. Consumers are likely to draw the same connections between PattieGonia's collaborations and Patagonia, particularly when direct competitors like The North Face "play on the Patagonia irony" when collaborating with PattieGonia. SUF 108; *Sleekcraft*, 599 F.2d at 350 ("danger presented is that the public will mistakenly assume there is an association between the producers").

**4. PattieGonia's Intent**

When a defendant knowingly flexes the goodwill and reputation of an established trademark, "courts presume that the defendant can accomplish [that] purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354; *Gianni Versace*, 328 F.Supp.3d at 1020 (inferring intent, in part, from defendant's knowledge of plaintiff's brand and defendant's similar branding materials).

PattieGonia was aware of Patagonia and its marks when selecting their name and deliberately leveraged Patagonia's goodwill. SUF 24. They refer to Patagonia as the "real" Patagonia, describe Patagonia stores as the "motherland," call Patagonia vests "my merch," and advertised themselves with stickers bearing "rip off" and "knock off" Patagonia logos. SUF 25. This conduct accelerated despite PattieGonia's assent to basic guidelines for avoiding an association with Patagonia. SUF 39–45, 40. Labeling their conduct as "parody"—while also claiming to have developed proprietary trademark rights in the PATTIE GONIA mark—does not negate the intention to trade on Patagonia's brand. *See Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 813 (2d. Cir. 1999) (cited with approval in *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 155 (2023)).[3]

[3] PattieGonia now claims their mark was inspired by the Patagonia region. There is no post, costume, sweatshirt, or sticker that highlights the Patagonia region. SUF 120. Even if it were true, this intention does not blunt the evidence that, from the start, PattieGonia took every opportunity to associate with Patagonia's marks.

Like the other confusion factors, PattieGonia's intentions support summary judgment.

**5. Actual Confusion and Survey Evidence**

Because mustering actual confusion evidence is difficult, its presence is strong evidence of likely confusion. *Gianni Versace*, 328 F.Supp.3d at 1018.

Numerous consumers posted on social media that they believed PattieGonia's advertisements were genuine Patagonia advertisements, that PattieGonia "partnered with Patagonia," and that Patagonia "sponsored" PattieGonia's activities. SUF 80–104. Consumers also reported their confusion to Patagonia, including consumers who assumed PattieGonia's collaboration with The North Face to celebrate Pride was a Patagonia initiative. SUF 76–79.

Patagonia's expert, David Neal, PhD, conducted two consumer surveys that confirm consumers are confused when exposed to PattieGonia's brand. Some respondents were shown a PATTIE GONIA HIKING CLUB sweatshirt as worn while others were shown PattieGonia's "fan art" sticker on a water bottle as PattieGonia displayed these products in social media posts. After accounting for control groups, the surveys yielded net confusion rates of 34% for stickers and 24% for sweatshirts. SUF 105–106. This degree of confusion in *Eveready*-style surveys (that ask open-ended questions) far exceeds the level courts have found sufficient to support an inference of likely confusion. *Baron App, Inc. v. OpenAI, Inc.*, 820 F.Supp.3d 881, 901 (N.D. Cal. 2026) (granting TRO, noting courts generally treat a confusion rate of 10% as evidence that confusion is likely when other evidence supports such a finding); *Warner Bros. Entm't v. Global Asylum, Inc.*, No. CV 12-9547 PSG (CWx), 2012 WL 6951315, at *9 (C.D. Cal. Dec. 10, 2012), *aff'd*, 544 Fed.Appx. 683 (9th Cir. 2013) (granting TRO where survey showed 16% to 24% net confusion).

Concrete instances of actual consumer confusion, corroborated by survey evidence, strongly supports a finding that the PATTIE GONIA mark and logo are likely to cause consumer confusion as a matter of law. *Anheuser-Busch, Inc. v. Balducci*

*Publ'ns*, 28 F.3d 769, 775 (8th Cir. 1994) (judgment entered on appeal where 6% of survey respondents thought parody was produced by, and more than half thought permission was required of, trademark owner).

**6. Other Factors**

**Marketing Channels:** Both Patagonia and PattieGonia sell products online and rely on search engines and online advertising to bring consumers to their sites. SUF 112. PattieGonia uses social media accounts to promote their own products and the goods and services of other brands. SUF 43, 51. Patagonia also promotes environmental organizations; supports Pride; uses ambassadors to organize events and recreational activities; connects interested followers with environmental projects; and promotes its products on social media, its website, and through brand ambassadors. SUF 17–18. Consumers interested in these subjects naturally are likely to encounter both parties' content through social media feeds and recommendations. PattieGonia admits that their posts of copycat logos or emblems may be served to consumers by social media algorithms for years. SUF 119.

Both parties also promote and resell used apparel online. Their products are resold through common third-party platforms, including eBay, Depop, Poshmark, and Facebook Marketplace. SUF 112–113. Because consumers may encounter the marks in similar social media and online shopping environments, the likelihood of confusion is increased. *Nissan*, 378 F.3d at 1019 ("Nissan Computer traded on the goodwill of Nissan Motor by offering links to automobile-related websites.")

**Likelihood of Expansion:** Patagonia has expanded its brand into new areas including launching food and beer products that are environmentally responsible, and providing financing and investment to environmental startups. SUF 20. PattieGonia, likewise, has expanded beyond drag appearances. What PattieGonia initially characterized as a "pun" or "parody" has evolved into a commercial enterprise encompassing an online store, entertainment and production services, and brand sponsorships—all centered on environmental and inclusivity initiatives. Any further

expansion by either party is likely to increase the probability of confusion. *See Conversive, Inc. v. Conversagent, Inc.*, 433 F.Supp.2d 1079, 1093 (C.D. Cal. 2006) (potential expansion makes confusion more likely if parties' products already are similar).

**Degree of Care:** The parties have not produced substantial evidence regarding consumer sophistication. Even if consumers are sophisticated, however, they are likely to believe that PattieGonia's promotion of other brands supporting environmental and inclusivity under the nearly identical PATTIE GONIA mark reflects sponsorship by Patagonia. *See Charles Schwab & Co. v. Hibernia Bank*, 665 F. Supp. 800, 811 (N.D. Cal. 1987); *Conversive*, 433 F.Supp.2d at 1092–93.

#### 7. Totality of Confusion Factors

Because all confusion factors strongly support summary judgment, Patagonia seeks judgment that all commercial uses for which PattieGonia seeks a PATTIE GONIA trademark registration are infringing. The Proposed Order does not extend to expressive activities, such as drag appearances and non-commercial speech. But when PattieGonia uses the mark and copycat logo to identify and promote a commercial purpose, the undisputed evidence shows a likelihood of confusion.

## V. SUMMARY JUDGMENT SHOULD BE GRANTED ON PATTIEGONIA'S LACHES DEFENSE[4]

"[L]aches bars a trademark claim … where the trademark holder knowingly

---

[4] PattieGonia's fifth affirmative defense also asserts waiver, acquiescence, and estoppel. PattieGonia has no evidence to support these defenses. *E.g. Marketquest Grp., Inc. v. BIC Corp.*, 316 F.Supp.3d 1234, 1294 (S.D. Cal. 2018) (summary judgment against acquiescence, waiver, and estoppel defenses because there was no affirmative act, knowing relinquishment of rights, or objective conduct that would lead the defendant to believe the plaintiff would refrain from enforcing its trademark rights). Patagonia explicitly advised PattieGonia to refrain from certain uses if it wanted to avoid a trademark dispute. *See adidas-Am., Inc. v. Payless Shoesource, Inc.*, 546 F.Supp.2d 1029, 1075 (D. Or. 2008) (summary judgment against estoppel by acquiescence defense where movant objected to particular uses but allegedly failed to follow up).

allowed the infringing mark to be used without objection for a lengthy period of time." *Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*, 880 F.3d 1109, 1115 (9th Cir. 2018). An infringement claim is barred by laches only if the defendant establishes (1) unreasonable delay by plaintiff in bringing suit, and (2) prejudice resulting from that delay. *Id.* Laches is no defense for a defendant with "unclean hands." *DC Comics v. Towle*, 989 F.Supp.2d 948, 972 (C.D. Cal. 2013), *aff'd*, 802 F.3d 1012 (9th Cir. 2015).

To determine whether a delay was unreasonable, courts look to the limitations period for the analogous state-law claim—here, four years. *Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 990 & n.2 (9th Cir. 2009); *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 997 & n.11 (9th Cir. 2006). A lawsuit filed within that period creates a "strong presumption" against laches. *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 837 (9th Cir. 2002).

### A. Patagonia Acted Reasonably in Response to PattieGonia's Evolving Use

Laches does not require a trademark owner to sue at the first sign of potentially infringing conduct, particularly where the nature and commercial significance of the defendant's use changes. The progressive encroachment doctrine recognizes that a trademark owner may wait to sue until infringement becomes clear. *OpenAI, Inc. v. Open A.I., Inc.*, 719 F.Supp.3d 1033, 1050 (N.D. Cal. 2024), *aff'd*, No. 24-1963, 2024 WL 4763687 (9th Cir. Nov. 13, 2024) (laches not a bar until "defendants uploaded a product that directly competed with plaintiff's AI tools"). "Laches is not measured from a defendant's first use of the contested mark, but from the date that defendant began significantly impacting plaintiff's goodwill and business reputation." *Nat'l Customer Eng'g Inc. v. Lockheed Martin Corp.*, No. CV 96-8938 DDP (ANx), 1997 WL 363970, at *6 (C.D. Cal. Feb. 14, 1997).

The undisputed chronology demonstrates that Patagonia acted reasonably in responding to PattieGonia's evolving activities. PattieGonia does not recall having a specific plan for the drag character when PattieGonia first adopted the name. SUF 23.

But from the start, PattieGonia made repeated references to Patagonia's brand. SUF 25–28. Early articles characterized PattieGonia's name as a "pun" on the Patagonia brand. SUF 29. PattieGonia claims these were all "jokes" or "parody." SUF 50.

The law has shown deference to parodies and performances that satirize protected trademarks. *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989) ("in general the [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression."). At the same time, a claimed parody is not exempt from ordinary infringement analysis when the mark is used to indicate source of a product or service. *Jack Daniel's Props.*, 599 U.S. at 157 ("confusion is most likely to arise when someone uses another's trademark as a trademark—meaning, again, as a source identifier—rather than for some other expressive function."); *see also Punchbowl, Inc. v. AJ Press, LLC*, 90 F.4th 1022, 1031 (9th Cir. 2024) (when the defendant has filed trademark applications, the likelihood of confusion test applies)[5].

The expressive origins of PattieGonia's drag persona are therefore material to assessing the reasonableness of Patagonia's conduct. Patagonia never ignored PattieGonia's visible commercial activities. To the contrary, in 2022, Patagonia directly addressed PattieGonia's use, setting forth baseline expectations to avoid the appearance that PattieGonia was acting as Patagonia's spokesperson. Rather than immediately suing, Patagonia tried to preserve room for expression while protecting against misleading suggestions of sponsorship or affiliation. Nothing in Patagonia's measured response approved PattieGonia's commercial use of a PATTIE GONIA trademark. SUF 56–61.

When PattieGonia ignored the safeguards Patagonia outlined, the circumstances materially changed. PattieGonia announced a clear commercial purpose when it

---

[5] *Jack Daniels* and *Punchbowl* confirm that "fair use" and "First Amendment" (Dkt. 19 at 11, defenses 7,9) do not bar trademark infringement claims in these circumstances.

offered branded apparel. SUF 66. Patagonia promptly objected. PattieGonia refused to discuss resolution and instead filed a trademark application in 2025. In response, Patagonia promptly sued. SUF 69–72.

PattieGonia cannot plausibly invoke "free speech" and "parody" defenses to its otherwise deliberate infringement, while insisting Patagonia immediately should have recognized the "joke" or "pun" was a deliberate attempt to create a brand based on Patagonia's reputation. PattieGonia's own minds are unsettled about when their "trademark" use started. They have provided four different statements—all under oath and advised by counsel—describing when they first used the "mark" on various goods and services.[6] Equity does not require Patagonia to resolve uncertainty in favor of litigation. *Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*, 311 F.Supp.2d 1023, 1033–34 (D. Or. 2004), *aff'd*, 465 F.3d 1102 (9th Cir. 2006) ("Courts developed the [progressive encroachment] doctrine to alleviate the dilemma trademark owners often face: whether to sue as soon as it learns about possible infringement and thereby risk suing prematurely, or delay filing suit and thereby risk being subject to a laches defense."); *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 462 (4th Cir.1996) (laches is inapplicable where plaintiff delayed suit until infringement had clearly ripened).

The evidence shows the need to sue PattieGonia did not become concrete until 2025 when PattieGonia first claimed trademark rights. When PattieGonia expanded into apparel and filed a trademark application, Patagonia timely sued. Nothing about the undisputed sequence of events establishes unreasonable delay. *See adidas-Am., Inc. v. Payless Shoesource, Inc.*, 546 F.Supp.2d 1029, 1070 (D. Or. 2008) (citing *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic and Sports Physical Therapy P.C.*, 314 F.3d 62, 70 (2d Cir. 2002) (no obligation to sue until "right to protection has ripened such that plaintiff knew or should have known ... that [it] had a provable infringement

---

[6] Ex. 31 compares the statements in PattieGonia's trademark application with PattieGonia's multiple interrogatory responses about this issue. SUF 75.

claim....”)); *Monster Energy Co. v. BeastUp LLC*, 395 F.Supp.3d 1334 (E.D. Cal. 2019) (disposing of laches defense when plaintiff sued less than four years after defendant began selling energy drinks, though defendant used mark earlier on other goods).[7]

**B. PattieGonia's Unclean Hands Bars Laches**

While continuing to invoke parody, PattieGonia's trademark application and last supplemental discovery responses claim trademark rights dating from 2019. SUF 75. If this were true, PattieGonia's "trademark use" took deliberate aim at Patagonia's brand. SUF 25–32.

A party asserting laches must "must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co*., 324 U.S. 806, 814 (1945). Courts have rejected laches defenses where defendants intentionally appropriated another's branding to capitalize on the owner's reputation. *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 490 (5th Cir. 2008) (rejecting laches where defendant deliberately incorporated universities' color scheme to benefit from reputation); *Nat'l Customer Eng'g*, 1997 WL 363970, at *5 ("laches may be invoked only by a party acting in good faith."); *DC Comics*, 989 F.Supp.2d at 972, *aff'd*, 802 F.3d 1012 ("Defendant's bad faith deprives him from asserting laches") (citing *Smack Apparel Co.*).

PattieGonia cannot have it both ways. If PattieGonia's deliberate references to Patagonia's brand were parody, then Patagonia was at least reasonable in trying to avoid litigation. If PattieGonia claims their early conduct started the laches clock, then

[7] At minimum, Patagonia's challenge to PattieGonia's expansion into promotion and sale of products survives any laches defense. PattieGonia did not begin selling apparel and stickers until after Fall 2024. Patagonia learned PattieGonia was selling PATTIE GONIA apparel in December 2024, Patagonia promptly objected. SUF 66–68. Patagonia sued a few months after PattieGonia filed their trademark application. *See Au-Tomotive Gold Inc. v. Volkswagen of Am., Inc.*, 603 F.3d 1133, 1140 (9th Cir. 2010) (affirming summary judgment against laches because suit was brought within state statute of limitations); *Bauer Bros.*, 159 F.Supp.3d at 1216 (granting summary judgment against laches because movant filed suit less than four years after learning of alleged infringement).

it cannot overcome the unclean hands that arise from deliberately creating their purported brand on the tailwinds of Patagonia's goodwill.

The defendant in *Harley Davidson* also claimed its alleged parody mitigated any unclean hands. 164 F.3d at 813. The defendant adopted a version of Harley Davidson's shield logo, adding "Unauthorized Dealer" to try to disclaim sponsorship. The court rejected the parody defense on grounds that defendant's mark "simply uses [Harley's shield] somewhat humorously to promote his own products and services." *Id.* The court also rejected the defendant's laches defense, finding that the defendant's purported parody in service of its own mark "undermine[d] any claim of good faith." *Id.*

PattieGonia's hands became even less "clean" following the parties' 2022 discussions. Despite acknowledging their understanding of Patagonia's trademark guidelines, PattieGonia proceeded to ignore them. After the parties' discussions, PattieGonia—Patagonia knows from discovery—systematically distributed tens of thousands of stickers displaying copycat Patagonia logos and Patagonia's distinctive font, decorated costumes with copycat logos, and displayed those designs in posts to promote tour events and environmental initiatives. PattieGonia then started selling apparel and stickers and applied for a trademark registration. SUF 39–45, 66–68.

Having deliberately traded on Patagonia's goodwill and ignored the safeguards intended to avoid a dispute, PattieGonia cannot use laches to shield their infringement.

### C. PattieGonia Cannot Demonstrate Prejudice

PattieGonia identifies no investments in their brand based on a belief that Patagonia would refrain from challenging their expanded commercial activities. SUF 74. Much of PattieGonia's actual advertising expense appears to be for copycat stickers. SUF 39-40. Investment in deliberately imitating another's brand is not the kind of prejudice that supports laches. Investment supports prejudice only where the defendant is "using the infringing word or design *as a trademark,* and thus had built up goodwill in the mark as a designation of source." *adidas-Am.*, 546 F.Supp.2d at 1073

(emphasis in original); *see also Harley Davidson*, 164 F.3d at 813 (no prejudice from being ordered to stop parody of plaintiff's logo).

## VI. CONCLUSION

PattieGonia's commercial uses cause likely confusion and laches cannot excuse them. Patagonia, accordingly, requests partial summary judgment as outlined in the Proposed Order.

Dated: November 11, 2026

Respectfully submitted,

VERSO LAW GROUP LLP

By: */s/ Gregory S. Gilchrist*
Gregory S. Gilchrist
Ryan Bricker
Sophy J. Tabandeh
Kourtney Speer

Attorneys for Plaintiff
Patagonia, Inc.

## L.R. 11-6.2 CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff Patagonia, Inc., certifies that this brief contains less than 5600 words and does not exceed 20 pages, which complies with the word limit of this Court pursuant to its order dated February 3, 2026 (Dkt. 13).

Dated: November 11, 2026

Respectfully submitted,

VERSO LAW GROUP LLP

By: */s/ Gregory S. Gilchrist*
Gregory S. Gilchrist
Ryan Bricker
Sophy J. Tabandeh
Kourtney Speer

Attorneys for Plaintiff
Patagonia, Inc.